UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
JOHN MICHAEL COHAN, living,
Plaintiff,
v.
UNITED STATES TRUSTEE PROGRAM,
UNITES STATES TRUSTEE SCOTT BOMKAMP, in his official capacity,
and
SCOTT BOMKAMP, in his individual capacity,
JOHN AND JANE DOES 1-100,
Defendants.
Case No. _____

**Case: 1:25-cv-02009   JURY DEMAND**
**Assigned To : Moss, Randolph D.**
**Assign. Date : 6/26/2025**
**Description: Pro Se Gen. Civ. (F-DECK)**

## COMPLAINT FOR FRAUD, DUE PROCESS VIOLATIONS, AND OBSTRUCTION OF JUSTICE

### I. INTRODUCTION

1. This action challenges willful misconduct by U.S. Trustee Scott Bomkamp, including:

  - ▶ Evidence tampering (deleting 341 meeting warnings) (Exhibit 1 and 2);
  - ▶ Knowingly violating a restraining order (knowingly allowing Peace Ekuta to testify as "Amber Adams") (Exhibit 11 and 11-D);
  - ▶ Fraudulent conversion to Chapter 7 by suppressing exculpatory evidence (44 loans, $10M+ refunds) (Exhibit 4 and 6).

### II. JURISDICTION & VENUE

1. Jurisdiction:
  - 28 U.S.C. § 1331 (federal question)
  - Bivens v. Six Unknown Agents, 403 U.S. 388 (1971) (individual capacity claim)

2. Venue is proper in D.C. (UST headquarters).

### III. PARTIES

1. Plaintiff John Michael Cohan is a living being of sound mind domiciled in the Florida State Republic. He brings this action to vindicate his constitutional rights and to seek redress for ongoing violations of law committed against him by federal officers and their collaborators.



RECEIVED

JUN 2 6 2025

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

2. Defendant United States Trustee Program is an agency within the United States Department of Justice, headquartered in Washington, D.C., and is responsible for overseeing the administration of bankruptcy cases pursuant to 28 U.S.C. § 581 et seq.

3. Defendant United States Trustee Scott Bomkamp, sued in his official capacity, is a federal officer employed by the United States Trustee Program and assigned to oversee bankruptcy matters in the relevant judicial district. At all times relevant to this action, he acted under color of federal law, authority, office and title.

4. Defendant United States Trustee Scott Bomkamp, sued in his individual capacity, personally engaged in acts described herein, including but not limited to, tampering with evidence, violating court orders, abusing his office, and participating in retaliatory conduct against Plaintiff outside the scope of lawful federal authority.

5. Defendants John and Jane Does 1–100 are unknown individuals, attorneys, agents, government officials, private actors, or entities who, at all relevant times, aided, abetted, conspired with, or otherwise participated in the unlawful conduct described in this Complaint. Plaintiff is presently unaware of their true names and specific identities but will amend this Complaint to allege their identities once discovered.

## IV. FACTUAL ALLEGATIONS

A. Fraud on the Court (Rule 60(d)(3))

1. Defendant Bomkamp acted audio tampering to remove Plaintiff's warnings (Exhibit 11: FBI submission describing abrupt cuts at 40:27-40:43 and obscure audio waveforms of the original audio provided by UST Bomkamp to Bryan Mickler, Debtor's counsel, to John Michael Cohan + to the Federal Bureau of Investigation of the State of Florida and State of Illinois).

B. Due Process Violations (5th Amendment)

2. Bomkamp personally litigated for conversion to Ch. 7 without:

- ▶ Consulting with the Debtor or Debtor's counsel
- ▶ Reviewing loan/refund documents.
- ▶ Reviewing all bank records

C. Obstruction of Justice (18 U.S.C. § 1503)

3. Bomkamp willfully violated Florida restraining order FV-04-002494-22 (Exhibit 11-D), a personal act outside his official duties.

## IV. CLAIMS FOR RELIEF

Count I: Fraud on the Court (Against Bomkamp in Both Capacities)

1. Bomkamp knowingly presented falsified evidence to bankruptcy court.

Count II: Bivens Claim (Against Bomkamp Individually.)

2. Bomkamp violated Plaintiff's 5th Amendment due process rights through:

- ▶ Evidence suppression;
- ▶ Retaliatory conversion to Ch. 7.

Count III: Obstruction of Justice (Against Bomkamp Individually)

3. Bomkamp's personal decision to allow Peace Ekuta to testify violated:

- ▶ Fla. Stat. § 741.31(4)(a);
- ▶ 18 U.S.C. § 1503.

Count IV: Malicious Prosecution (Against Bomkamp Individually)

4. Defendant Bomkamp initiated or continued judicial proceedings (including the fraudulent conversion to Chapter 7 and reliance on falsified evidence) without probable cause and with malice, constituting malicious prosecution under federal and/or state law.

- ▶ Bomkamp lacked probable cause to pursue conversion, as evidenced by his failure to review exculpatory evidence (44 loans, $10MM+ refunds).

- ▶ Bomkamp acted with malice by knowingly suppressing evidence and violating due process to retaliate against Plaintiff.

- ▶ Plaintiff has suffered and continues to suffer damages as a direct result of Bomkamp's actions.

Count V: Suppression of Evidence – "Fruit of the Poisonous Tree" (Against Bomkamp in Both Capacities)

5. Defendant Bomkamp's willful evidence tampering (Exhibits 1–2) and fraudulent suppression of exculpatory material (Exhibits 4, 6) tainted all subsequent judicial proceedings, rendering

them unconstitutional under the Due Process Clause (5th Amendment) and the "fruit of the poisonous tree" doctrine (Wong Sun v. United States, 371 U.S. 471 (1963)).

▶ Poisonous Tree: Bomkamp's misconduct (audio tampering, restraining order violation, and suppression of 44 loans/$10MM+ refunds) was the original illegality.

▶ Fruit: All evidence derived from his misconduct—including the motions to convert to Chapter 7 (Exhibits 5, 7) and court rulings relying on falsified records—must be deemed inadmissible and void.

▶ Remedy: Any orders or judgments stemming from tainted evidence should be vacated under Rule 60(d)(3).

Count VI: Wrongful Conversion (Against Defendant United States Trustee, and John/Jane Does 1–100)

6. Plaintiff realleges and incorporates by reference all prior paragraphs as if fully set forth herein.

The United States Trustee, acting under color of federal authority, office, title and law and in concert with other unknown defendants, wrongfully converted Plaintiff's property by fraudulently initiating and perpetuating Chapter 7 proceedings based on knowingly false allegations of fraud, tampered evidence, and procedural misconduct.

Despite an independent Examiner's report finding no fraud, the United States Trustee deliberately disregarded exculpatory financial records, tampered with official 341 meeting recordings, and manipulated procedural laws, along with others, to suit his narrative. This wrongful conversion resulted in the unlawful seizure, liquidation, and deprivation of Plaintiff's property and business assets without lawful due process, and in direct violation of Plaintiff's constitutional rights under the Fifth Amendment.

The conversion was not the result of mere judicial error, but rather an orchestrated abuse of process intended to retaliate against Plaintiff, cause reputational and financial harm, and unlawfully deprive Plaintiff of protected property interests.

As a direct and proximate result of Defendants' wrongful conversion, Plaintiff has suffered severe financial loss, reputational damage, emotional distress, and ongoing deprivation of property, entitling Plaintiff to compensatory, punitive, and equitable relief.

## VII. PRAYER FOR RELIEF

Plaintiff requests:
1. Compensatory damages from Bomkamp personally;
2. Punitive damages for willful misconduct, including malicious prosecution;
3. Injunctive relief against UST Program;

4. Criminal referrals to DOJ;

5. Fees/costs under 28 U.S.C. § 1927.

Dated: 06-23-2025

Respectfully submitted in good faith,

John Michael Cohan, without prejudice, without recourse, UCC 1-308, 1-103
iustusprocessus@outlook.com

## EXHIBITS

**Exhibit 1** – 1 Flash Drive of copy of 341 original audio "Genie Investment 4-17-24" – Copies also provided in person to 6061 Gate Parkway Jacksonville, Florida 32256 on 05-09-2025

**Exhibit 2** - Audio waveform with flatline

**Exhibit 3** – Chain of custody documents.

**Exhibit 4** – Liens filed by Parasec for Closed Loans dispelling any theory of keeping money for ourselves or not following through on promises, we provided loans to businesses, [and these loans are being suppressed as they were not on a list of recoverable on the March 31, 2025 Interim Report].

**Exhibit 5** – 1st Motion to Convert by United States Trustee and Reply

**Exhibit 6** – Examiner Report [finding no fraud and also demonstrating the 44 Business Loans and $10MM+ in refunds through the various schedules]

**Exhibit 7** – 2nd Motion to Convert by United States Trustee

**Exhibit 8** – Excerpt from Special Counsel regarding UST conduct "fraud"

**Exhibit 9** – Misconduct Summary submitted with Motion to Dismiss in response to Chapter 7 Trustee Adversary complaint as Exhibit C on or around 02-14-2025 and struck by the Bankruptcy Court imminently afterwards

**Exhibit 10** – David Hughes and John Michael Cohan are the original whistleblowers through our counsel regarding Velanos and Warren Law Group.

**Exhibit 11** – Formal Complaint to FBI – Copies also provided in person to 6061 Gate Parkway Jacksonville, Florida 32256 on 05-09-2025

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
JOHN MICHAEL COHAN, living,

Plaintiff,

v.

UNITED STATES TRUSTEE PROGRAM,
UNITES STATES TRUSTEE SCOTT BOMKAMP, in his official capacity,
and
SCOTT BOMKAMP, in his individual capacity,
JOHN AND JANE DOES 1-100,
Defendants.

Case No. _____

Case: 1:25-cv-02009   JURY DEMAND
Assigned To : Moss, Randolph D.
Assign. Date : 6/26/2025
Description: Pro Se Gen. Civ. (F-DECK)

## MOTION TO FILE PERSONAL ADDRESS UNDER SEAL AND FOR VIRTUAL PROCEEDINGS

Plaintiff respectfully moves this Court to:

1. Seal Plaintiff's residential address due to active restraining orders and safety concerns

2. Designate all court communications to be sent electronically to: iustusprocessus@outlook.com

3. Permit all pre-trial hearings and trials to be conducted virtually or telephonically.

Good cause exists under LCvR 5.1(h) and Fed. R. Civ. P. 5.2(d) due to:

- Documented safety threats requiring address protection

- Plaintiff's out-of-state status making in-person appearances burdensome

- Email service being equally reliable for notice purposes

Dated: 06-23-2025

Respectfully submitted in good faith,

John Michael Cohan, without prejudice, without recourse, UCC 1-308, 1-103
iustusprocessus@outlook.com

Address For Service To Be Put Under Seal
John Michael Cohan
c/o 11179 Limerick Drive
Jacksonville, Florida State Republic 32221-4120

# EXHIBIT 1



# EXHIBIT 2





Along with this packet, you have received a USB thumb drive with Original Unmodified Audio received from UST Bomkamp delivered to Mickler and picked up by myself. You are next in the chain of custody. Your copy will have the same date and time listed above 04-25-2024 at 12:11 PM. This screen shot was taken 06-22-2025 at 6:30 PM.

# EXHIBIT 3

 **Outlook**

## FW: Genie Investments NV, Inc.; 24-00496-BAJ

**From** Bryan Mickler <bkmickler@planlaw.com>

**Date** Wed 4/17/2024 4:01 PM

**To**   John from Genie Investments <jmcohan@genieinvestments.com>; David from Genie Investments <dhughes@genieinvestments.com>

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

**From:** Bryan Mickler
**Sent:** Wednesday, April 17, 2024 4:01 PM
**To:** 'Bomkamp, Scott E. (USTP)' <Scott.E.Bomkamp@usdoj.gov>
**Subject:** Genie Investments NV, Inc.; 24-00496-BAJ

Scott

Both Mr. Hughes and Mr. Cohan are extremely upset at the events of the Meeting of Creditors today. It was entirely inappropriate to mention that a former attorney was indicted for acts that had no relationship with the debtor and only serve to inflame the emotions of the mob that is out to destroy the business of Genie.

Please take all immediate steps to ensure that there are no internet postings by the members of the 341 group which serve to link Genie and the despicable actions of Mr. Conners. Genie (through my office) would like to be copied on any emails that are sent to the group to ensure that everyone is on notice of the prohibition on further internet postings related to the Conners episode. Any related postings by the group will be met with an immediate sanctions motion by Genie for violations of the stay and the court's examiner order allowing the Debtor to continue to conduct business.

We also request that the Trustee's office send the audio recordings of all 341 meetings to my office as soon as possible.

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

 **Outlook**

---

### Re: Genie Investments (3:24-bk-496-BAJ) 341 audio

---

**From** Bryan Mickler <bkmickler@planlaw.com>

**Date** Wed 4/24/2024 8:56 AM

**To**  John from Genie Investments <jmcohan@genieinvestments.com>

**Cc**  David from Genie Investments <dhughes@genieinvestments.com>

Ordered today.

Bryan Mickler
Sent from my iPhone

> On Apr 18, 2024, at 3:11 PM, John from Genie Investments <jmcohan@genieinvestments.com> wrote:

> CAUTION: This message was sent from outside the company

Bryan,

Only the last two dates (when alleged creditor Adams appeared). Thank you.

Sincerely,

<image001.png>

**John Michael Cohan**
Genie Investments, Director
<image002.jpg>

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity. DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710   AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see:
http://www.ftc.gov/privacy/glbact/glbsub1.htm

PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.

This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

**From:** Bryan Mickler <bkmickler@planlaw.com>
**Sent:** Thursday, April 18, 2024 2:36 PM
**To:** John from Genie Investments <jmcohan@genieinvestments.com>; David from Genie Investments <dhughes@genieinvestments.com>
**Subject:** FW: Genie Investments (3:24-bk-496-BAJ) 341 audio

Let me know which dates you need?

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

**From:** Bomkamp, Scott E. (USTP) <Scott.E.Bomkamp@usdoj.gov>
**Sent:** Thursday, April 18, 2024 2:00 PM
**To:** Sinclair, Pat A. (USTP) <Pat.A.Sinclair@usdoj.gov>
**Cc:** Bryan Mickler <bkmickler@planlaw.com>
**Subject:** Genie Investments (3:24-bk-496-BAJ) 341 audio

CAUTION: This message was sent from outside the company

Hi Pat,

Please coordinate with Mr. Mickler regarding the 341 audio in this case.

The dates of the 341 meetings were: 3/20/24, 3/27/24, 4/3/24; and 4/17/24.

Mr. Mickler can clarify whether he would like all the audio, or only the last two dates (when alleged creditor Adams appeared).

Thanks,

Scott Bomkamp

 Outlook

## Copies

**From** Bryan Mickler <bkmickler@planlaw.com>

**Date** Wed 6/5/2024 2:10 PM

**To** John from Genie Investments <jmcohan@genieinvestments.com>; David from Genie Investments <dhughes@genieinvestments.com>

Certified copies of Docket and VP at my office along with audio files of 341 meetings. Ready for pickup whenever.

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

# EXHIBIT 4

6/6/25, 3:18 PM

Parasec: Invoices



**PARASEC**
National Entity Formation & Compliance

Welcome, John (not John? /

HOME        CONTACT US ☒        DASHBOARD        CA

## Instructions

To look for specific invoices, you may search by date range, entity name, your reference number or the work order number. You may also choose to view invoices that are open and/or those invoices that have already been paid.

Please note that due to internal processes, invoices may take up to 24 hours to appear on the online portal. If you would like to make a payment before an invoice appears, please contact us at accounting@parasec.com.

## Search for Invoices

Start date:        End date:        Reference #:

Entity Name:        W/O #:

Ordered By:
<All>        ⌄
☑ Open ☑ Paid

search

## Invoice Search Results

print | export results

31 paid invoices found

To sort your results, simply click on the column headers. To view an order in more detail, click on the row of the order in question.

To pay your invoices online, simply select the invoice(s) you'd like to apply payment to. Once the payment process has been completed, your online records will be updated.

| Pay | Invoice Number | Invoice Date | Reference # | Whom | Invoiced | Due |
|---|---|---|---|---|---|---|
| | 156012601 | 03/03/21 | UCC Filings | LLC; LLC; MIMS-IPR LLC | $256.00 | $0.00 |
| | 164980601 | 08/30/21 | UCC-1 Filings | LLC; LLC; LLC, | $281.00 | $0.00 |
| | 1871511 | 11/14/22 | UCC-1 filings | LLC; LLC; | $1,049.00 | $0.00 |
| | 188071601 | 11/21/22 | UCC1 Filings | LLC; LLC; Inc. | $130.00 | $0.00 |
| | 185952001 | 12/12/22 | UCC Filing - ZNOC Enterprises LLC | LLC | $42.00 | $0.00 |
| | 189226401 | 12/18/22 | UCC Filing 12-16-22 | LLC; LLC; LLC | $115.50 | $0.00 |
| | 188459501.AR | 01/30/23 | (none) | Inc. | $2,384.00 | $0.00 |
| | 1923503 | 04/04/23 | (none) | Inc. | $753.00 | $0.00 |
| | 195383301 | 04/19/23 | UCC Filing 4-11-23 | LLC; LLC; LC; | $1,165.00 | $0.00 |
| | 197794301.AR | 06/14/23 | (none) | Inc. | $474.00 | $0.00 |
| | 198664S | 06/15/23 | UCC Filing - JER's PLACE LLC | LLC | $45.00 | $0.00 |
| | 200050201 | 07/10/23 | Winslow Homes LLC | LLC | $85.00 | $0.00 |
| | 200226401.AR | 07/25/23 | (none) | | $195.00 | $0.00 |
| | 197794301.ARA | 08/04/23 | (none) | | ($304.00) | $0.00 |
| | 202605101 | 09/05/23 | UCC Filing n9-4-23 | LLC | 353.00 | $0.00 |
| | 203532001 | 09/25/23 | (none) | 202328926770 | $57.00 | $0.00 |
| | 201475901.AR | 11/01/23 | (none) | | $304.00 | $0.00 |
| | 208950201.AR | 12/05/23 | (none) | | $656.25 | $0.00 |
| | 208886501.AR | 01/10/24 | (none) | | $150.00 | $0.00 |
| | 208856601.AR | 01/10/24 | (none) | INC. | $150.00 | $0.00 |
| | 211690201.AR | 03/08/24 | (none) | | $25.00 | $0.00 |
| | 211690801.AR | 03/29/24 | (none) | INC. | $18.00 | $0.00 |
| | 212657801 | 04/08/24 | (none) | LLC | $525.00 | $0.00 |
| | 217396801.AR | 06/11/24 | (none) | | $150.00 | $0.00 |
| | 217396901.ARA | 08/12/24 | (none) | | ($150.00) | $0.00 |
| | 228116401.AR | 01/10/25 | (none) | | $150.00 | $0.00 |
| | 228116501.AR | 01/10/25 | (none) | INC. | $150.00 | $0.00 |
| | 229896701.AR | 02/11/25 | (none) | LLC | $75.00 | $0.00 |

6/6/25, 3:18 PM

| | | | Parasec Invoices | |
|---|---|---|---|---|
| 228116501.ARA 03/04/25 | (none) | INC. | ($150.00) | $0.00 |
| 228116401.ARA 03/04/25 | (none) | NV | ($150.00) | $0.00 |
| 229885701.ARA 04/22/25 | (none) | LLC | ($75.00) | $0.00 |

select all   de-select all   print selected invoices

## ABOUT US

As an employee-owned company, our people are invested in your success and to delivering exceptional customer service.

**LEARN MORE**

## QUICK LINKS

**BLOG**

**MEET THE TEAM**

**STATE BUSINESS FORMS**

800.533.7272

**REQUEST A WEB DEMO**

**CONTACT US**

in

© 2019 Parasec | Website design and implementation by Uptown Studios | Privacy Policy | Terms of Use | Sitemap

  

https://www.parasec.com/app/secure/account/Billpay.aspx

2/2

# EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

In re:

Genie Investments NV, Inc.,

Case No.: 3:24-bk-00496-BAJ
Chapter 11

**Expedited Hearing Requested**

Debtor.

_____/

## UNITED STATES TRUSTEE'S EXPEDITED MOTION TO APPOINT CHAPTER 11 TRUSTEE, OR, IN THE ALTERNATIVE, APPOINT AN EXAMINER, DISMISS THIS CASE, OR CONVERT THIS CASE TO CHAPTER 7

Mary Ida Townson, United States Trustee for Region 21 (the "United States Trustee"), by and through the undersigned counsel, moves for the appointment of a chapter 11 trustee, or, in the alternative, appoint an examiner, dismiss this case, or convert this case to chapter 7. In support, the United States Trustee states as follows.

### SUMMARY OF ARGUMENT

The Court should not permit the debtor, Genie Investments NV, Inc. ("Debtor"), to continue as a debtor-in-possession because the Debtor conducted fraudulent schemes against small business owners. The Debtor offered its victims the prospect of loans with attractive rates and no personal guarantees. Debtor conditioned funding on the small business owners transferring money to the Debtor as prepaid interest. The Debtor then failed to fund the loans and failed to return the money. According to its own admissions, the Debtor invested the money received from the small business owners in a highly speculative scheme and lost most of the funds. The Debtor's conduct demonstrates dishonesty, incompetence, gross

mismanagement, and risks harming the Debtor's creditors further should the Debtor remain a debtor-in-possession. Consequently, the Court should order the United States Trustee to appoint a chapter 11 trustee in this case. In the alternative, the Court should appoint an examiner, dismiss this case, or convert this case to proceed under chapter 7.

## FACTUAL BACKGROUND

1.    On February 21, 2024, (the "Petition Date") the Debtor, Genie Investments NV, Inc., filed a skeletal voluntary chapter 11 petition to initiate this case. (Doc. No. 1).

2.    Shortly thereafter, a group of eighteen small business owners who organized themselves through social media (collectively, the "Small Business Owners"), contacted the United States Trustee. The Small Business Owners credibly allege that the Debtor is involved in a scheme of fraud. The allegations in this motion are based upon interviews with the members of the Small Business Owners and their signed statements, which are attached to this motion as Composite Exhibit A.

3.    As part of its fraudulent scheme, the Debtor and a co-conspirator entity known as McMann Commercial Lending, LLC ("McMann") would offer a loan program they called the BELOC, which stands for "business expansion line of credit." This loan program was advertised as having below market interest rates and no personal guarantees – a critical allure for any small business owner.

4.    The Small Business Owners approached the BELOC program with a variety of business objectives. One member of the Small Business Owners is a farmer who wished to refinance the line of credit that secures his farm.[1] Another member is a real estate agent,

---

[1] See Exhibit A, Statement of Blake Stringer.

who due to her business success, sought to put her savings to work by combining a business loan with buying an apartment building.[2] Yet another member is the owner of a technology company that develops a mental-health-oriented smartphone app, who sought to expand her business.[3] In summary, the Small Business Owners were pursuing salutary business objectives for which they needed capital.

5.     Although the BELOC program appealed to the Small Business Owners, the terms of the BELOC included one less-favorable provision. The Debtor informed the Small Business Owners that, to prepay interest or for other manufactured reasons, they would need to wire money into a so-called "ICA" or interest carry account. Based upon these representations, the Small Business Owners each wired between $30,000 and $500,000 into an ICA.

6.     The Debtor did not fund the loans of the Small Business Owners, despite having received their substantial payments through the ICA. Instead, the Debtor made a litany of excuses. The Debtor hid behind contractual language or blamed McMann Commercial and third-party "wholesale lenders" even though the Small Business Owners were led to believe that the Debtor itself would be the capital provider. When the Small Business Owners eventually asked for their money back, the Debtor refused. In summary, the Debtor kept the Small Business Owners' money and did not provide them with any benefit.

7.     The Small Business Owners suffered serious consequences resulting from

---

[2] See Exhibit A, Statement of Lea Muse.
[3] See Exhibit A, Statement of Lis Butkiewicz.

losing their money to the Debtor. One of the Small Business Owners borrowed a total of

$30,000 from "Happy Money" and "Rocket Loans" under unfavorable terms to prepay the

fictious interest alleged by the Debtor.[4] Another of the Small Business Owners, a farmer,

had to file a personal bankruptcy case because he could not recover from the loss of $365,000

in working capital.[5] All the Small Business Owners suffered lost business opportunities.

8.      The Debtor's conduct has resulted in at least one lawsuit. North Haven

Lodging Partners, LLC and Willingford Lodging Partners, LLC (collectively the "Lodging

Partners") filed a federal lawsuit against the Debtor.[6] The Lodging Partners allege that the

Debtor and McMann offered the Lodging Partners lines of credit totaling $36,000,000.

However, as a condition precedent, the Lodging Partners were required to transfer money to

the Debtor for "prepayment of interest" in the amount of $3.6 million. As with the Small

Business Owners, the Lodging Partners allege that the Debtor did not fund the loan and

wrongfully kept the Lodging Partners' $3.6 million. Upon information and belief, the Debtor

filed this bankruptcy case to obtain a stay in the Lodging Partners litigation.

9.      Recently, the Debtor filed a lawsuit in the Middle District of Florida (the

"Florida Fed. Lawsuit")[7] wherein the Debtor attempts to explain the disposition of the Small

Business Owners' and Lodging Partners' money. In its complaint,[8] Debtor alleges that it

---

[4] See Exhibit A, Statement of Lea Muse.

[5] See Exhibit A, Statement of Blake Stringer and Case No. 24-2000-11 in the U.S. Bankruptcy Court for the Northern District of Texas.

[6] See Case No. 1:23-cv-16264 in the Northern District of Illinois, which complaint is attached hereto as Exhibit B. The Lodging Partners are not among the Small Business Owners who contacted the United States Trustee.

[7] See Case No. 6:24-cv-00271 in the U.S. District Court for the Middle District of Florida.

[8] The complaint in the Florida Fed. Case is attached hereto as See Exhibit C.

invested $9 million with an entity known as Velanos Principal Capital ("Velanos"). Velanos

promised that it would purchase and trade "standby letters of credit" to increase the Debtor's

initial investment of $9 million to $75 million within sixty days, which, according to

Velanos, was a risk-free investment. See Exhibit C, at p. 2. Debtor claims that Velanos kept

the money, except for $500,000, which was refunded to the Debtor in May 2023. Id. at 3.

### LEGAL STANDARDS

10.    The presumption in chapter 11 is that a debtor will continue managing its

own affairs during the duration of a case. "This presumption is based on the belief that the

debtor-in-possession is most knowledgeable about, and best able to run, the debtor's

business." *In re Sundale, Ltd.*, 400 B.R. 890, 899 (Bankr. S.D. Fla. 2009). "Nevertheless, in

the appropriate case, the appointment of a trustee is a power which is critical for the Court

to exercise in order to preserve the integrity of the bankruptcy process and to ensure that the

interests of creditors are served." *In re Matter of Intercat, Inc.*, 247 B.R. 911, 920 (Bankr.

S.D. Ga. 2000).

11.    The Bankruptcy Code at 11 U.S.C. § 1104(a) provides two alternative

grounds for appointing a trustee, one mandatory and one discretionary. Section 1104(a)

states in pertinent part:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee —
>
> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . .; or

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate . . .

12.    Subsection 1104(a)(1) is mandatory and § 1104(a)(2) is discretionary. "Once the court finds that cause exists under § 1104(a)(1), there is no discretion; an independent trustee must be appointed. Unlike subsection (a)(1), § 1104(a)(2) may well entail the exercise of a spectrum of discretionary powers and equitable considerations, including a cost-benefit analysis, to determine whether the appointment of a reorganization trustee would be in the interests of creditors, equity security holders and other interests of the estate." *In re SunCruz Casinos, LLC*, 298 B.R. 821, 828–29 (Bankr. S.D. Fla. 2003) (internal citations and quotations omitted). "Among the factors courts consider in determining whether to appoint a chapter 11 trustee under § 1104(a)(2) are: (1) the trustworthiness of the debtor; (2) the debtor's past and present performance and prospects for the debtor's reorganization; (3) confidence, or lack thereof, of the business community and creditors in present management; and (4) the benefits derived by appointment of a trustee, balanced against the costs of appointment." *In re Keeley & Grabanski Land P'ship*, 455 B.R. 153, 164–65 (B.A.P. 8th Cir. 2011).

13.    The movant bears the burden in seeking the appointment of a trustee. Although Courts disagree on what burden of proof to apply, the better view is that Courts should apply the "preponderance of the evidence" standard. Considering an analogous legal standard, the Supreme Court has held that the appropriate standard of proof in § 727 litigation was "preponderance of the evidence," notwithstanding the chapter 7 debtor's presumptive entitlement to a discharge. *Grogan v. Garner*, 498 U.S. 279 (1991). The same standard should apply to chapter 11 trustee appointments, notwithstanding the chapter 11

6

debtor's presumptive entitlement to manage its own affairs. *See Keeley*, 455 B.R. at 163 (finding that the evidentiary standard for appointment of a chapter 11 trustee should be the same as for § 727 discharge exceptions). *But see Sundale*, 400 B.R. at 899-900 (applying clear and convincing standard).

14.    If the Court does not appoint a trustee, the Court may in its discretion appoint an examiner. 11 U.S.C. § 1104(c)(1). *E.g., In re Hardy*, 319 B.R. 5 (Bankr. M.D. Fla. 2004) (appointing an examiner as an alternative to a chapter 11 trustee appointment). As a further alternative, the Court may also dismiss or convert a case to chapter 7 for cause, whichever is in the best interests of creditors. 11 U.S.C. § 1112. Grounds for dismissal or conversion under § 1112 includes gross mismanagement of the estate and bad faith. 11 U.S.C. § 1112(b)(4)(B). *In re 239 Worth Ave. Corp.*, 236 B.R. 492, 495 (Bankr. S.D. Fla. 1999) (equating bad faith with "an intent to abuse the judicial process and the purposes of the reorganization process, which may include the breach of a debtor's fiduciary duty.")

## ARGUMENT

15.    The appointment of a chapter 11 trustee is required in this case under both the mandatory and discretionary prongs of 11 U.S.C. § 1104(a). The United States Trustee addresses each prong in turn.

16.    The appointment of a chapter 11 trustee is required, for cause, due to "fraud and dishonesty" or, in the alternative, "incompetence and gross mismanagement." The Debtor engaged in a pattern of promising business loans with low interest rates and no personal guarantees to induce victims, including the Small Business Owners and the Lodging Partners, to advance funds for pre-payment of interest and for other manufactured

motives. The Debtor then simply stole the Small Business Owners' and the Lodging Partners' money. These actions constitute a dishonest and fraudulent scheme mandating the appointment of a chapter 11 trustee.

17.    In the alternative, the Debtor's management is at least culpable of incompetence and gross mismanagement. According to the Debtor's own allegations in the Florida Lawsuit, the Debtor paid $9 million dollars to an entity, Velanos, that promised to provide a 800% return within sixty days at zero risk. The terms offered by Velanos were obviously suspect because it is common knowledge that the sorts of investments that can yield an 800% return in sixty days (*e.g.*, cryptocurrency, options, or highly leveraged stock purchases) come with a high risk of total loss. If the Debtor indeed made this investment with Velanos, the transaction demonstrates the absence of sound, practical judgment and a high degree of recklessness particularly because the investment was made with other people's money. This incompetence and gross mismanagement require the immediate appointment of a chapter 11 trustee in this case.

18.    The Court also should order the appointment of a chapter 11 trustee under § 1104(a)(2) as all the relevant factors support such an appointment. The first factor - "trustworthiness of the debtor" - weighs strongly in favor of appointing a trustee because the Debtor's management admittedly made poor investment decisions and has been credibly accused of fraud. The second factor - "the debtor's past and present performance and prospects for the debtor's reorganization" - weighs strongly in favor of appointing a trustee because the Debtor failed to fund numerous loans, admittedly lost large sums of money, and whose incompetence and reckless disregard for other people's money caused harm. The third

factor is "confidence, or lack thereof, of the business community and creditors in present management" An entire community of business owners fell victim to the Debtor's fraud, as demonstrated by composite Exhibit A, and they have no confidence in the Debtor's management. Finally, the fourth factor is "the benefits derived by appointment of a trustee, balanced against the costs of appointment." Although the value of the funds currently in the Debtor's possession is unknown, the benefits derived from appointing a trustee likely outweighs the costs of appointment. The Debtor admitted to receiving $500,000 in May 2023 and can fund its attorney's post-petition retainer. The recent implementation of subchapter V has demonstrated that chapter 11 trustees can be cost-effective and successful. For these reasons, the appointment of a trustee would be most beneficial for the estate. Thus, the Court should use its discretionary authority to appoint a chapter 11 trustee in this case.

19.    In the alternative, if the Court does not appoint a chapter 11 trustee, the Court should appoint an examiner, dismiss this case, or convert this case to chapter 7. The same discretionary factors that support appointing a chapter 11 trustee support the appointment of an examiner. Likewise, if the Court is not inclined to appoint a chapter 11 trustee, the Debtor's gross mismanagement and bad faith abuse of the bankruptcy process warrants dismissal or conversion to chapter 7.

## CONCLUSION

The appointment of a chapter 11 trustee is necessary to protect the integrity of the bankruptcy system. The Debtor's management engaged in a scheme to defraud and dishonestly target small business owners luring them with false promises of below market business loans with attractive rates and no personal guarantees. The promotion and

protection of small businesses is a critical component of the bankruptcy code and an entity that defrauds small business owners should not continue as a debtor-in-possession.[9]

At a minimum, the Debtor engaged in "incompetence and gross mismanagement" which requires the immediate appointment of a chapter 11 trustee. The Debtor admittedly made a highly suspect investment with money provided by third parties to whom the Debtor had outstanding obligations. This undisputed allegation was conceded by the Debtor in Court filings. The Court should immediately order the United States Trustee to appoint a chapter 11 trustee in this case, dismiss this case, convert the case to chapter 7, or appoint an examiner.

WHEREFORE, the United States Trustee moves this Court for an order directing the United States Trustee to appoint a chapter 11 trustee in this case, appoint an examiner in this case, dismiss this case, convert this case to chapter 7, or for such other relief as the Court deems appropriate.

Dated: March 5, 2024.                     Respectfully Submitted

                                          Mary Ida Townson
                                          United States Trustee for Region 21

                                          /s/  Scott Bomkamp
                                          Scott Bomkamp, Trial Attorney
                                          Office of the United States Trustee
                                          U.S. Department of Justice
                                          400 W. Washington St., Suite 1100
                                          Orlando, FL 32801
                                          Telephone No.:  (407) 648-6301, Ext. 150
                                          Facsimile No.:   (407) 648-6323

---

[9] The exclusion of small business owners with primarily business debt from means testing and the recent enaction of subchapter V are two examples of the bankruptcy code's promotion and protection of small business.

Email: scott.e.bomkamp@usdoj.gov
Indiana Bar No.: 28475-49

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion was served on March 5, 2024 on all parties appearing electronically via CM/ECF, or via First Class United States mail on the following:

Genie Investments NV, Inc.
Attention: John Michael Cohan
PO Box 60443
Jacksonville, FL 32236

/s/   Scott Bomkamp
Scott Bomkamp, Trial Attorney

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

In re:

Genie Investments NV, Inc.,                         Case No.: 3:24-bk-00496-BAJ
                                                    Chapter 11

          Debtor.
_____/

**UNITED STATES TRUSTEE'S REPLY TO DEBTOR'S RESPONSE TO
EXPEDITED MOTION TO APPOINT CHAPTER 11 TRUSTEE,
APPOINT EXAMINER, DISMISS CASE OR CONVERT TO CHAPTER 7**

Mary Ida Townson, United States Trustee for Region 21 (the "United States
Trustee"), by and through the undersigned counsel, replies to the Response to Expedited
Motion to Appoint Chapter 11 Trustee or in the Alternative, Appoint an Examiner, Dismiss
this Case or Convert this Case to Chapter 7 ("Response"; Doc. No. 34) filed by the debtor,
Genie Investments NV, Inc. ("Debtor"). In support, the United States Trustee states as
follows.

## SUMMARY OF ARGUMENT

Even if the Court believes the Debtor's narrative, a chapter 11 trustee should be
appointed immediately, or this case should be converted to chapter 7. The Debtor lost its
money to Velanos in an obviously speculative or fraudulent investment. This would
constitute "incompetence or gross mismanagement" if the Debtor used its own money, but
it constitutes fraud as well because the Debtor used money that was supposed to be reserved
for its customers' prepaid interest payments. Furthermore, the Debtor's investment with

Velanos cannot fully excuse the Debtor's conduct because the Debtor continued collecting funds from the same victims even after learning that Velanos would not disburse funds.

The Debtor's argument that other parties, notably McMann Commercial Lending ("McMann"), are responsible for the Debtor's conduct is undone by the Debtor's own admission that it entered numerous "Bridge Loan" agreements establishing direct privity with its victims. Finally, during the section 341 meeting of creditors, the Debtor testified that it transferred hundreds of thousands of dollars to "asset protection" companies which, standing alone, warrants immediate appointment of a chapter 11 trustee or conversion to chapter 7. At a minimum, the Court must appoint an examiner because the Debtor admitted liquidated debts exceeding $5 million.

## ADDITIONAL BACKGROUND

1.    The United States Trustee's Expedited Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint an Examiner, Dismiss This Case, or Convert This Case to Chapter 7 ("Trustee's Motion"; Doc. No. 20) provides additional facts and background information. Those facts are incorporated into this reply by reference.

2.    After filing the Trustee's Motion, the United States Trustee conducted an Initial Debtor Interview ("IDI"), collected various documents from the Debtor, and conducted a section 341 meeting ("341 Meeting"). The United States Trustee also interviewed and collected documents from numerous victims of the Debtor's lending scheme.

3.    On March 14, 2023, the Debtor participated in the IDI with United States Trustee Bankruptcy Analyst Daniel Muñoz. At the IDI, David Hughes stated that he and

John Cohan operate a Wyoming corporation called "Better Method." Mr. Hughes explained that Better Method functioned as an asset protection company. He explained that certain victims, including Blake Stringer and "Kristin," sought to receive refunds through threatening litigation and trying to reverse wire transfers. According to Mr. Hughes, Better Method was established to stymie these efforts.

4.    In connection with the IDI, the Debtor provided financial documents, including a summary of debts owed to customers and Morgan Stanley bank statements. The Debtor's Morgan Stanley bank account shows that the Debtor had $10,566,138.22 in cash on January 1, 2024, less than two months before filing for bankruptcy relief, and $2,516.80 in cash on January 31, 2024.

5.    The 341 Meeting was held on March 27, 2024, where the United States Trustee asked Mr. Hughes questions regarding the Debtor's transfers of cash in January 2024. Mr. Hughes explained that, in January 2024, the Debtor paid back a loan with Morgan Stanley in the approximate amount of $10,000,000. He also explained that it transferred approximately $500,000 to an affiliate company identified as "Genie Investments II" to pay legal fees and for asset protection. He also confirmed the existence of Better Method.

6.    During the 341 Meeting, the United States Trustee also asked Mr. Hughes questions about the summary of debts spreadsheet provided by the Debtor. The summary is an Excel spreadsheet listing several categories of debts, including $9,727,644 as "Total Refundable." The Debtor admitted that $9,727,644 was, in fact, the outstanding amount that the Debtor believes it owes its customers.

7.    During the 341 Meeting, the United States Trustee inquired regarding the

Debtor's payments to Velanos. The Debtor confirmed a $9 million payment to Velanos to "put its money to work." The Debtor confirmed the money came from the Debtor's victims. The Debtor characterized the loss of the Velanos money as a *"force majeure"* event.

8.      The United States Trustee interviewed numerous victims of the Debtor, and most believed that their money was being placed into a secure account that would pre-pay several months of their loan indebtedness. Not one of the victims believed that the Debtor would take the money and use it in a high-risk investment. Some victim accounts conflict with the Debtor's explanation of losing all its money to Velanos. According to the Debtor's lawsuit against Velanos, attached as Exhibit C to the Trustee's Motion, Velanos promised the Debtor $75 million by the end of 2022. Yet, the Debtor accepted $3.8 million from North Haven Lodging Partners, LLC and its affiliate in May 2023 in connection with a promised loan. The Debtor has not explained why it continued to accept money from its victims after, by its own admission, its funding source (Velanos) had proven to be a fraud.

9.      The United States Trustee also interviewed numerous victims of the Debtor to better understand the relationship between the Debtor, McMann, and other third parties. Most customers were in contractual privity with both McMann and the Debtor. Typically, the "BELOC" documents named McMann as the lender and required a 10% pre-payment. The "Bridge Loan" was devised to finance this 10% pre-payment, and the Bridge Loan itself typically required a 15% pre-payment. The Bridge Loan documents typically named the Debtor as the lender. Hypothetically, if a customer ultimately wanted a $3,000,000 loan (from McMann), he or she would need a $300,000 pre-payment. To facilitate this, a $300,000 Bridge Loan was offered (from the Debtor) requiring a $45,000 pre-payment to

the Debtor.[1] On top of this 15% fee, the Debtor also charged many of the victims a $25,000 (or $30,000) "due diligence" fee.

10.    Numerous victims communicated with the Debtor directly after their loans failed to fund. Some victims received phone calls in which they were offered excuses or bullied by the Debtor. Some were dragged into arbitration by the Debtor when they attempted to reveal the truth of the Debtor's practices online. At least one victim believes that the Debtor manipulated loan documents to make the arbitration process more favorable for the Debtor. Some victims were offered a "reward program" as an incentive to fund the Debtor's attorney fees in its litigation against Velanos in exchange for being in the "front of the line" on any potential recovery. One victim was offered money by the Debtor to divulge contact information on some of the more activist victims.

11.    The Debtor's victims recounted harrowing stories of personal loss. A mother of ten children has struggled to afford school supplies and shoes for her family. A father of five children second mortgaged his home for over $200,000 in an equity loan and may soon declare bankruptcy or lose his home. Another victim indebted herself to hard money lenders. A family farmer, who may be the last organic family farmer in his area of Texas, had to file a personal bankruptcy case and may now lose his farm. Another victim took a leap of faith from a secure corporate job to become an entrepreneurial property investor and may now be stranded for employment. Family bonds have been torn by recriminations over intrafamily loans that were used to fund the pre-payments for the Bridge Loans. Ultimately, society suffers because small business owners, like the Debtor's victims, are the very people who

---

[1] The undersigned adopts the language of the scheme with a large grain of salt.

efficiently allocate capital and employ other members of the community.

12.    Finally, the Debtor is delinquent in filing many required documents. Although the Debtor has received an extension to file its Schedules, the Local Rule 2081-1 documents, Statement of Financial Affairs, and numerous required filings are not covered by the extension. The delinquent filings include: (1) a certification of authorization to file the case; (2) a corporate ownership statement; (3) a list of 20 largest creditors; and (4) a case management summary. (See Doc. No. 6-1).

## LAW AND ARGUMENT

### A. The Court Should Immediately Appoint a Chapter 11 Trustee or Covert This Case to Chapter 7

13.    Facially, the Debtor's management is at least culpable of incompetence and gross mismanagement. The Debtor alleges it paid $9 million dollars to Velanos who promised to provide an 800% return within sixty days at zero risk. As set forth in the Trustee's Motion, such a transaction is obviously suspect and warrants the appointment of a chapter 11 trustee based on the Debtor's admitted incompetence or gross mismanagement.

14.    The circumstances surrounding this suspect transaction also warrants a finding of dishonesty and fraud. The Debtor's victims were told that their money would be used to fund interest payments on their BELOC loan or their Bridge Loan. No one was told that their money would be used for a speculative investment or that the funding of their loans was somehow dependent upon the success of a speculative investment. Furthermore, the Debtor continued taking the victims' money, including from the North Haven Lodging Partners, well after the Debtor was aware that Velanos would not provide the return anticipated by the end of 2022. The Debtor's deceptions elevate their incompetence and

gross mismanagement to fraud. The Debtor's fraud is reinforced by their continued attempts to silence and bully its victims after the loans failed to fund.

15. The Debtors cannot establish that McMann, or some other entity, was the actual party at fault. As discussed in the Response, the Debtor was in direct contractual privity with numerous victims, and every victim wired money to the Debtor's accounts. Numerous victims had communications with the Debtor after the loans defaulted and some were threatened or offered inducements for their silence. The Debtor offered some victims money to turn on other victims and solicited additional funds from some victims to fund its litigation against Velanos. The Debtor also initiated arbitration against several of the victims. Ultimately, the Debtor itself made the ill-fated investment of investor money in Velanos.

16. The appointment of a chapter 11 trustee is also mandated by the pre-petition transfers to which the Debtor admitted at the IDI and the 341 Meeting. To keep money away from the victims, the Debtor admittedly transferred funds to both "Genie Investments II" and "Better Method." These transfers are fraudulent based upon the pendency of litigation, the insolvency of the Debtor, the overall character of the Debtor, and the nature of its actions in this fraudulent scheme. *See In re Levine*, 134 F.3d 1046, 1053 (11th Cir. 1998) (discussing badges of fraud). The Debtor also transferred approximately $10 million to a creditor on the eve of filing its chapter 11 bankruptcy petition. A chapter 11 trustee should be appointed because the Debtor admitted to deliberately diminishing the bankruptcy estate before filing.

**B.    In the Alternative, an Examiner is Mandated**

17. If no trustee is appointed, the bankruptcy code mandates the appointment of an examiner because the Debtor's liquidated debts exceed $5 million. Pursuant to 11 U.S.C.

§ 1104, if a debtor owes a liquidated amount over $5 million for "other than debts for goods, services, or taxes, or owing to an insider" an examiner is mandated. *See In re FTX Trading Ltd.*, 91 F.4th 148 (3d Cir. 2024) (holding that such an appointment is mandatory). The Debtor's own spreadsheet demonstrated a $9,727,644 debt which the Debtor admitted it owes its customers. This debt is liquidated even if it were disputed. Accordingly, the Court must appoint an examiner if it does not convert the case to chapter 7 or appoint a chapter 11 trustee.

WHEREFORE, the United States Trustee moves this Court for an order directing the United States Trustee to appoint a chapter 11 trustee in this case, or alternatively appoint an examiner in this case, or dismiss this case and convert it to chapter 7, or for such other relief as the Court deems appropriate.

Dated: March 29, 2024.

Respectfully Submitted

Mary Ida Townson
United States Trustee for Region 21

/s/ Scott Bomkamp
Scott Bomkamp, Trial Attorney
Office of the United States Trustee
U.S. Department of Justice
400 W. Washington St., Suite 1100
Orlando, FL 32801
Telephone No.: (407) 648-6301, Ext. 150
Facsimile No.: (407) 648-6323
Email: scott.e.bomkamp@usdoj.gov
Indiana Bar No.: 28475-49

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion was served on March 29, 2024 on all parties appearing electronically via CM/ECF.

/s/  Scott Bomkamp
Scott Bomkamp, Trial Attorney

# EXHIBIT

# 11

# EXHIBIT 6

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

In re:                                                    Case No.:  3:24-bk-00496-BAJ
                                                          Chapter 11
GENIE INVESTMENTS NV INC.,

          Debtor.
_____/

## NOTICE OF FILING OF EXAMINER'S REPORT

Maria M. Yip, as Examiner, by and through her undersigned counsel, gives notice of the

filing of her *Examiner's Report* attached hereto.

*/s/ Ryan E. Davis*
RYAN E. DAVIS
Florida Bar No. 0179851
davis@whww.com
**WINDERWEEDLE, HAINES, WARD
& WOODMAN, P.A.**
Post Office Box 880
Winter Park, FL 32790-0880
Telephone:  (407) 423-4246
Facsimile:  (407) 645-3728

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 28, 2024, a copy of the foregoing has been furnished
via:

**CM/ECF to:**

Bryan K. Mickler, Esq.
Mickler & Mickler
5452 Arlington Expressway
Jacksonville, FL 32211
Email: court@planlaw.com

Scott E Bomkamp, Esq.
DOJ-Ust
United States Trustee

1

400 W. Washington St., Suite 1100
Orlando, FL 32801
Email: scott.e.bomkamp@usdoj.gov

United States Trustee
George C Young Federal Building
400 West Washington Street, Suite 1100
Orlando, FL 32801

All those registered to receive CM/ECF on this case.

<u>US Mail to</u>:

Debtor
Genie Investments NV Inc.
PO Box 60443
Jacksonville, FL 32236

Local Rule 1007-2 parties in interest listed on the attached mailing matrix.

/s/ Ryan E. Davis
RYAN E. DAVIS

Label Matrix for local noticing
113A-3
Case 3:24-bk-00496-BAJ
Middle District of Florida
Jacksonville
Fri Jun 28 16:54:01 EDT 2024

(p)BELLE MAISON REALTY  LLC
ATTN LEA MUSE
1133 E 83RD ST
171
CHICAGO IL 60619-6455

Archer Capital Investments
Attn: Michael Thompson
1448 W. Salmon Caddis Drive
Bluffdale, UT 84065-5122

Meetopolis LLC
Attn: Lisa Butkiewicz
5434 E Kathleen Road
Scottsdale, AZ 85254-1759

Autonomous Drine Solutions LLC
dba Calaway Solutions
Attn: Garrett Calaway
7180 S Hudson Circle
Centennial, CO 80122-2553

North Haven Lodging Partners, LLC
Attn: Benjamin Morris, Esq.
Foley & Lardner LLP
11988 El Camino Real, Suite 400
San Diego, CA 92130-2594

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Belle Maison Realty, LLC
Attn: Lea Muse
1133 E 83rd Street 171
Chicago, IL 60619

End of Label Matrix
Mailable recipients    5
Bypassed recipients    0
Total                  5

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**
www.flmb.uscourts.gov

In re:

Genie Investments NV, Inc.,                          Case No. 3:24-bk-00496-BAJ

      Debtor.                                       Chapter 11

_____/

## EXAMINER'S REPORT

Maria M. Yip, the Court appointed Examiner of Genie Investments NV, Inc., a Chapter 11

case, in accordance with the *Order Approving Selection of Chapter 11 Examiner* (Doc. No. 68)

files this Report.

Served and filed on June 28, 2024.

By: _____

**Maria M. Yip, Examiner**
2 S. Biscayne Blvd., Suite 2690
Miami, FL 33131
Ph. (305) 787-3750   Fax: 1 (888) 632-2672
Email: myip@yipcpa.com

## Table of Contents

I.    INTRODUCTION ............................................................................................................ 3

II.   BACKGROUND ON DEBTOR............................................................................................ 5

III.  CONNECTION BETWEEN THE DEBTOR OR ITS AFFILIATES AND MCMANN
COMMERCIAL LENDING OR ITS AFFILIATES............................................................ 10

IV.   ALLEGED FRAUDULENT AGREEMENT WITH VELANOS PRINCIPAL
CAPITAL.................................................................................................................... 13

V.    CONNECTION AND TRANSFERS BETWEEN DEBTOR AND ANY AFFILIATES OR
DEBTOR RELATED ENTITIES..................................................................................... 25

VI.   TRANSFERS BETWEEN DEBTOR, INCLUDING ITS DIRECTORS, OFFICERS,
INSIDERS, OR AFFILIATES OVER LAST TWO YEARS ................................................. 29

VII.  LIMITATIONS IN FINDINGS BASED ON AVAILABLE RECORDS....................... 46

VIII. OBSERVATIONS AND CONCLUSIONS ....................................................................... 48

## I.    INTRODUCTION

### History of the Chapter 11 Case and Examiner's Charge

1. On February 21, 2024, (the "Petition Date"), Genie Investments NV, Inc. ("Genie NV" or the "Debtor") filed a voluntary Chapter 11 bankruptcy petition commencing the bankruptcy case (Doc. No. 1) (the "Case").

2. On April 11, 2024, after a two-day trial, the Court entered an *Order Granting in Part and Denying in Part United States Trustee's Expedited Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint an Examiner, Dismiss the Case, or Convert the Case to Chapter 7* (the "Order") (Doc. No. 60.) The Order directed the Examiner to investigate the alleged fraud in this Case, including but not limited to:

   a. the connection, if any, between the Debtor or its affiliates, and McMann Commercial Lending or its affiliates;

   b. the alleged fraudulent agreement with Velanos Principal Capital;

   c. the connection and transfers between the Debtor and any affiliates or Debtor entities;

   d. any transfers between the Debtor, including its directors, officers, insiders, or affiliates over the last two years.

3. Additionally, pursuant to the Order, the Debtor in Possession must fully and transparently cooperate with the entirety of the investigation conducted by the Examiner.

4. On April 16, 2024, I was appointed Examiner pursuant to the *Appointment of Chapter 11 Examiner* (Doc. No. 63).

5. I hereby present my observations in the form of this report (the "Report"). I have prepared schedules with detailed information pertaining to the issues contained in this Report which

are attached as exhibits. These exhibits are an integral part of this Report and should be relied upon accordingly.

6. This Report is based on the best information available to me as of the writing of this Report, including a review of:

    a. Debtor's bankruptcy petition, schedules and statement of financial affairs ("SOFA");

    b. the recordings from the meetings of the creditors held on the following dates:

        i. March 27, 2004;

        ii. April 3, 2024 (part 1 and part 2); and

        iii. April 17, 2024.

    c. several communications with the Debtor's principals;

    d. bank statements;

    e. brokerage statements;

    f. deposition transcripts;

    g. loan agreements;

    h. QuickBooks exports provided by the Debtor;

    i. contracts;

    j. Affidavits filed by creditors in the Case;

    k. documents provided by third parties; and

    l. available public records.

7. On April 26, 2024, I conducted a two hour interview of the Debtor's principals, with their counsel, to better understand the Debtor's business operations and the relationships between the parties in the case.

8. At the April interview, the Debtor's principals agreed to provide relevant banking and business records immediately after the interview. My team set up a Sharefile for the immediate transfer of records. However, records were not provided by the Debtor's principals until the week of May 13, 2024, on a rolling basis, after a hearing with the Court on May 13, 2024. Since that date, the Debtor's principals have been cooperative in providing the records requested.

9. On June 10, 2024, I conducted a second interview of the Debtor's principals. This interview lasted approximately 90 minutes.

10. On June 25, 2024, I conducted a third interview of the Debtor's principals.

11. Based on my review of the Debtor's schedules, bank records requested and transactions in those bank accounts, I have identified five bank accounts, one brokerage account, and a loan account in the Debtor's name. Additionally, I have identified and analyzed three bank accounts of companies related to Genie NV based on common ownership. The eight bank accounts, one brokerage account and loan account reviewed are reflected in **Exhibit 1.**

## II.    BACKGROUND ON DEBTOR

### Genie Investments NV

12. Genie NV was formed in Nevada on December 17, 2021. As of September 14, 2022, the company had the following officers:

    a.   Michael Connor ("Connor"), President;

    b.   David Hughes ("Hughes"), Secretary;

    c.   Caleb Davis ("Davis"), Treasurer; and

    d.   John Cohan ("Cohan"), Other. [1]

13. According to the Debtor's SOFA (Doc. No. 40), Hughes and Cohan each own 50% of Genie NV.

14. During the 341(a) meetings of creditors, Hughes provided the following information:

    a.   Genie NV was formed to make good, friendly, fair loans to businesses.[2]

    b.   When Genie NV was formed, Connor was invited to do legal work for the Debtor. Connor then left Genie NV for personal reasons in August 2022 or September 2022. Connor was apparently indicted during that time frame and separated from Genie NV.[3]

    c.   Referral agents, promoters, and brokers across the country connected potential borrowers to Genie NV, as a potential lender.[4]

    d.   Genie NV maintained an office in Florida and did not have any employees other than management.[5]

15. Based on my review of the Nevada Secretary of State website, Connor was no longer listed as an officer of the Debtor as of February 8, 2023. In addition, as of August 29, 2023, Hughes was no longer listed as an officer of the Debtor.

**The Debtor's Business**

16. Genie NV was engaged in the lending business in a number of ways. Potential borrowers or customers would be connected with Genie NV through referral sources, including through Zoomeral, Inc. ("Zoomeral"). Borrowers would pay Zoomeral an origination fee

---

[1] Nevada Secretary of State Website. www.nvsilverflume.gov/home.
[2] Section 341 Meeting of Creditors transcript dated March 27, 2024, pp. 10:13-16.
[3] Audio recording from the Section 341 Meeting of Creditors held on April 17, 2024.
[4] Audio recording from the Section 341 Meeting of Creditors held on April 17, 2024.
[5] Ibid.

6

for connecting the borrower with Genie NV.  Zoomeral is owned by Hughes and Cohan and will be covered in further detail later in the Report.

17. Small business owners and potential borrowers looking to obtain a line of credit facility for their respective companies contacted Genie NV who offered customers a low interest, non-recourse loan referred to as a Business Expansion Line of Credit ("BELOC").[6]

18. The BELOC agreement defines Lender Capital Partners ("Lender Capital Partners") as the one or more lender-clients of Genie NV providing funding towards the BELOC.[7]

19. According to Hughes and Cohan, none of Genie NV's customers had loans funded by Genie NV's Lender Capital Partners.  Genie NV attempted to locate potential Lender Capital Partners, however none of the Lender Capital Partners came to fruition and provided funding.[8]

20. As part of the process of obtaining the BELOC loan, Genie NV would require the borrower to enter into a due diligence fee agreement and pay fees to Genie NV ("Due Diligence Agreement" and "Due Diligence Fees") to conduct certain due diligence services. According to the Due Diligence Agreement, potential borrowers were required to also pay Genie NV "a non-accountable and non-refundable fee" and payment of the Due Diligence Fees was not a guarantee that Genie NV would offer funding to the borrower.[9]

21. As part of the Due Diligence Agreement, Borrowers were required to provide Genie NV with financial statements, bank records and a business plan.[10]

---

[6] Genie Investments Terms and Contingent Commitment Letter, dated March 9, 2023.
[7] Business Expansion Line of Credit Agreement, dated March 9, 2023.
[8] Interview of Cohan and Hughes, dated June 25, 2024.
[9] Genie Investments, NV Due Diligence Fee Agreement.
[10] Ibid.

22. According to the BELOC Loan Agreement, Genie NV would require their borrowers to establish an interest reserve account ("ICA"), and to pay a "minimum contribution"[11] of the total loan amount within 7 calendar days after the fully executed LOC (Asset backed Line of Credit Loan) documents were received by Genie NV.[12]

23. If the borrower established the ICA and complied with the conditions of the BELOC and Genie failed to provide the first loan advance when due, the borrower would have the option to terminate the agreement and request a full refund of the ICA. The borrower was required to deliver written notice in the form of a notarized termination letter to Genie NV by certified mail. Upon receipt of the notice, Genie NV would have forty (40) international business-banking days from the date of receipt within which to return the ICA to the borrower.[13]

24. In certain instances, Genie NV would provide a bridge loan for the borrower to fund the ICA. The borrower on the bridge loan was typically required to prepay 15% of the ICA payment related to the loan in the form of a bridge interest payment prior to receiving the bridge loan ("Bridge Interest Fees").

25. Genie NV and Zoomeral (owned by Cohan and Hughes) were to be paid:

    a. Zoomeral - a fee as the originator for the loan;

    b. Genie NV - a Due Diligence Fee for doing the requisite research and approval of the loan;

    c. Genie NV - the ICA reserves due to the lender as part of the BELOC loan; and

    d. Genie NV - the interest due as the lender on the loan.

---

[11] The contribution amount ranged from 10% to 15%.

[12] Business Expansion Line of Credit Agreement between Genie Investments as Lender and McMann Commercial Lending LLC.

[13] Business Expansion Line of Credit Agreement, dated March 9, 2023. Section 13.7.

26. In many instances, Genie NV collected the fees reflected above in (b) and (c) even though the borrowers did not receive funding.

27. According to Cohan, during the time the Debtor was in business, the Debtor closed over 50 loans to customers.[14] Based on an excel schedule provided by the Debtor titled, "Loan Closing Dates", Genie NV closed approximately 44 loans totaling $4,061,000 in loans to customers. The average amount of the loan closed was $92,000.

28. Based on my analysis of the eight bank accounts for which I received records, I have been able to identify with a few exceptions, 44 loans reflected on the Loan Closing Dates excel schedule provided by the Debtor that were funded.

29. According to the Debtor's QuickBooks, from August 31, 2021 to May 1, 2024, the Debtor collected funds from customers for ICA Reserves, Due Diligence Fees, and Bridge Interest as reflected in the table below:

| Category | Amount |
|---|---|
| ICA Reserves | $ 13,217,477.00 |
| Bridge Interest | 6,417,480.00 |
| Due Diligence Fees | 1,162,225.00 |
| TOTAL | $ 20,797,182.00 |

30. Additionally, according to the Debtor's QuickBooks, from August 31, 2021 to May 1, 2024, the Debtor refunded 15 customers refunds of $10,545,130. It is unclear from the Debtor's QuickBooks how much of the refunds pertain to customers' ICA or bridge loans.

---

[14] Section 341 Meeting of Creditors transcript dated March 27, 2024, pp. 11:4-17.

31. Based on my review of the Debtor's books and records, I have identified some instances where the source of funds for a borrower's termination refund was another borrower's ICA deposit.

## III.    CONNECTION BETWEEN THE DEBTOR OR ITS AFFILIATES AND MCMANN COMMERCIAL LENDING OR ITS AFFILIATES

### McMann Commercial Lending / McMann Capital LLC

32. McMann Commercial Lending ("McMann") was incorporated in Illinois on June 14, 2018 by Walter P. Trock ("Trock"). Trock is listed as its Manager.[15] On August 14, 2023, McMann registered with the Illinois Secretary of State to conduct business under the name of McMann Capital LLC ("McMann Capital").

33. McMann Capital is a national commercial mortgage banker that provides mortgage brokers, community bankers, commercial bankers, and borrowers access to the secondary market for long-term, fixed-rate, non-recourse, and recourse commercial real estate mortgage loans.[16]

34. According to Hughes, the Debtor and McMann Capital were 100% separate businesses.[17]

35. According to Hughes, the Debtor had its customers/ borrowers with whom they dealt with directly. In addition, according to Hughes in some instances, the Debtor was the lender and McMann was the borrower. According to the agreement between McMann and Genie NV ("McMann Agreement"), the Debtor was to loan funds to McMann to be used as funding for loans to McMann's customers.

---

[15] Office of the Illinois Secretary of State. https://apps.ilsos.gov/businessentitysearch .
[16] https://mcmanncapital.com/about/
[17] Section 341 Meeting of Creditors transcript dated March 27, 2024, pp. 13:4-11.

36. According to Hughes, McMann would instruct its clients to send the payments for the Due Diligence Fees and ICA funds directly to Genie NV out of convenience.[18]

37. In some instances, borrowers paid McMann an upfront initial application fee related to a loan with Genie NV.[19] These were also referred to as due diligence fees for McMann.[20]

38. Ultimately, many of McMann's customers/borrowers transferred funds to the Debtor for Due Diligence Fees and to fund the ICA, however, the customer's loans were not funded by McMann or the Debtor. McMann's customers did not receive a refund of their Due Diligence Fees or ICA funding.

39. On October 24, 2023, SWK Attorneys at Law, on behalf of McMann sent a letter to Genie NV demanding that it immediately provide refunds to two borrowers under BELOC agreements that previously funded ICA reserves.[21] According to the letter, McMann states the following regarding the ICA funds to be returned to borrowers:

> As Genie well knows, any issues Genie may have with its purported "capital provider" are wholly irrelevant to the refund of ICA Payments. Genie received the funds at issue from each respective borrower on May 3, 2023. Genie was required to hold said funds in trust to cover interest due under the respective BELOCS as it accrued, once (and if) funded. *These refunds are in no way dependent on outside capital or the availability of funds from any third-party, including Genie's purported and yet to be identified wholesale lender.* It appears this "force majeure" explanation – the purported reason Genie was unable to fund these and various other BELOCS procured by McMann - is an obvious attempt to fabricate an otherwise non-existent basis for Genie's current and wholly unjustified refusal to issue refunds of ICA Payments received directly from prospective borrowers. No such basis exists, as the refunds are wholly unrelated to Genie's inability to fund these BELOCS, and in fact, are specifically required upon receipt of the termination notices, including those issued as a result of Genie's inability to fund the respective loans.

---

[18] Section 341 Meeting of Creditors transcript dated March 27, 2024, pp. 16:3-17.

[19] Affidavit of Rejoe Joy, dated February 29, 2024, Affidavit of Kristin Stegent, dated March 1, 2024 and Affidavit of Blake Stringer, dated, February 28, 2024..

[20] Affidavit of L. Muse, dated February 28, 2024.

[21] Letter from SWK Attorneys at Law to David Hughes, John Michael Cohan, and Genie Investments NV, dated October 24, 2023.

11

40. According to Hughes, the Debtor does not have an obligation to the McMann customers/borrowers.[22] Notwithstanding, Hughes has stated that the Debtor wants to have McMann's customers repaid and has scheduled them as creditors of the Debtor.

41. Based on our review of the Debtor's bank accounts, we traced 21 transfers from the Debtor to McMann during the period May 2022 through August 2023 totaling $289,550. In addition we traced three transfers from McMann to the Debtor on November 15, 2022, May 31, 2023, and June 1, 2023 totaling $232,575. Below are the transfers from the Debtor to McMann:

| Account Name | Account No. | Date | Payee | Amount |
|---|---|---|---|---|
| Genie Investments NV | x8502 | 09/16/22 | Mcmann Commercial Lending LLC | $ (16,000) |
| Genie Investments NV | x8502 | 10/07/22 | Mcmann Commercial Lending LLC | (18,750) |
| Genie Investments NV | x8502 | 10/18/22 | Mcmann Commercial Lending LLC | (16,000) |
| Genie Investments NV | x8502 | 10/18/22 | Mcmann Commercial Lending LLC | (20,000) |
| Genie Investments NV | x8502 | 11/14/22 | Mcmann Commercial Lending LLC | (12,000) |
| Genie Investments NV | x8502 | 11/16/22 | Mcmann Commercial Lending LLC | (16,000) |
| Genie Investments NV | x8502 | 01/04/23 | Mcmann Commercial Lending LLC | (22,000) |
| Genie Investments NV | x8502 | 01/12/23 | Mcmann Commercial Lending LLC | (8,000) |
| Genie Investments NV | x8502 | 01/30/23 | Mcmann Commercial Lending LLC | (12,000) |
| Genie Investments NV | x8502 | 02/01/23 | Mcmann Commercial Lending LLC | (10,000) |
| Genie Investments NV | x8502 | 02/06/23 | Mcmann Commercial Lending LLC | (16,000) |
| Genie Investments NV | x8502 | 02/08/23 | Mcmann Commercial Lending LLC | (6,000) |
| Genie Investments NV | x8502 | 02/15/23 | Mcmann Commercial Lending LLC | (16,000) |
| Genie Investments NV | x8502 | 03/02/23 | Mcmann Commercial Lending LLC | (12,000) |
| Genie Investments NV | x8502 | 03/27/23 | Mcmann Commercial Lending LLC | (10,000) |
| Genie Investments NV | x8502 | 03/27/23 | Mcmann Commercial Lending LLC | (10,000) |
| Genie Investments NV | x8502 | 04/24/23 | Mcmann Commercial Lending LLC | (12,000) |
| Genie Investments NV | x8502 | 04/26/23 | Mcmann Commercial Lending LLC | (14,800) |
| Genie Investments NV | x8502 | 04/26/23 | Mcmann Commercial Lending LLC | (18,000) |
| Genie Investments NV | x8502 | 05/03/23 | Mcmann Commercial Lending LLC | (12,000) |
| Genie Investments NV | x8502 | 05/05/23 | Mcmann Commercial Lending LLC | (12,000) |
| | | | TOTAL | $(289,550) |

42. Based on our discussions with Cohan and Hughes, these payments were related to Due Diligence Fees earned by McMann related to loans on which it performed due diligence

---

[22] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.

12

services. McMann would receive 40% of the Due Diligence Fees and Genie NV would receive 60%.

## IV.   ALLEGED FRAUDULENT AGREEMENT WITH VELANOS PRINCIPAL CAPITAL

43. I have analyzed the Debtor's connection to Velanos Principal Capital ("Velanos") in two ways. First, the Debtor's capital contributions to Velanos and secondly, the current proposed settlement with Velanos.

### Debtor's Multiple Capital Contributions to Velanos

44. By way of background, Velanos was formed in Wyoming on April 15, 2022[23] and Joshua Wearmouth ("Wearmouth") is the sole owner of Velanos.[24] Neither Velanos or Wearmouth are registered investment advisers.[25] According to Hughes, Will Byrd ("Byrd") introduced the Debtor to Velanos. Hughes hoped that the investment in Velanos would have provided the funds needed by the Debtor to fund its customers' loans. [26]

45. The Debtor's Chapter 11 Case Management Summary refers to Velanos as a capital provider of the Debtor (Doc. No. 63).

46. On October 19, 2022, the Debtor[27] entered into a Joint Venture Agreement with Velanos (the "Velanos JVA"). The Velanos JVA states that it was formed to participate in one or more private business opportunities, including but not limited to the trading of currency,

---

[23] Wyoming Secretary of State website, https://wyobiz.wyo.gov/Business/Default.aspx

[24] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 17:5-6.

[25] Joint Venture Agreement between Genie Investments NV, LLC and Velanos Principal Capital Inc. dated October 19, 2022, para. 14.1.

[26] Section 341 Meeting of Creditors transcript dated March 27, 2024, pp. 21:14-17.

[27] It should be noted that the Velanos JVA reflects the parties as Velanos Principal Capital, Inc. and Genie Investments NV, LLC, not Genie Investments NV, Inc. We researched Genie Investments NV, LLC in both Nevada and Florida and were unable to locate a company with that name. According to Cohan, there is no entity with the name Genie Investments NV, LLC and that the Velanos JVA has a spelling error.

13

notes, bonds, financial instruments, physical commodities, precious metals, and project financing initiatives.[28]

47. Genie NV retained The Warren Law Group ("Warren Law") "to serve as general counsel/advice, contract/legal document preparation and or review, transaction structuring, strategic planning & asset protection escrow/paymaster services in connection with the Debtor's joint venture with Velanos Principal Capital, Inc." [29]

48. On October 28, 2022, $10 million was wired from the Debtor's JPMorgan Chase account ending x8502 to Warren Law. According to Christopher D. Warren with the Warren Law Group, those funds were disbursed accordingly:

    a. $3 million to Velanos on November 22, 2022;

    b. $5 million to customer Plutus Financial Inc on November 22, 2022;

    c. $1.95 million returned to Genie NV's JPMorgan Chase account ending x8502 on November 22, 2022; and

    d. $50,000 to the Warren Law Group on November 22, 2022 as an escrow fee approved by Davis.

49. I have reviewed the bank account records of Warren Law and confirmed the transactions above.

50. The Debtor also transferred $100,000 to the Law Offices of Scott J. Oh LLC ("Scott Oh") on October 12, 2022, and $21,600 on October 19, 2022.

51. According to the Velanos JVA, Genie NV was to provide Velanos with initial capital resources, and Velanos was to "provide the structuring to generate liquidity and returns

---

[28] Joint Venture Agreement between Genie Investments NV, LLC and Velanos Principal Capital, Inc. dated October 19, 2022, para. I.

[29] Letter of Engagement between Warren Law Group and Genie Investments NV, LLC dated October 14, 2022.

14

and project financing from assets and cash through collateralization, securitization, managing trades, and transactions, and structuring and administering joint ventures."[30]

52. Both Genie NV and Velanos were to be compensated on a profit-sharing basis.[31]

53. According to the deposition of Wearmouth, based on the structure of the Velanos JVA, Velanos had autonomy and rights to use or invest the funds how they saw fit.[32]

54. The Velanos JVA was categorized as a strategic capital/systematic purchase and sell transaction, and the asset being purchased and sold were Standby Letters of Credit ("SBLC") from HSBC London described as a top rated issuer.[33]

55. Velanos was to provide Genie NV with a rolling profit participation in the joint venture activities of up to $25,000,000.  The joint venture was to generate 100% returns in 30 days, and the remaining return of up to $25,000,000 within 60 days, post commencement of the Velanos JVA.[34]

56. According to the Velanos JVA, after Genie NV contributed its assets (pursuant to the agreement), Velanos shall provide Genie NV copies of the current transactional bank account statement showing the relevant trade transactions every 30 days during Genie NV's participation in the Velanos JVA.[35]

57. However, Velanos did not provide the Debtor with current transactional bank account statements showing the relevant trade transactions.[36]

---

[30] Joint Venture Agreement between Genie Investments NV, LLC and Velanos Principal Capital, Inc. dated October 19, 2022, para. II and III.
[31] Joint Venture Agreement between Genie Investments NV, LLC and Velanos Principal Capital, Inc. dated October 19, 2022, para. III.
[32] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 120:12-17.
[33] Appendix to the Joint Venture Agreement between Genie Investments NV, LLC and Velanos Principal Capital, Inc. dated October 19, 2022.
[34] Ibid.
[35] Appendix to the Joint Venture Agreement between Genie Investments NV, LLC and Velanos Principal Capital, Inc. dated October 19, 2022.
[36] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 131:10-13.

15

58. Wearmouth testified that it would constitute a material breach of contract if profits were not paid to Genie NV within 60 days of the contribution of assets. In the event of material breach by Velanos, Genie NV could terminate the Velanos JVA and declare it null and void.[37]

59. As part of the Velanos JVA, Genie NV wired $3,000,000 to Velanos on October 20, 2022.

60. According to Wearmouth, Velanos purchased one or more SBLCs with the $3,000,000 transferred by Genie NV and with Velanos' existing capital position.[38] Those SBLCs were subsequently sold.[39]

61. According to Wearmouth, Genie NV's $3,000,000 capital contribution was part of an overall $25,000,000 investment that was to return $349,000,000 in net profit to Velanos.[40]

62. On November 21, 2022, Genie NV and Velanos amended the Velanos JVA ("First Amendment"), whereby Genie NV made an additional $3,000,000[41] capital contribution and Velanos agreed to increase Genie NV's profit participation to $50,000,000.[42]

63. According to Wearmouth, the First Amendment was prompted by his understanding that Genie NV had additional capital to invest.[43]

64. Sixty days after entering into the Velanos JVA in October 2022, Velanos had not distributed any profits to Genie NV.[44] Similarly, Velanos had not distributed any profits to Genie NV 60 days after the First Amendment in November 2022.

---

[37] Ibid.
[38] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 144-145:24-1.
[39] Ibid.
[40] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 145:18-22.
[41] On November 30, 2022, Genie NV wired an additional $3,000,000 pursuant to the First Amendment
[42] Amendment to Joint Venture Agreement, dated November 21, 2022.
[43] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 149:15-18.
[44] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 126:14-17.

16

65. On November 21, 2022, the Warren Law Group wired an additional $3,000,000 to Velanos on behalf of Genie NV.

66. On May 2, 2023, Velanos wired $499,975 to the Debtor. This has been the only transfer from Velanos to the Debtor as of the date of this Report. According to Cohan, this was to "represent a good faith down payment towards the repayment of Genie's funds."

67. According to Hughes, the ultimate source of the funds transferred to Velanos was funds that customers paid to Genie NV.[45]

68. On June 3, 2023, Genie NV and Velanos amended the Velanos JVA ("Second Amendment"), whereby Genie NV and Velanos incorporated new deadlines for the return of Genie NV's contributions and for payout of Genie NV's profit allocation.[46]

69. Pursuant to the Second Amendment, Velanos was to facilitate the opening of a commercial bank account titled in the name of Genie NV, as the sole account owner and signatory, at Nordic Trust Alliance KB ("Nordic Trust") in Miami. Velanos was not to have any access to or control over this account.[47]

70. Additionally, according to the Second Amendment, the following terms were to be met:

   a. on or before June 15, 2023, Velanos was to deposit the sum of $9,500,000 into Genie NV's Nordic Trust account, free and clear of all encumbrances, liens, and holds/restrictions. Immediately thereafter, Genie NV shall send by wire transfer $9,500,000 to the Genie NV account held at JP Morgan Chase bank;

   b. on or before June 30, 2023, Velanos was to deposit an additional $50,000,000 into Genie NV's Nordic's Trust account, free and clear of all encumbrances, liens, and

---

[45] Section 341 Meeting of Creditors transcript dated March 27, 2024, pp. 20:5-12.
[46] Second Amendment to Joint Venture Agreement, dated June 3, 2023.
[47] Second Amendment to Joint Venture Agreement, dated June 3, 2023, para. 1.

17

holds/restrictions. Immediately thereafter, Genie NV shall send by wire transfer the sum of $6,000,000 to Genie NV's account held at JP Morgan Chase bank; and

c. the remaining $44,000,000 held in Genie NV's Nordic Trust account was intended for future allocation to a new trade program offered by Velanos and to be provided under a new contract having the same terms, conditions, returns, and deadlines as the original contract.[48]

71. According to the terms of the Second Amendment if the terms were not met, Velanos would be in breach of contract, without an opportunity to cure.[49]

72. As previously stated, Genie NV received $499,975 from Velanos on May 2, 2023. With the exception of this payment, as of the date of this Report, the Debtor has not received a return of its contributions nor a payout of Genie NV's profit allocation in accordance with the Velanos JVA, First Amendment or Second Amendment.

73. According to Wearmouth, the funds were in a bank account; however, there was a hold put on the funds in the account. In addition, there was an investigation within the bank. The account was locked by the bank subsequently.[50]

74. According to Cohan, the source of the $9,000,000 in capital contributions to Velanos was "income earned by Genie during the period of 2021 and 2022 prior to the transfer to Velanos." This was income from "ICA payments by customers, bridge loan interest by customers and due diligence payments by customers during this time period."

---

[48] Second Amendment to Joint Venture Agreement, dated June 3, 2023, para. 2, 3, and 4.
[49] Second Amendment to Joint Venture Agreement, dated June 3, 2023, para. 5.
[50] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 177:2-23.

18

75. Based on our analysis of the Debtor's general ledger and its Morgan Stanley brokerage account, the Debtor;

    a.  had at best purportedly earned Due Diligence Fees in 2022 of $360,150; and

    b.  had interest in the Morgan Stanley Brokerage account in 2022 of $7,295.

76. The Debtor stated in its SOFA and Amended SOFA that its gross revenues in calendar year 2022 of $399,195.[51] These revenues of less than $400,000 could not have been the source of the $9,000,000 contributed Velanos.

77. According to Hughes, the customer's ICA deposit and Bridge Interest was income earned by the Debtor, even if ultimately the customer's loan was never funded. However, Hughes also stated that up until August 2023, Genie NV had always refunded the ICA deposits and Bridge Interest if requested by the customer in accordance with the terms of the BELOC Agreement or Bridge Loan Agreement.

**[INTENTIONALLY LEFT BLANK]**

---

[51] Statement of Financial Affairs (DE 40) and Amended Statement of Financial Affairs (DE61-1).

78. Although the Debtor received funding from its customers (including McMann customers) for ICAs, these amounts were to be held as a reserve for future interest payments. Clearly, the source of the capital contributions to Velanos totaling $9,000,000 in the October through December 2022 time frame could not have been funded from the customers payments to the Debtor but rather from the customer's ICA and Bridge Interest deposits.

79. Additionally, the Debtor continued to accept deposits for ICA deposits and Bridge Interest after the Velanos default in December 2022, despite likely not being able to fund any of those loans.

80. According to the Debtor's QuickBooks, from April 1, 2023 through June 30, 2023, months after the default on the Velanos JVA, Genie NV received approximately $4,967,975 in ICA deposits and $192,575 in bridge interest.

81. According to an email from Trock to McMann borrowers, he stated that "the ICA is pre paid interest account that belongs to you that is used to pay the monthly interest due on the loan until the ICA account is exhausted."[52]

82. Customers believed that the ICA account was a "trust account set up for the pre-payment of interest on the total of the bridge loan."[53]

83. The Debtor's use of customer funds as the source for the joint venture with Velanos demonstrates gross mismanagement of the customer's funds. In particular. Neither Velanos nor Wearmouth were registered investment advisors and the returns promised by Velanos pursuant to the Velanos JVA were 100% in 30 days and profit participation that would have resulted in a 900% return, which should have raised a red flag.

---

[52] Email from Walt Trock to customer, dated February 8, 2023.
[53] Affidavit of Blake Stringer, dated February 28, 2024.

<u>Debtor's Litigation Against Velanos</u>

84. On October 25, 2023, Genie NV commenced an arbitration proceeding against Velanos, seeking a determination that Velanos materially breached the Velanos JVA and an award of damages.[54]

85. According to the deposition of Wearmouth, in December 2023, Velanos purportedly agreed to pay Genie NV $15 million to settle the dispute with Genie NV. According to Wearmouth, the funds were not made available yet because Genie NV and Velanos were negotiating the dates, times, and terms of how the funds were to be received.[55]

86. Since the Debtor was unable to consummate an agreement with Velanos, on February 6, 2024, Genie Investments NV, LLC[56] filed a lawsuit in the U.S. District Court for the Middle District of Florida, case number 6:24-cv-00271, in which it asserted claims related to the Velanos JVA for:

   a. Violations of Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5(a) and (c);

   b. California corp. CORP § 25401 – unlawful acts in connection with offer, sale, or purchase of a security; and

   c. Common-Law Fraud

87. On May 23, 2024, Velanos and Genie NV entered into a proposed settlement ("Proposed Settlement"), pending Court approval whereby the Debtor is to be paid $15,000,000 according to a payment plan comprised of ten installment payments as detailed below:[57]

---

[54] Settlement Agreement between Velanos Principal Capital, Inc. and Genie Investments NV, LLC dated May 16, 2024.
[55] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 213:1-10.
[56] As previously stated Hughes stated that the entity in the Agreement does not exist and that it was spelling error.
[57] Ibid.

| Installment Payment | Amount | Terms |
|---|---|---|
| 1 | $50,000 | Within two (2) business days of the effective date of the Settlement Agreement |
| 2 | $500,000 | On or before June 30, 2024 |
| 3 | $1,000,000 | On or before September 30, 2024 |
| 4 | $2,000,000 | On or before December 31, 2024 |
| 5 | $2,000,000 | On or before March 31, 2025 |
| 6 | $2,000,000 | On or before June 30, 2025 |
| 7 | $2,000,000 | On or before September 30, 2025 |
| 8 | $2,000,000 | On or before December 31, 2025 |
| 9 | $2,000,000 | On or before March 31, 2026 |
| 10 | $1,450,000 | On or before June 30, 2026 |
|  | $15,000,000 |  |

88. I am skeptical about this Proposed Settlement between the Debtor and Velanos for the following reasons: the Debtor has had an on-going relationship with Velanos since the Velanos JVA in October 2022 and during this time Velanos has failed to make its payments to the Debtor for numerous reasons. The following are some of these instances:

   a. Wearmouth previously committed to repaying the Debtor since the initial default on the Velanos JVA in December 2022. Despite repeated promises of repayment by Wearmouth and Velanos through letters, proof of funds communications, correspondences to and from banks, no repayment to the Debtor has materialized.

   b. Letter from Wearmouth to Genie Investments NV, LLC, dated December 30, 2022, stating:

      "This letter is to inform you that the $75,000,000 USD owed to you will be available on or before January 15th, 2023."[58]

   c. Email from Wearmouth to David Hughes, dated January 27, 2023, claiming that $10 million has been wired to Genie NV and another $39 million would be forthcoming.[59]    The email included a screenshot that purportedly supporting

---

[58] Letter from Joshua Wearmouth to Genie Investments NV, LLC dated December 30, 2022.
[59] Email from Joshua Wearmouth to David Hughes dated January 27, 2023.

Velanos' statement that it had initiated a $10,000,000 wire transfer from a ScotiaBank account to Genie NV's checking account at JPMorgan Chase.[60] Genie NV however, did not receive the funds reflected on the screen shot.

d.  Letter from Wearmouth to Genie Investments NV, LLC, dated March 24, 2023, stating that $10,000,000 has been wired to Genie NV and that a wire transfer receipt and tracer report will be provided, demonstrating proof of funds.[61] Again, Genie NV did not receive these funds.

e.  Letter from Wearmouth to the Walker Law Office, dated October 13, 2023, stating:

> "We intend to remedy the situation by providing capital returns from the JVA, or through the creation of capital funds through a new joint venture within 60 banking days or less."[62]

f.  Text message from Wearmouth to Hughes, dated November 1, 2023, which included a screenshot illustrating $19.8 million in available funds to be transmitted to the Debtor.[63]

## ISSUES WITH COLLECTIBILITY IF VELANOS DEFAULTS AGAIN

89. Based on our research, prior to owning Velanos, Wearmouth owned a company similar to Velanos called S.S.O. Capital ("SSO"). SSO was no longer in business at the time of Wearmouth's deposition.[64]

90. On September 18, 2023, the Honorable Peter H. Froelicher entered a judgment in favor of Four Thirteen, LLC ("413 LLC") against S.S.O. Global Group, Inc., S.S.O. Capital Inc., S.S.O. International Capital PLC, Joshua Wearmouth, Larry Stephens, Adriana E.

---

[60] Exhibit 3 to the Declaration of David Hughes in Support of Motion for Preliminary Injunctive Relief, dated December 13, 2023.
[61] Letter from Joshua Wearmouth to Genie Investments NV, LLC dated March 24, 2023.
[62] Letter from Joshua Wearmouth to the Walker Law Office dated October 13, 2023.
[63] Exhibit 8 to the Declaration of David Hughes in Support of Motion for Preliminary Injunctive Relief, dated December 13, 2023.
[64] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 15-16.

23

Dominguez, David C. Norton, Edmund Moriniere, and Ronald G. Meyers ("413 Litigation"). A judgment was awarded (the "413 Judgment") against S.S.O. Capital Inc. for the following counts:

    a.  Breach of Contract of the JPA;

    b.  Breach of Contract for the Promissory Note;

    c.  Breach of the Covenant of Good Faith and Fair Dealing;

    d.  Breach of Fiduciary Duties;

    e.  Fraud;

    f.  Constructive Fraud;

    g.  Negligent Misrepresentation;

    h.  Conversion;

    i.  Unjust Enrichment;

    j.  Violation of the Wyoming Securities Act; and

    k.  Alter Ego piercing the Corporate Veil.[65]

91. The defendants were held jointly and severally liable. More specifically, the Court entered a judgment against Wearmouth in the amount of $1,000,000 in damages plus attorney's fees of $150,000 for the following according to the 413 Judgment:

    a.  Breach of Contract of the Promissory Note;

    b.  Breach of the Covenant of Good Faith and Fair Dealing of the Promissory Note;

    c.  Breach of Fiduciary Duty of the Promissory Note;

    d.  Fraud;

    e.  Constructive Fraud;

---

[65] Judgment ordered against SSO, filed September 19, 2023.

    f.   Negligent Misrepresentation;

    g.   Civil Conspiracy;

    h.   Conversion – Promissory Note;

    i.   Unjust Enrichment – Promissory Note; and

    j.   Violation of the Wyoming Securities Act.[66]

92. On May 1, 2024, 413, LLC, a judgment creditor, filed an Affidavit in Florida to domesticate the judgment against SSO and Wearmouth in Florida in connection with the 413 Judgment described in the preceding paragraphs.

93. Should Velanos default on the Proposed Settlement, any judgement obtained in favor of Genie NV against Velanos and/or Wearmouth may be subordinated to judgment creditor, 413 LLC.

94. Based on Velanos' history of defaulting on its previous commitments to Genie NV, should the Debtor receive Court approval for the Proposed Settlement, it should require that the Debtor obtain a secured interest with a priority lien on assets of both Velanos and/or Wearmouth for full amount of the settlement.

V.     **CONNECTION AND TRANSFERS BETWEEN DEBTOR AND ANY AFFILIATES OR DEBTOR RELATED ENTITIES**

**Genie Investments NV, Inc.**

95.   I analyzed bank records for the following accounts held in the name of Genie NV:

    a.   JPMorgan Chase Bank account ending x8502;

    b.   JPMorgan Chase Bank account ending x2222;

---

[66] Judgment ordered against Wearmouth, filed September 19, 2023.

    c. JPMorgan Chase Bank account ending x9701; and

    d. JPMorgan Chase Bank account ending x3350.

96. Attached as **Exhibit 2** is a schedule of the flow of funds into Genie NV bank accounts. Attached as **Exhibit 3** is a schedule of the flow of funds out of Genie NV bank accounts. I have assigned customers a unique identifier in order to protect any personally identifiable information (PII) or potentially sensitive customer information.

97. I also analyzed the following brokerage and loan accounts held in the name of Genie NV:

    a. Morgan Stanley Portfolio Management Active Assets account ending x2290 ("Genie Brokerage Account"); and

    b. Morgan Stanley Liquidity Access Line account ending x1290 ("Genie Line of Credit").

### Genie Brokerage Account

98. The Genie Brokerage Account was opened in November 2022. The investment objectives were capital appreciation, income, aggressive income and speculation.[67]

99. This account was opened with an initial $3,700,000 transfer from Genie NV's JPMorgan Chase account ending x8502.

100. On January 3, 2023, Genie NV transferred $1,450,000 from its JPMorgan Chase account ending x8502 to the Genie Brokerage Account.

101. On May 5, 2023, Genie NV transferred another $5,600,000 from JPMorgan Chase account ending x8502, increasing the ending balance in the account to $11,942,263.18 as of May

---

[67] Morgan Stanley account in the name of MSL FBO Genie Investments NV C/O Caleb Michael Davis, November 2022.

31, 2023. The source of the funds for the $5,600,000 transferred by Genie NV into the brokerage account is detailed below:

   a. $1,800,075 deposit from customer #58 related to a bridge loan;

   b. $1,800,075 deposit from customer #81 related to a bridge loan; and

   c. $1,118,592 deposit from a Michael Connor Esq. account at Wells Fargo Bank. According to Hughes, customers previously deposited funds into the Michael Connor Esq. account when obtaining loans from Genie.

102. On September 20, 2023, Genie NV transferred $600,000 from the Genie Brokerage Account to an account at TD Bank held in the name of Genie Investments II, LLC ("Genie II"). Genie II will be discussed later in the Report.

103. On January 3, 2024, Genie NV transferred $9,935,237 from the Genie Brokerage Account to the Genie Line of Credit to pay off the outstanding loan as detailed.

104. Clearly, Genie's customer's funds were used to pay off the Genie Line of Credit as opposed to the obligations owed to Genie NV's borrowers.

105. On January 4, 2024, approximately two months before the bankruptcy filing, Genie NV transferred another $644,606.44 from the Genie Brokerage Account to Genie II.

106. There is minimal activity in the Genie Brokerage Account after the transfer to Genie II and the repayment of the Genie Line of Credit.

### Genie Line of Credit

107. The Genie Line of Credit was opened in November 2022.

108. The Debtor borrowed $3,000,000 from the Genie Line of Credit on November 29, 2022. Those funds were transferred to the Genie NV JPMorgan Chase account ending x8502 on the same day. One day later, on November 30, 2022, $3,000,000 was transferred from

Genie NV JPMorgan Chase account ending x8502 to Velanos account at Bank of Nova Scotia. Prior to this transfer, Genie NV's JPMorgan Chase account ending x8502 had a balance of $711,242 as illustrated further in the diagram below:



109. On May 31, 2023, the Debtor borrowed another $5,735,000 from the Genie Line of Credit and transferred those funds to the Genie NV JPMorgan Chase account ending x8502 on the same day. On the following day, Genie NV transferred $5,000,000 to 1P Ventures, LLC, a customer for a "termination refund" according to Cohan and the Debtor's QuickBooks records. Immediately prior to the transfer from the Genie Line of Credit, Genie NV's JPMorgan Chase account ending x8502 had a balance of $106,812.54 as illustrated further in the diagram below:



110. We have been unable to locate a corresponding deposit in the amount of $5,000,000 for 1P Ventures, LLC. According to Cohan and Hughes, this investor is related to Paul Kurkoff,

28

who connected Genie NV to potential borrowers.[68]    According to Cohan, "In some instances, entities were created for the purposes of our program. It was very common for companies to send in their funds from a different company that they own or from a personal account. They also sometimes received their refunds in different accounts as well."

111.  As previously noted, On January 3, 2024, approximately two months before the filing of the bankruptcy petition, Genie NV transferred $9,935,237 from the Genie Brokerage Account to the Genie Line of Credit as payment in full.  Repayment of the Genie Line of Credit at Morgan Stanley was not made in the ordinary course and no new value was provided to the Debtor.

## VI.  TRANSFERS BETWEEN DEBTOR, INCLUDING ITS DIRECTORS, OFFICERS, INSIDERS, OR AFFILIATES OVER LAST TWO YEARS

112.  The Debtor's principals, Cohan, Hughes, and Davis owned companies that received significant transfers from the Debtor in the two years prior to the bankruptcy filing.  Genie NV's initial SOFA listed these payments as "Loan/Compensation to Directors", however, the SOFA was amended on April 12, 2024 and categorized these payments as "Loans to insider corporations."

113.  The companies and the payments to the companies owned by Hughes, Cohan, and Davis are described in the following sections.

### Zoomeral, Inc.

114.  Zoomeral, Inc. ("Zoomeral") was formed in Delaware on March 6, 2018.[69] Hughes owns 82.5% and Cohan owns 17.5%.[70]

---

[68] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.
[69] State of Delaware Department of State: Division of Corporations. https://icis.corp.delaware.gov/
[70] Interview of Cohan and Hughes, dated June 24, 2024.

115. Zoomeral is a "directory that is designed to create maximum competition for capital while its borrowing subscribers remain safe and anonymous." Zoomeral states that it aims to put an end to predatory lending and lender discrimination, believing that everyone and every business should have equal access to the money they need at the very best rates and terms.[71]

116. Potential borrowers would apply through Zoomeral and be connected to potential lenders.[72]

117. Zoomeral earned commissions upon loans closing from Genie NV.[73]

118. According to a loan agreement dated September 5, 2022, between the Debtor and Zoomeral, the Debtor was to loan up to $3,000,000 in the form of a non-recourse unsecured line of credit to Zoomeral and Zoomeral promised to repay this principal amount to the lender, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance.[74]

119. The loan was to be repaid in the form of one (1) balloon payment due on December 5, 2029.[75]

120. Additionally, Zoomeral had the sole right and decision making authority to be granted an extension of the loan agreement for up to ten (10) additional years upon the request of the borrower.[76]

121. The loan is an unsecured, non-recourse, loan, with no personal guarantee by the officers of Zoomeral.[77]

122. According to the loan agreement, Zoomeral was to use the funds in accordance with a business plan provided by Zoomeral and attached to the loan agreement. According to the

---

[71] https://zoomeral.com/our-story/
[72] Audio recording from the Section 341 Meeting of Creditors held on April 17, 2024.
[73] Ibid.
[74] Loan agreement between Genie Holdings NV and Zoomeral, Inc. dated September 5, 2022, para. 1.
[75] Loan agreement between Genie Holdings NV and Zoomeral, Inc. dated September 5, 2022, para. 2.
[76] Loan agreement between Genie Holdings NV and Zoomeral, Inc. dated September 5, 2022, para. 4.
[77] Loan agreement between Genie Holdings NV and Zoomeral, Inc. dated September 5, 2022, para. 24, 25 and 26.

executive summary attached to the loan agreement, Zoomeral is a pioneering SaaS company focused on delivering innovative educational materials to the financial industry. Their mission is to enhance productivity and streamline operations through advanced technology, intuitive design, and scalable features.

123. Hughes executed the loan agreement on behalf of Zoomeral and Cohan executed the agreement on behalf of the Debtor.

124. According to Cohan, the loans to Zoomeral were not for the benefit of the Debtor, but were to operate Zoomeral's business.[78]

125. According to Hughes, Genie NV loaned Zoomeral a line of credit "like all other businesses get loans." [79]

126. The terms of the loan to Zoomeral are under extremely favorable terms to the borrower and far outside the ordinary course of what Zoomeral would receive from a standard loan at the time.

127. During the period May 2022 through August 2023, the Debtor transferred approximately $2,189,818 to Zoomeral.

128. During the same period, Zoomeral transferred approximately $496,763 to the Debtor. Therefore, Zoomeral received approximately $1,693,056 in excess of what it transferred to the Debtor. **Exhibit 4** details the total transfers between Zoomeral and the Debtor.

129. According to the Debtor's SOFA (Doc. No. 40.), the Debtor paid $1,900,000 to Zoomeral as a "Loan/Compensation to David Hughes as Director." However, the Debtor's Amended SOFA (Doc. No. 61-1), was amended to reflect that the Debtor transferred $1,380,590.24 to Zoomeral as an "insider corporation loan".

---

[78] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.
[79] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.

130. According to my review of the Debtor's bank records, there does not appear to have been any repayments of the loans by Zoomeral to the Debtor to date.

131. Additionally, Genie II transferred $979,250 to Zoomeral during the period January 2023 to April 2024 as reflected in the table below:

| Account Name | Account No. | Date | Payee | Amount |
|---|---|---|---|---|
| Genie Investments II LLC | x4873 | 04/24/23 | Zoomeral Inc | $ (22,500.00) |
| Genie Investments II LLC | x4873 | 05/22/23 | Zoomeral Inc | (15,000.00) |
| Genie Investments II LLC | x4873 | 06/23/23 | Zoomeral Inc | (3,750.00) |
| Genie Investments II LLC | x4873 | 09/05/23 | Zoomeral Inc | (3,000.00) |
| Genie Investments II LLC | x4873 | 09/22/23 | Zoomeral Inc | (230,000.00) |
| Genie Investments II LLC | x4873 | 11/21/23 | Zoomeral Inc | (70,000.00) |
| Genie Investments II LLC | x4873 | 12/12/23 | Zoomeral Inc | (40,000.00) |
| Genie Investments II LLC | x4873 | 01/05/24 | Zoomeral Inc | (60,000.00) |
| Genie Investments II LLC | x4873 | 01/08/24 | Zoomeral Inc | (500,000.00) |
| Genie Investments II LLC | x4873 | 02/05/24 | Zoomeral Inc | (35,000.00) |
| | | | **TOTAL** | **$(979,250.00)** |

132. Genie II transferred $979,250 to Zoomeral within the one-year period preceding Genie NV's bankruptcy filing.

133. Genie II was formed on September 14, 2022 in Delaware.[80]

134. Genie II is owned 50% by Hughes and 50% by Cohan.[81]

135. Based on my analysis, the source of funds for the payments by Genie II to Zoomeral was the Debtor's Morgan Stanley accounts and customer deposits as reflected in **Exhibit 5** (Summary of Inflows for Genie II).

136. The Debtor's loan to Zoomeral remain outstanding.[82]

---

[80] State of Delaware Department of State: Division of Corporations. https://icis.corp.delaware.gov/
[81] Audio recording from the Section 341 Meeting of Creditors held on April 17, 2024.
[82] Ibid.

## Capitulum Homes / Capitulum LLC

137. Capitulum LLC ("Capitulum") was formed on January 11, 2017 in New York.[83]

138. Capitulum is owned solely by Cohan.[84]

139. According to a loan agreement, dated September 5, 2022, between the Debtor and Capitulum, the Debtor was to loan up to $1,500,000 in the form of a non-recourse unsecured line of credit to Capitulum and Capitulum promised to repay this principal amount to the lender, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance.[85]

140. The loan was to be repaid in the form of one (1) balloon payment due on December 5, 2029.[86]

141. Additionally, Capitulum had the sole right and decision making authority to be granted an extension of the loan agreement for up to ten (10) additional years upon the request of Capitulum.[87]

142. The loan is an unsecured, non-recourse, loan, with no personal guarantee by the officers of Capitulum.[88]

143. According to the loan agreement, Capitulum was to use the funds in accordance with a business plan provided by Capitulum and attached to the loan agreement. According to the executive summary attached to the loan agreement, Capitulum is a real estate

---

[83] New York Department of State Division of Corporations. https://apps.dos.ny.gov/publicInquiry/#search
[84] Audio recording from the Section 341 Meeting of Creditors held on April 17, 2024.
[85] Loan agreement between Genie Holdings NV and Capitulum dated September 5, 2022, para. 1.
[86] Loan agreement between Genie Holdings NV and Capitulum, LLC dated September 5, 2022, para. 2.
[87] Loan agreement between Genie Holdings NV and Capitulum, LLC dated September 5, 2022, para. 4.
[88] Loan agreement between Genie Holdings NV and Capitulum, LLC dated September 5, 2022, para. 24, 25 and 26.

investment firm with a mission to transform undervalued properties into desirable homes, creating value for communities and returns for investors.[89]

144. Cohan executed the loan agreement on behalf of Capitulum and Hughes executed the agreement on behalf of the Debtor.

145. According to Cohan, the loans to Capitulum, were not for the benefit of the Debtor, but were to operate the Capitulum's business.[90]

146. The terms of the loan to Capitulum are under extremely favorable terms to the borrower and far outside the ordinary course of what Capitulum would receive from a standard loan at the time.

147. During the period May 2022 through August 2023, the Debtor transferred $517,110 to Capitulum as detailed in the table below:

[INTENTIONALLY LEFT BLANK]

---

[89] Exhibit A (Executive Summary) to the Loan agreement between Genie Holdings NV and Capitulum, LLC dated September 5, 2022, para. 24, 25 and 26.
[90] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.

| Account Name | Account No. | Date | Payee | Amount |
|---|---|---|---|---|
| Genie Investments NV | x8502 | 09/16/22 | Capitulum LLC | $ (2,437.00) |
| Genie Investments NV | x8502 | 09/22/22 | Capitulum LLC | (16,667.00) |
| Genie Investments NV | x8502 | 10/03/22 | Capitulum LLC | (20,000.00) |
| Genie Investments NV | x8502 | 10/19/22 | Capitulum LLC | (162,063.17) |
| Genie Investments NV | x8502 | 10/19/22 | Capitulum LLC | (10,800.00) |
| Genie Investments NV | x8502 | 10/20/22 | Capitulum LLC | (33,333.34) |
| Genie Investments NV | x8502 | 11/02/22 | Capitulum LLC | (4,666.66) |
| Genie Investments NV | x8502 | 11/04/22 | Capitulum LLC | (5,000.00) |
| Genie Investments NV | x8502 | 11/14/22 | Capitulum LLC | (35,320.83) |
| Genie Investments NV | x8502 | 11/16/22 | Capitulum LLC | (7,250.00) |
| Genie Investments NV | x8502 | 11/29/22 | Capitulum LLC | (10,000.00) |
| Genie Investments NV | x8502 | 12/06/22 | Capitulum LLC | (83,875.00) |
| Genie Investments NV | x8502 | 12/12/22 | Capitulum LLC | (2,812.50) |
| Genie Investments NV | x8502 | 12/13/22 | Capitulum LLC | (2,812.50) |
| Genie Investments NV | x8502 | 12/16/22 | Capitulum LLC | (15,000.00) |
| Genie Investments NV | x8502 | 12/16/22 | Capitulum LLC | (100.00) |
| Genie Investments NV | x8502 | 12/23/22 | Capitulum LLC | (5,250.00) |
| Genie Investments NV | x8502 | 01/04/23 | Capitulum LLC | (8,250.00) |
| Genie Investments NV | x8502 | 01/12/23 | Capitulum LLC | (3,000.00) |
| Genie Investments NV | x8502 | 01/20/23 | Capitulum LLC | (2,437.50) |
| Genie Investments NV | x8502 | 01/30/23 | Capitulum LLC | (4,500.00) |
| Genie Investments NV | x8502 | 02/01/23 | Capitulum LLC | (3,750.00) |
| Genie Investments NV | x8502 | 03/01/23 | Capitulum LLC | (20,000.00) |
| Genie Investments NV | x8502 | 04/11/23 | Capitulum LLC | (5,534.37) |
| Genie Investments NV | x8502 | 06/13/23 | Capitulum LLC | (2,000.00) |
| Genie Investments NV | x8502 | 07/03/23 | Capitulum LLC | (50,000.00) |
| Genie Investments NV | x8502 | 07/28/23 | Capitulum LLC | (250.00) |
| | | | **TOTAL** | **$(517,109.87)** |

148. According to Cohan and Hughes, the loans to Capitulum remains outstanding.[91]

149. According to the Debtor's SOFA (Doc. No. 40.), Cohan is affiliated with Capitulum and received $500,000 from the Debtor as a "Loan/Compensation to John Cohan as director." The Debtor's Amended SOFA (Doc. No. 61-1), were amended to reflect that the Debtor transferred $517,409.70 to Capitulum as an "insider corporation loan".

150. According to my review of the Debtor's bank records, there does not appear to have been any repayments of the loan by Capitulum to the Debtor to date.

---

[91] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.

## Cald Holdings LLC

151. Cald Holdings LLC ("Cald") was formed on June 22, 2020 in Florida. Davis is listed as the president of Cald Holdings.[92]

152. According to Cohan, Cald is an investment company operated by Davis.[93]

153. According to a loan agreement, dated September 5, 2022, between the Debtor and Cald, the Debtor was to loan up to $1,500,000 in the form of a non-recourse unsecured line of credit to Cald and Cald promised to repay this principal amount to the Debtor, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance.[94]

154. The loan was to be repaid in the form of one (1) balloon payment due on December 5, 2029.[95]

155. Additionally, Cald had the sole right and decision making authority to be granted an extension of the loan agreement for up to ten (10) additional years upon the request of the borrower.[96]

156. The loan is an unsecured, non-recourse loan, with no personal guarantee by the Cald's officers. [97]

157. According to the loan agreement, the borrower was to use the funds in accordance with a business plan provided by the borrower and attached to the loan agreement. According to the business plan, Cald is an independent investment firm with a focus on managing our own capital through strategic investments in stocks and bonds and their investment strategy

---

[92] State of Florida Division of Corporations. https://search.sunbiz.org/Inquiry/CorporationSearch/ByName.
[93] Audio recording from the Section 341 Meeting of Creditors dated April 17, 2024.
[94] Loan agreement between Genie Holdings NV and CALD Holdings dated September 5, 2022, para. 1.
[95] Loan agreement between Genie Holdings NV and CALD Holdings dated September 5, 2022, para. 2.
[96] Loan agreement between Genie Holdings NV and CALD Holdings dated September 5, 2022, para. 4.
[97] Loan agreement between Genie Holdings NV and CALD Holdings dated September 5, 2022, para. 25 and 26.

was capital allocation.  Cald allocated capital across a diversified portfolio of stocks and bonds with a focus on value investing and income generation.[98]

158. Davis executed the loan agreement on behalf of Cald and Cohan executed the agreement on behalf of the Debtor.[99]

159. The Debtor transferred $517,108.87 to Cald during the period May 2022 through August 2023 as detailed in the table below:

| Account Name | Account No. | Date | Payee | Amount |
|---|---|---|---|---|
| Genie Investments NV | x8502 | 09/16/22 | Cald Holdings LLC | $ (2,437.00) |
| Genie Investments NV | x8502 | 09/22/22 | Cald Holdings LLC | (16,666.00) |
| Genie Investments NV | x8502 | 10/03/22 | Cald Holdings LLC | (20,000.00) |
| Genie Investments NV | x8502 | 10/19/22 | Cald Holdings LLC | (172,863.17) |
| Genie Investments NV | x8502 | 10/20/22 | Cald Holdings LLC | (33,333.33) |
| Genie Investments NV | x8502 | 11/02/22 | Cald Holdings LLC | (4,666.66) |
| Genie Investments NV | x8502 | 11/04/22 | Cald Holdings LLC | (5,000.00) |
| Genie Investments NV | x8502 | 11/14/22 | Cald Holdings LLC | (35,320.83) |
| Genie Investments NV | x8502 | 11/16/22 | Cald Holdings LLC | (7,250.00) |
| Genie Investments NV | x8502 | 11/29/22 | Cald Holdings LLC | (10,000.00) |
| Genie Investments NV | x8502 | 12/07/22 | Cald Holdings LLC | (83,875.00) |
| Genie Investments NV | x8502 | 12/12/22 | Cald Holdings LLC | (2,812.50) |
| Genie Investments NV | x8502 | 12/13/22 | Cald Holdings LLC | (2,812.50) |
| Genie Investments NV | x8502 | 12/16/22 | Cald Holdings LLC | (15,000.00) |
| Genie Investments NV | x8502 | 12/16/22 | Cald Holdings LLC | (100.00) |
| Genie Investments NV | x8502 | 12/23/22 | Cald Holdings LLC | (5,250.00) |
| Genie Investments NV | x8502 | 01/04/23 | Cald Holdings LLC | (8,250.00) |
| Genie Investments NV | x8502 | 01/12/23 | Cald Holdings LLC | (3,000.00) |
| Genie Investments NV | x8502 | 01/20/23 | Cald Holdings LLC | (2,437.50) |
| Genie Investments NV | x8502 | 01/30/23 | Cald Holdings LLC | (4,500.00) |
| Genie Investments NV | x8502 | 02/01/23 | Cald Holdings LLC | (3,750.00) |
| Genie Investments NV | x8502 | 03/01/23 | Cald Holdings LLC | (20,000.00) |
| Genie Investments NV | x8502 | 04/11/23 | Cald Holdings LLC | (5,534.38) |
| Genie Investments NV | x8502 | 06/13/23 | Cald Holdings LLC | (2,000.00) |
| Genie Investments NV | x8502 | 07/03/23 | Cald Holdings LLC | (50,000.00) |
| Genie Investments NV | x8502 | 07/28/23 | Cald Holdings LLC | (250.00) |
| | | | **TOTAL** | **$ (517,108.87)** |

160. According to Cohan, the loans to Cald were not for the benefit of the Debtor, but were to operate Cald's business.

---

[98] Loan agreement between Genie Holdings NV and CALD Holdings dated September 5, 2022 - Business Plan of Cald Holdings.
[99] Loan agreement between Genie Holdings NV and CALD Holdings dated September 5, 2022, pp. 9.

161. Once again, the terms of the loan to Cald were under extremely favorable terms to the borrower and far outside the ordinary course of what Cald would receive from a standard loan at the time.

162. Davis does not appear to be currently affiliated with the Debtor.

163. According to Cohan and Hughes, the loans to Cald remains outstanding.[100]

164. According to the Debtor's SOFA (Doc. No. 40.), Davis is affiliated with Cald and the Debtor transferred $500,000 to Cald as a "Loan/Compensation to Caleb Davis as former director." The Debtor's Amended SOFA (Doc. No. 61-1), were amended to reflect that the Debtor transferred $516,358.87 to Cald as a "Loan to an insider corporation controlled by Former Director."

165. According to my review of the Debtor's bank records, there does not appear to have been any repayments of the loan by Cald to the Debtor to date.

## Genie Investments II, LLC

166. As previously stated, Genie II was formed on September 14, 2022 in Delaware and is owned 50% by Hughes and 50% by Cohan.[101] [102]

167. The Debtor entered into a loan agreement dated August 15, 2023 with Genie Investments II. The Debtor was to loan up to $2,000,000 in the form of a non-recourse unsecured line of credit to the Genie II and Genie II promised to repay this principal amount to the lender, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance.[103]

---

[100] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.
[101] State of Delaware Department of State: Division of Corporations. https://icis.corp.delaware.gov/
[102] Audio recording from the Section 341 Meeting of Creditors held on April 17, 2024.
[103] Loan agreement between Genie Holdings NV and Genie Investments II, LLC dated August 15, 2023, para. 1.

168. The loan was to be repaid in the form of one balloon payment due on August 15, 2030.

169. Additionally, Genie II had the sole right and decision making authority to be granted an extension of the loan agreement for up to ten (10) additional years upon the request of the borrower.[104]

170. The loan is an unsecured, non-recourse loan, with no personal guarantee by the officers of the Genie II.

171. According to the loan agreement, Genie II was to use the funds in accordance with a business plan provided by Genie II and attached to the loan agreement. According to the executive summary attached to the loan agreement, Genie II operates as a lending company, specializing in providing a range of investment and loan products to corporate clients. Genie II's mission is to empower financial growth and stability for their clients through innovative lending solutions and investment opportunities, while maintaining transparency about the risks and rewards associated with financial activities.[105]

172. Cohan executed the loan agreement on behalf of Genie II and Hughes executed the agreement on behalf of the Debtor.

173. According to Cohan, the loans were not for the benefit of the Debtor, but were to operate Genie II's business.[106]

174. The terms of the loans to Genie II are under extremely favorable terms to the borrower and far outside the ordinary course of what Genie II would receive from a standard loan at the time.

175. According to Cohan and Hughes, the loans to Genie II remain outstanding.[107]

---

[104] Loan agreement between Genie Holdings NV and Genie Investments II, LLC dated August 15, 2023, para. 4.
[105] Genie Investments II LLC, Executive Summary, dated August 15, 2023.
[106] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.
[107] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.

184. As also reflected in **Exhibit 6,** and summarized in the table below, Genie II paid $222,381 to several law firms.

| Payee | Amount |
|---|---|
| Walker Law Office LLC | $ (103,316.89) |
| Spiegel and Utrera | (59,426.13) |
| Shaver Law Group | (57,238.00) |
| Warren Law Group | (2,400.00) |
| **TOTAL** | **$ (222,381.02)** |

## Better Methods I LLC

185. Better Methods I LLC ("Better Methods") was formed in Wyoming on October 18, 2023. Cohan is the managing member.[108]

186. Better Methods is owned 50% by Hughes and 50% by Cohan.[109]

187. Cohan controls the bank account for Better Methods.[110]

188. According to Cohan, Better Methods is an asset management company set up to protect the Debtor's assets and the assets of the Debtor's clients.[111]

189. The Debtor entered into a loan agreement dated January 3, 2023 with Better Methods. The Debtor was to loan up to $500,000 in the form of a non-recourse unsecured line of credit to Better Methods and Better Methods promised to repay this principal amount to the lender, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance.[112]

190. The loan was to be repaid in the form of one (1) balloon payment due on January 3, 2030.[113]

---

[108] Wyoming Secretary of State. https://wyobiz.wyo.gov/Business/Default.aspx
[109] Audio recording from the Section 341 Meeting of Creditors dated April 17, 2024.
[110] Ibid.
[111] Section 341 Meeting of Creditors transcript dated March 27, 2024, pp. 27:12-20.
[112] Loan Agreement between Genie Investments NV and Better Methods LLC, dated January 3, 2003.
[113] Loan Agreement between Genie Investments and Better Methods LLC, para. 2.

41

191. Additionally, Better Methods had the sole right and decision making authority to be granted an extension of the loan agreement for up to ten (10) additional years upon the request of the borrower.

192. The loan is an unsecured, non-recourse, loan, with no personal guarantee by the officers of the Better Methods.

193. According to the loan agreement, the Borrower was to use the funds in accordance with a business plan provided by the Borrower and attached to the loan agreement. According to the executive summary attached to the loan agreement, Better Methods specializes in investments and asset management, offering innovative financial strategies and solutions to their clients. Their mission is to leverage unique market opportunities to provide substantial returns on their investments.[114]

194. The terms of the loan to Better Methods are under extremely favorable terms to the borrower and far outside the ordinary course of what Better Methods would receive from a standard loan at the time.

195. Cohan executed the loan agreement on behalf of Better Methods and Hughes executed the agreement on behalf of the Debtor.

**[INTENTIONALLY LEFT BLANK]**

---

[114] Executive Summary of Better Methods.

196. Better Methods received funds from and disbursed funds to Genie NV and Genie II as detailed in the following table:

| Account Name | Account No. | Date | Payee | Amount |
|---|---|---|---|---|
| Genie Investments NV | x8502 | 01/06/23 | Better Methods | $ (100,000.00) |
| Genie Investments NV | x8502 | 03/07/23 | Better Methods | (450,000.00) |
| Genie Investments NV | x8502 | 03/08/23 | Better Methods | (100,000.00) |
| Genie Investments NV | x8502 | 07/12/23 | Better Methods | 520,000.00 |
| | | | Subtotal | $ (130,000.00) |
| Genie Investments II LLC | x4873 | 01/08/24 | Better Methods | (100,000.00) |
| | | | Subtotal | $ (100,000.00) |
| | | | TOTAL | $ (230,000.00) |

197. As reflected in the table, Better Methods received $130,000 in net transfers from the Debtor and $100,000 from Genie II for total transfers of $230,000 to Better Methods.

198. According to the Debtor's Amended SOFA (Doc. No. 61-1), the Debtor transferred $81,500 to Better Methods as an insider corporate loan.

199. According to Cohan, "all funds transferred to Better Methods ultimately were used for Genie legal fees and other Genie expenses (i.e. Adam Walker's office, Bryan Mickler's office, arbitration costs, other attorney fees, accounting fees, etc.)"

## Genie's Angels

200. Genie's Angels LLC ("Genie's Angels") was formed in Delaware.[115]

201. Genie's Angels was set up to be a non-profit entity established by the principals of the Debtor to help people pay off their credit cards.[116]

202. I was unable to locate incorporation or formation documents for Genie's Angels.

---

[115] Interview of David Hughes and John Cohan, held on June 10, 2024.
[116] Audio recording from the Section 341 Meeting of Creditors held on April 17, 2024.

203. The Debtor entered into a loan agreement dated June 1, 2023 with Genie's Angels (Borrower). The Debtor was to loan up to $50,000 in the form of a non-recourse unsecured line of credit to Genie's Angels and Genie's Angels promised to repay this principal amount to the lender, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance.[117]

204. The loan was to be repaid in the form of one (1) balloon payment due on June 1, 2030.[118]

205. Additionally, Genie's Angels had the sole right and decision making authority to be granted an extension of the loan agreement for up to ten (10) additional years upon the request of the borrower.[119]

206. The loan is an unsecured, non-recourse, loan, with no personal guarantee by the officers of the Genie's Angels.

207. According to the loan agreement, the Borrower was to use the funds in accordance with a business plan provided by the Borrower and attached to the loan agreement. According to the executive summary attached to the loan agreement, Genie's Angels is a financial services startup dedicated to providing innovative solutions for consumers seeking to efficiently manage and pay off their credit card debt.[120]

208. The loan was executed by Cohan on behalf of Genie's Angels and Hughes on behalf of the Debtor.

209. The Debtor transferred $25,000 to Genie's Angels on June 9, 2023.

---

[117] Loan agreement, dated June 1, 2023 between Genie Investments NV and Genie's Angels LLC, para. 1.
[118] Loan agreement, dated June 1, 2023 between Genie Investments NV and Genie's Angels LLC, para. 2.
[119] Loan agreement, dated June 1, 2023 between Genie Investments NV and Genie's Angels LLC, para. 4.
[120] Genie's Angels Executive Summary.

210. The terms of the loan to Genie's Angels are under extremely favorable terms to the borrower and far outside the ordinary course of what Genie's Angels would receive from a standard loan at the time.

211. There does not appear to have been any repayments of the loans by Genie's Angels to the Debtor to date.

212. According to the Debtor's Amended SOFA (Doc. No. 61-1), the Debtor transferred $25,000 to Genie's Angels as a "loan to an insider corporation".

## Genie Investments NV, Inc. (Florida)

213. Genie Investments NV, Inc. was incorporated in April 2024 in Florida by Hughes and Cohan ("Genie Florida).[13]

214. I was provided with and analyzed bank records for Wells Fargo account ending x9881 held in the name of Genie Florida. According to Hughes and Cohen, this was the only account in the name of Genie Florida.

215. The Debtor transferred $11,275,000 from its JPMorgan Chase account ending x8502 on July 28, 2022 to Genie Florida's Wells Fargo account ending x9881. On September 22, 2022, Genie Florida transferred the exact same amount back to the Debtor's JPMorgan Chase account ending x8502. There is no other activity in the Genie Florida Wells Fargo other than interest earned during this time period.

216. According to Cohan, the Genie Investments NV Inc., Wells Fargo account was opened because "we wanted to have multiple bank accounts open to diversify our banking relationships."

## Genie Investments LLC

217. Genie Investments LLC ("Genie Investments") was incorporated in 2020 in Delaware.[121]

218. I analyzed the bank records for two bank accounts held at TD Bank in the name of Genie Investments, TD Bank account ending x2343 for the period February 2024 through May 2024 and TD Bank account ending x2998 for the period February 2021 through January 2024. Both of these accounts had minimal activity during this period.

## VII.  LIMITATIONS IN FINDINGS BASED ON AVAILABLE RECORDS

219. Based on my communications with creditors and a review of Affidavits filed by customers, it appears that at times customers did not remit funds directly to the Debtor for ICA payments, Due Diligence Fees, or other payments related to loans, but rather to accounts that according to Hughes and Cohan are held in the name of third parties. Below is a list of non-debtor bank accounts that customers remitted funds to and the name of the account holder according to communications with Hughes and Cohan:

   a. HomeStreet Bank account ending x1792 – "IOTA account for an attorney named Michael Connor for which Genie NV has no access";

   b. First Merchant Bank account ending x7536 – "McMann account for which Genie NV has no access";

   c. JPMorgan Chase account ending x1287 – "Knights Bank account for which Genie has no access";

   d. Wells Fargo Bank account ending x9842 – "IOTA account for an attorney named Michael Connor for which Genie NV has no access"; and

---

[121] State of Delaware Department of State: Division of Corporations. https://icis.corp.delaware.gov/

46

   e. Old Plank Trail Community Bank account ending x6406 – According to Cohan, "to the best of his knowledge, this is a McMann account."

220. In addition, based on my review of the bank records, we noted transfers from another account in the name of Michael Connor IOTA Account ending x7497 at Wells Fargo.

221. As of the writing of this Report, I have not reviewed records for these accounts.

222. Of specific importance are the Michael Connor IOTA accounts identified at Wells Fargo. During the period May 2022 through August 2023, the Debtor received approximately $15 million from these accounts which were deposited in the Debtor's JPMorgan Chase account ending x8502. As of the writing of this Report, we have not obtained records for these accounts. The table below summarizes the transfers from these accounts to the Debtor:

| Payor | Date | Amount |
|---|---|---|
| Michael Connor Esq | 06/08/22 | $ 5,027,000.00 |
| Michael Connor Esq | 07/12/22 | 6,250,000.00 |
| Michael Connor Esq | 10/14/22 | 2,073,184.67 |
| Michael Connor Esq | 11/02/22 | 505,030.00 |
| Michael Connor Esq | 05/04/23 | 1,118,592.88 |
| TOTAL | | $ 14,973,807.55 |

223. According to Hughes, there was a time during which customers made payments to the Michael Connor IOTA account(s). I am unable to determine which customers these funds belong to without having access to the Michael Connor IOTA account.

224. According to Hughes and public record information, Connor was arrested in August 2022 and indicted in April 2023. It is my understanding that Connor is incarcerated for the foreseeable future.

## VIII.  OBSERVATIONS AND CONCLUSIONS

### Current Conditions

225. There does not appear to be an ongoing viable business of Genie NV.  It is unlikely that future borrowers and customers would enter into a lending relationship with the Debtor after the substantial amount of reputational damage incurred by the Debtor.

226. There have been approximately $30.9 million in claims filed in this case.

227. The most recent monthly operating report ("MOR") filed by the Debtor on April 30, 2024 (Doc. No. 106), includes a profit and loss statement that lists total income of $0. Additionally, the Debtor attached its Morgan Stanley statement to the April MOR reflecting an ending balance of $0.96 as of April 30, 2024, so there is no cash on hand. The balance sheet lists its primary asset as $83,500,025 in accounts receivable from Velanos.

228. The balance sheet attached to the April MOR also lists $8,110,700 in loans receivable.  I have reviewed a loan schedule provided by the Debtor, titled, "Principal Due" and reconciled the loans on that schedule against the loans reflected on the Debtor's April 30, 2024 balance sheet.  Approximately $3.6 million of the loans receivables are loans to the related businesses of Cohan, Hughes, and Davis.  Therefore, there remains approximately $4.5 million in non-insider loans receivables as of April 30, 2024.

### [INTENTIONALLY LEFT BLANK]

48

229. The table below provides the total amount of balloon payments by year for the non-insider loans. The majority of the funds are not due to come in until 2032.

| Term End Year | Amount |
|---|---|
| 2026 | $ 518,500.00 |
| 2027 | 191,000.00 |
| 2029 | - |
| 2030 | - |
| 2032 | 3,340,600.00 |
| 2033 | 530,000.00 |
| 2038 | 20,000.00 |
| **TOTAL** | **$ 4,600,100.00** |

Related Transactions

230. According to my review of the Debtor's books and records, significant transfers occurred between the Debtor and related companies within two years and one year of the filing of the bankruptcy petition as shown in the table below

| (Payee) / Payor | 1-Year Period Net Amount | 2-Year Period Net Amount |
|---|---|---|
| Zoomeral Inc | $ (534,381) | $ (1,771,556) |
| Genie Investments II | (736,606) | (736,606) |
| Capitulum LLC | (77,784) | (517,410) |
| Cald Holdings LLC | (77,784) | (517,109) |
| Better Methods | (30,000) | (130,000) |
| Genies Angels | (25,000) | (25,000) |
| **TOTAL** | **$ (1,481,556)** | **$ (3,697,681)** |

231. The Debtor has classified the payments to these companies as loans in its books and records. As previously stated, the terms of the loans to these entities are far outside the ordinary course that the respective companies would obtain through traditional loans. As of the date of this Report, these loans remain outstanding.

49

232. In addition, funds were transferred from Genie II to other businesses owned by Hughes and Cohan as summarized in the table below:

| (Payee)/Payor | Net Amount | |
|---|---|---|
| Zoomeral Inc | $ | (979,250) |
| Better Methods I LLC | | (100,000) |
| Genie Investments LLC / TD Bank x2998 | | (500) |
| **TOTAL** | **$** | **(1,079,750)** |

233. It appears that potential distributions for the creditors of this estate may result from the avoidance of potential preferential transfers and potential fraudulent transfers to insiders and potential claims against professionals.

234. Without the appointment of an independent fiduciary, it is unlikely that the Debtor-in-Possession can independently pursue avoidance of potential preference actions and potential fraudulent transfers against insiders to maximize recoveries for the creditors of the estate.

<u>Funding From Third Parties</u>

235. As previously stated, none of Genie NV's customers had loans funded by Genie NV's Lender Capital Partners. Genie NV attempted to locate potential Lender Capital Partners, however none of the Lender Capital Partners came to fruition and provided funding.

236. The Debtor entered an agreement with Velanos in which the Debtor proceeded to transfer $9,000,000 on the promise that Velanos would provide a 100% return in 30 days and profit participation up to approximately 900% in total.

237. The Debtor's use of customer funds as contributions to Velanos demonstrates gross mismanagement of the customer's funds. Neither Velanos nor Wearmouth were registered investment advisors and Velanos failed to meet its obligations to the Debtor.

238. To date, the Debtor's principals have failed to obtain third party funding which they admit is required for the operation of the Debtor.

### Proposed Settlement

239. Based on my investigation and the findings detailed throughout the Report, it would be detrimental to creditors of the estate to continue in a chapter 11 bankruptcy proceeding that solely relies on the Proposed Settlement and Velanos's commitment to make the payments in accordance with the Proposed Settlement.

240. As discussed earlier in this Report, Velanos has failed to meet its obligations to return millions of dollars of funds to the Debtor on numerous instances since at least December 30, 2022. The history of Velanos's default should weigh heavily on any consideration of the Proposed Settlement provided and ultimate distribution to the creditors of this estate.

241. Additionally, it would appear that Wearmouth is already subject to a creditor that has obtained a judgment against him in Wyoming which was also domesticated in Florida. Should the Proposed Settlement be approved, in the event of a default by Velanos, the Debtor's claim against Velanos and/or Wearmouth may be subordinated to non-estate creditors.

# EXHIBIT 1

| | *In re* : Genie Investments NV, Inc. | | |
|---|---|---|---|
| | Case No.: 3:24-bk-00496-BAJ | | |
| | | | |
| | Accounts Analyzed | | |
| | | | |
| No. | Institution | Account Name | Account No. |
| | | | |
| 1 | JPMorgan Chase Bank | Genie Investments NV | x2222 |
| 2 | JPMorgan Chase Bank | Genie Investments NV | x3350 |
| 3 | JPMorgan Chase Bank | Genie Investments NV | x8502 |
| 4 | JPMorgan Chase Bank | Genie Investments NV | x9701 |
| 5 | TD Bank | Genie Investments II LLC | x4873 |
| 6 | TD Bank | Genie Investments LLC | x2343 |
| 7 | TD Bank | Genie Investments LLC | x2998 |
| 8 | Wells Fargo | Genie Investments NV Inc | x9881 |
| 9 | Morgan Stanley | Genie Investments NV - Liquidity Access Line C/O Caleb Michael Davis | x1290 |
| 10 | Morgan Stanley | Genie Investments NV - Portfolio Management Active Assets Account C/O Caleb Michael Davis | x2290 |

# EXHIBIT 2

| In re: Genie Investments NV, Inc. | |
|---|---|
| Case No.: 3:24-bk-00496-BAJ | |
| | |
| Summary of Inflows for Genie Investments NV and Genie Investments NV Inc | |
| During the Period June 8, 2022 through August 21, 2023 | |
| (Sorted in Descending Order) | |
| | |
| **Payor** | **Amount** |
| Michael Connor Esq | $ 14,973,807.55 |
| Genie Investments NV LLC / Morgan Stanley Line of Credit x1290 | 9,515,000.00 |
| Customer 91 | 5,000,000.00 |
| Customer 49 | 3,846,300.00 |
| Customer 112 | 1,950,000.00 |
| Customer 58 | 1,800,075.00 |
| Customer 81 | 1,800,075.00 |
| Customer 52 | 1,100,000.00 |
| Genie Investments NV LLC / Morgan Stanley Brokerage Account x2290 | 920,890.00 |
| Customer 57 | 602,575.00 |
| Customer 4 | 565,150.00 |
| Better Methods / Morgan Stanley  x5290 | 520,000.00 |
| Customer 86 | 500,075.00 |
| Velanos Principal Capital Inc – Bank of Nova Scotia | 499,975.00 |
| Zoomeral Inc | 496,762.50 |
| Customer 10 | 350,075.00 |
| Customer 74 | 245,000.00 |
| Fratelli LLC | 240,150.00 |
| Customer 95 | 232,575.00 |
| 1/Amold J Ainsley 3/ | 200,075.00 |
| Customer 11 | 200,075.00 |
| Customer 8 | 180,075.00 |
| Customer 102 | 176,075.00 |
| Travis V Nokes | 165,075.00 |
| Customer 32 | 165,075.00 |
| Biassess Strategies LLC | 165,000.00 |
| Customer 59 | 155,000.00 |
| Cash | 152,500.00 |
| Pd&C Financial Services  LLC | 150,075.00 |
| Customer 7 | 150,000.00 |
| Customer 19 | 150,000.00 |
| Customer 94 | 120,075.00 |
| IKB Acquisitions IV LLC | 105,000.00 |
| Customer 55 | 100,075.00 |
| Customer 23 | 100,075.00 |
| Customer 88 | 100,075.00 |
| Unknown Deposit | 100,042.00 |
| Customer 30 | 95,000.00 |
| Customer 77 | 83,500.00 |

Page 1 of 4

| *In re: Genie Investments NV, Inc.* | |
|---|---|
| Case No.: 3:24-bk-00496-BAJ | |
| Summary of Inflows for Genie Investments NV and Genie Investments NV Inc | |
| During the Period June 8, 2022 through August 21, 2023 | |
| *(Sorted in Descending Order)* | |
| **Payor** | **Amount** |
| Customer 45 | 80,075.00 |
| Limitless Investment Group LLC | 80,075.00 |
| JPMC Cb Funds Transfer Same Day | 78,110.00 |
| Customer 22 | 75,000.00 |
| Foreign Remittance Credit – JPMorgan Chase Bank | 74,052.69 |
| Customer 14 | 70,000.00 |
| Customer 109 | 67,575.00 |
| Christopher J Lovett | 64,575.00 |
| Kristin Stegent Or Ryan S Stegent | 61,805.00 |
| Customer 53 | 60,075.00 |
| Customer 85 | 60,075.00 |
| Customer 72 | 60,000.00 |
| Customer 89 | 60,000.00 |
| Customer 46 | 57,500.00 |
| Customer 98 | 50,075.00 |
| Customer 41 | 50,075.00 |
| Donald J Strickland Sheri Lynn | 48,075.00 |
| Customer 13 | 45,000.00 |
| Customer 68 | 45,000.00 |
| Customer 105 | 40,150.00 |
| Customer 34 | 40,000.00 |
| Jiya Foods  Inc | 40,000.00 |
| Holland Energy Advisors LLC | 40,000.00 |
| Customer 6 | 37,000.00 |
| Customer 43 | 33,150.00 |
| Customer 93 | 30,075.00 |
| Hughes Holdings Group  LLC | 30,075.00 |
| Customer 80 | 30,000.00 |
| Customer 29 | 30,000.00 |
| Camila Gutierrez | 30,000.00 |
| Robin P Allen Trustee | 30,000.00 |
| Customer 92 | 30,000.00 |
| Lourndy St louis | 30,000.00 |
| Customer 39 | 30,000.00 |
| Deborah M Lee | 30,000.00 |
| Customer 62 | 29,000.00 |
| Customer 33 | 27,500.00 |
| Customer 31 | 25,974.31 |
| Katrina A Richter | 25,000.00 |

| Payor | Amount |
|---|---|
| *In re: Genie Investments NV, Inc.* | |
| Case No.: 3:24-bk-00496-BAJ | |
| | |
| Summary of Inflows for Genie Investments NV and Genie Investments NV Inc | |
| During the Period June 8, 2022 through August 21, 2023 | |
| *(Sorted in Descending Order)* | |
| | |
| **Payor** | **Amount** |
| | |
| Zon Hospitality Coro Operating | 25,000.00 |
| John Wilson | 25,000.00 |
| Make Enterprises LLC | 20,075.00 |
| GlobalwebSVentures LLC | 20,075.00 |
| Customer 28 | 20,075.00 |
| Customer 99 | 20,075.00 |
| Customer 101 | 20,075.00 |
| ilys LLC | 20,075.00 |
| Customer 25 | 20,075.00 |
| Customer 2 | 20,000.00 |
| Customer 67 | 15,075.00 |
| Customer 103 | 15,075.00 |
| Eastern Bank | 15,075.00 |
| Customer 48 | 15,000.00 |
| Customer 54 | 15,000.00 |
| Unknown Transfer - Chk78 | 15,000.00 |
| Michael Ehinger | 15,000.00 |
| Wrex & Whitney Lindsay Surprise | 15,000.00 |
| BJP Enterprises LLC | 10,000.00 |
| Customer 66 | 7,575.00 |
| Customer 9 | 7,575.00 |
| Beverly R Yoneyama Sammamish | 7,500.00 |
| Robert J Wrisley | 7,500.00 |
| Parasec | 5,671.25 |
| Customer 36 | 5,075.00 |
| Customer 96 | 5,075.00 |
| Verco Group Inc | 4,675.00 |
| Customer 84 | 2,575.00 |
| Kasy Consulting LLC | 1,575.00 |
| Dominique Brown | 1,050.00 |
| Interest Payment | 519.80 |
| Bank Service Charge Reversal | 350.00 |
| John O Ashby | 75.00 |
| Miscellaneous Fee Reversal | 15.00 |
| Caleb Michael Davis | 0.29 |
| **Totals** | $ 50,193,975.39 |

| In re: Genie Investments NV, Inc. | |
| :---: | :---: |
| Case No.: 3:24-bk-00496-BAJ | |
| | |
| Summary of Inflows for Genie Investments NV and Genie Investments NV Inc | |
| During the Period June 8, 2022 through August 21, 2023 | |
| (Sorted in Descending Order) | |
| | |
| **Payor** | **Amount** |
| | |
| *Sources:* | |
| Bank statements for JPMorgan Chase Bank account x2222 for the period of September 22, 2022 through August 21, 2023. | |
| Bank statements for JPMorgan Chase Bank account x3350 for the period of December 12, 2022 through August 21, 2023. | |
| Bank statements for JPMorgan Chase Bank account x8502 for the period of June 8, 2022 through August 21, 2023. | |
| Bank statements for JPMorgan Chase Bank account x9701 for the period of September 16, 2022 through August 21, 2023. | |
| Bank statements for Wells Fargo Bank account x9881 for the period of July 27, 2022 through October 3, 2022. | |

# EXHIBIT 3

| | |
|---|---|
| *In re: Genie Investments NV, Inc.* | |
| Case No.: 3:24-bk-00496-BAJ | |
| | |
| Summary of Outflows for Genie Investments NV and Genie Investments NV Inc | |
| During the Period June 8, 2022 through August 21, 2023 | |
| *(Sorted in Ascending Order)* | |
| | |
| **Payee** | **Amount** |
| | |
| Genie Investments NV LLC / Morgan Stanley Brokerage Account x2290 | $ (11,375,000.00) |
| Warren Law Group | (10,025,000.00) |
| Velanos Principal Capital Inc – Bank of Nova Scotia | (6,000,000.00) |
| Customer 3 | (5,000,000.00) |
| Zoomeral Inc | (2,268,318.24) |
| Customer 76 | (1,950,000.00) |
| Customer 49 | (1,724,800.00) |
| Customer 113 | (1,166,478.00) |
| Customer 15 | (800,000.00) |
| Customer 60 | (679,000.00) |
| Better Methods / Morgan Stanley  x5290 | (650,000.00) |
| Capitulum LLC | (517,109.87) |
| Customer 86 | (500,000.00) |
| Cald Holdings LLC | (499,567.21) |
| Customer 40 | (400,000.00) |
| Customer 83 | (399,900.00) |
| Michael Murphy | (381,000.00) |
| Customer 87 | (323,650.00) |
| Customer 18 | (320,000.00) |
| Customer 95 | (289,550.00) |
| Customer 57 | (281,250.00) |
| Customer 78 | (200,000.00) |
| Customer 90 | (175,000.00) |
| Biassess Strategies LLC | (165,000.00) |
| Customer 88 | (159,900.00) |
| Festivalpass LLC | (159,900.00) |
| Customer 69 | (150,000.00) |
| Customer 19 | (150,000.00) |
| Customer 35 | (150,000.00) |
| Soteria Group LLC | (148,412.50) |
| Customer 71 | (139,400.00) |
| Law Offices of Scott J OH  LLC | (121,600.00) |
| Customer 17 | (116,480.00) |
| OOP Solutions Inc | (110,752.00) |
| Law Offices of Scott J OH  LLC | (100,000.00) |
| Customer 73 | (100,000.00) |
| Customer 61 | (100,000.00) |
| Customer 43 | (98,000.00) |
| Customer 75 | (95,900.00) |

| *In re: Genie Investments NV, Inc.* | |
|---|---|
| Case No.: 3:24-bk-00496-BAJ | |
| | |
| Summary of Outflows for Genie Investments NV and Genie Investments NV Inc | |
| During the Period June 8, 2022 through August 21, 2023 | |
| *(Sorted in Ascending Order)* | |
| | |
| **Payee** | **Amount** |
| | |
| Customer 82 | (95,900.00) |
| Maroon West Star LLC | (95,000.00) |
| Craig Boddington | (79,900.00) |
| Mario B Wongshue or Nicholas B | (79,900.00) |
| Customer 65 | (75,000.00) |
| Trizon Solutions LLC | (72,700.00) |
| Spiegel and Utrera PA | (66,278.30) |
| Tcf Associates LLC | (64,900.00) |
| Customer 50 | (63,800.00) |
| Customer 63 | (58,000.00) |
| Casual Skillet | (55,800.00) |
| Relco Industries LLC | (51,900.00) |
| Walker Global Enterprises | (51,050.00) |
| Customer 51 | (50,000.00) |
| Customer 26 | (50,000.00) |
| Laneaxis Inc | (50,000.00) |
| Customer 21 | (50,000.00) |
| Customer 93 | (47,900.00) |
| Primary Owner | (46,250.00) |
| Customer 111 | (45,400.00) |
| Joho LLC | (45,000.00) |
| Customer 38 | (45,000.00) |
| Laneaxis Inc | (42,900.00) |
| Paul Dsouza | (42,780.00) |
| Customer 47 | (40,000.00) |
| Customer 44 | (39,900.00) |
| Customer 79 | (38,400.00) |
| Djt Business Brokers  LLC | (32,400.00) |
| Gobi Group LLC | (32,400.00) |
| Customer 5 | (31,900.00) |
| Customer 100 | (31,900.00) |
| GlobalwebSVentures LLC | (31,900.00) |
| Customer 99 | (31,900.00) |
| Customer 2 | (31,900.00) |
| Customer 37 | (31,900.00) |
| Customer 25 | (31,900.00) |
| Schein Realty LLC | (31,900.00) |
| Customer 27 | (30,000.00) |
| Unknown Debits | (30,000.00) |

| *In re: Genie Investments NV, Inc.* | |
|---|---|
| Case No.: 3:24-bk-00496-BAJ | |
| Summary of Outflows for Genie Investments NV and Genie Investments NV Inc | |
| During the Period June 8, 2022 through August 21, 2023 | |
| *(Sorted in Ascending Order)* | |
| **Payee** | **Amount** |
| Second Chance Assets LLC | (25,500.00) |
| Genies Angels | (25,000.00) |
| Customer 1 | (25,000.00) |
| Customer 84 | (23,900.00) |
| Jamaal R Wilson | (23,150.00) |
| Cald Holdings LLC | (17,541.66) |
| Eloy Rotana | (15,900.00) |
| Customer 16 | (15,900.00) |
| Helu U S Holdings Inc | (15,900.00) |
| Rockshop LLC | (15,900.00) |
| Customer 64 | (15,380.00) |
| Doba Tax And Accounting LLC | (15,000.00) |
| Prprty LLC | (15,000.00) |
| Eas Invest Group LLC | (12,900.00) |
| Farming CO Inc | (12,500.00) |
| Planting Seeds 4 Humanity Inc | (12,500.00) |
| Parasec | (12,088.75) |
| Djt Business Brokers  LLC | (8,250.00) |
| Customer 96 | (7,900.00) |
| A Threefold Cord LLC | (6,750.00) |
| Customer 42 | (6,000.00) |
| Soteria Group LLC | (5,625.00) |
| Shaver Law Group LLC | (5,000.00) |
| Customer 22 | (5,000.00) |
| Dave Lang | (4,500.00) |
| Bank Service Charge | (3,840.00) |
| Klie Enterprises LLC | (3,750.00) |
| Fiverrinc | (2,086.90) |
| Unknown Transfer - Cds x6314 | (2,000.00) |
| Fiverr | (1,236.35) |
| NV Sos Portal | (1,025.00) |
| Delaware Corp & Tax W | (780.00) |
| Corporate Filings LLC | (473.00) |
| Private Eyes Screening Group | (347.00) |
| Account Closing | (154.98) |
| Godaddy.com | (100.63) |
| Domestic Incoming Wire Fee | (75.00) |
| Wire Transfer Fee | (45.00) |
| **Totals** | $        (50,278,625.39) |

| *In re: Genie Investments NV, Inc.* | |
|---|---|
| Case No.: 3:24-bk-00496-BAJ | |
| | |
| Summary of Outflows for Genie Investments NV and Genie Investments NV Inc | |
| During the Period June 8, 2022 through August 21, 2023 | |
| *(Sorted in Ascending Order)* | |
| | |
| **Payee** | **Amount** |
| | |
| | |
| *Sources:* | |
| Bank statements for JPMorgan Chase Bank account x2222 for the period of September 22, 2022 through August 21, 2023. | |
| Bank statements for JPMorgan Chase Bank account x3350 for the period of December 12, 2022 through August 21, 2023. | |
| Bank statements for JPMorgan Chase Bank account x8502 for the period of June 8, 2022 through August 21, 2023. | |
| Bank statements for JPMorgan Chase Bank account x9701 for the period of September 16, 2022 through August 21, 2023. | |
| Bank statements for Wells Fargo Bank account x9881 for the period of July 27, 2022 through October 3, 2022. | |

# EXHIBIT 4

| | | | | | | |
|---|---|---|---|---|---|---|
| *In re: Genie Investments NV, Inc.* | | | | | | |
| Case No.: 3:24-bk-00496-BAJ | | | | | | |
| Schedule of Transfers Between Genie Investments NV and Zoomeral Inc. | | | | | | |
| During the Period July 27, 2022 through July 28, 2023 | | | | | | |
| *(Sorted by Date)* | | | | | | |
| **Institution** | **Account Name** | **Account No.** | **Date** | **Type** | **Payee/Payor** | **Amount** |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 09/12/22 | Wire | Zoomeral Inc | $ (7,500.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 09/16/22 | Wire | Zoomeral Inc | (6,937.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 09/22/22 | Wire | Zoomeral Inc | (16,666.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 09/23/22 | Wire | Zoomeral Inc | (300,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 09/23/22 | Wire | Zoomeral Inc | (71,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 09/27/22 | Wire | Zoomeral Inc | (7,500.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 09/26/22 | Wire | Zoomeral Inc | 210,000.00 |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 10/03/22 | Wire | Zoomeral Inc | (20,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 10/04/22 | Wire | Zoomeral Inc | (22,500.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 10/05/22 | Wire | Zoomeral Inc | (127,500.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 10/07/22 | Wire | Zoomeral Inc | (47,217.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 10/12/22 | Wire | Zoomeral Inc | (505.50) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 10/14/22 | Wire | Zoomeral Inc | (8,040.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 10/19/22 | Wire | Zoomeral Inc | (172,863.17) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 10/20/22 | Wire | Zoomeral Inc | (33,333.33) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 10/31/22 | Wire | Zoomeral Inc | (6,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 10/31/22 | Wire | Zoomeral Inc | (61,600.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 11/02/22 | Wire | Zoomeral Inc | (4,666.66) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 11/04/22 | Wire | Zoomeral Inc | (5,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 11/14/22 | Wire | Zoomeral Inc | (35,320.83) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 11/14/22 | Wire | Zoomeral Inc | (224,250.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 11/16/22 | Wire | Zoomeral Inc | (7,250.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 11/17/22 | Wire | Zoomeral Inc | 138,262.50 |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 11/18/22 | Wire | Zoomeral Inc | (15,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 11/29/22 | Wire | Zoomeral Inc | (10,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 11/29/22 | Wire | Zoomeral Inc | (12,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 12/06/22 | Wire | Zoomeral Inc | (247,500.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 12/07/22 | Wire | Zoomeral Inc | (83,875.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 12/09/22 | Wire | Zoomeral Inc | 148,500.00 |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 12/12/22 | Wire | Zoomeral Inc | (2,812.50) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 12/13/22 | Wire | Zoomeral Inc | (2,812.50) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 12/13/22 | Wire | Zoomeral Inc | (3,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 12/13/22 | Wire | Zoomeral Inc | (30,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 12/13/22 | Wire | Zoomeral Inc | (54,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 12/16/22 | Wire | Zoomeral Inc | (100.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 12/16/22 | Wire | Zoomeral Inc | (15,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 12/23/22 | Wire | Zoomeral Inc | (5,250.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 01/04/23 | Wire | Zoomeral Inc | (8,250.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 01/05/23 | Wire | Zoomeral Inc | (9,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 01/12/23 | Wire | Zoomeral Inc | (3,000.00) |

| | | | | | | |
|---|---|---|---|---|---|---|
| *In re: Genie Investments NV, Inc.* | | | | | | |
| Case No.: 3:24-bk-00496-BAJ | | | | | | |
| | | | | | | |
| Schedule of Transfers Between Genie Investments NV and Zoomeral Inc. | | | | | | |
| During the Period July 27, 2022 through July 28, 2023 | | | | | | |
| *(Sorted by Date)* | | | | | | |
| | | | | | | |
| **Institution** | **Account Name** | **Account No.** | **Date** | **Type** | **Payee/Payor** | **Amount** |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 01/20/23 | Wire | Zoomeral Inc | (2,437.50) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 01/30/23 | Wire | Zoomeral Inc | (4,500.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 02/01/23 | Wire | Zoomeral Inc | (3,750.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 02/06/23 | Wire | Zoomeral Inc | (33,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 02/08/23 | Wire | Zoomeral Inc | (3,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 03/01/23 | Wire | Zoomeral Inc | (20,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 03/06/23 | Wire | Zoomeral Inc | (6,900.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 03/16/23 | Wire | Zoomeral Inc | (5,850.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 03/16/23 | Wire | Zoomeral Inc | (16,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 03/16/23 | Wire | Zoomeral Inc | (33,150.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 03/17/23 | Wire | Zoomeral Inc | (30,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 04/11/23 | Wire | Zoomeral Inc | (77,481.25) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 04/24/23 | Wire | Zoomeral Inc | (60,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 04/26/23 | Wire | Zoomeral Inc | (5,500.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 04/26/23 | Wire | Zoomeral Inc | (5,500.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 05/03/23 | Wire | Zoomeral Inc | (4,500.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 05/05/23 | Wire | Zoomeral Inc | (4,500.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 06/06/23 | Wire | Zoomeral Inc | (75,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 06/06/23 | Wire | Zoomeral Inc | (80,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 06/13/23 | Wire | Zoomeral Inc | (6,500.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 07/03/23 | Wire | Zoomeral Inc | (100,000.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 07/28/23 | Wire | Zoomeral Inc | (250.00) |
| JPMorgan Chase Bank | Genie Investments NV | x8502 | 07/28/23 | Wire | Zoomeral Inc | (3,250.00) |
| | | | | | **Grand Total** $ | **(1,771,555.74)** |

*Sources:*
Bank statements for JPMorgan Chase Bank account x8502 for the period of September 16, 2022 through June 1, 2023
Bank statements for JPMorgan Chase Bank account x2222 for the period of September 22, 2022 through August 21,
Bank statements for Wells Fargo Bank account x9881 for the period of July 27, 2022 through October 3, 2022.
Bank statements for JPMorgan Chase Bank account x9701 for the period of September 16, 2022 through August 21,
Bank statements for JPMorgan Chase Bank account x3350 for the period of December 12, 2022 through August 21,

# EXHIBIT 5

| *In re: Genie Investments NV, Inc.* | | |
|---|---|---|
| Case No.: 3:24-bk-00496-BAJ | | |
| | | |
| Summary of Inflows for Genie Investments II, LLC | | |
| During the Period January 25, 2023 through April 30, 2024 | | |
| *(Sorted in Descending Order)* | | |
| | | |
| **Payor** | | **Amount** |
| | | |
| Genie Investments NV LLC / Morgan Stanley Brokerage Account x2290 | $ | 1,244,606.44 |
| Customer 70 | | 375,000.00 |
| Unknown Deposit - x1722 | | 150,000.00 |
| Customer 110 | | 150,000.00 |
| Customer 12 | | 100,075.00 |
| Unknown Deposit | | 66,580.24 |
| Customer 48 | | 56,325.00 |
| Customer 24 | | 50,075.00 |
| Customer 95 | | 25,000.00 |
| Percy Law Group PC | | 20,432.87 |
| Customer 84 | | 20,075.00 |
| Tower Transition Logistics | | 15,100.00 |
| Customer 56 | | 15,075.00 |
| Spiegel and Utrera PA | | 2,816.35 |
| ZipRecruiter Inc | | 447.81 |
| Unknown Credits | | 105.00 |
| Walker Law Office LLC | | 0.96 |
| **Totals** | $ | **2,291,714.67** |
| | | |
| | | |
| *Sources:* | | |
| Bank records for TD Bank account ending x4873 held in the name of Genie Investments II LLC for the period of January 25, 2023 through April 30, 2024. | | |

Page 1 of 1

# EXHIBIT 6

| *In re: Genie Investments NV, Inc.* | |
|---|---|
| Case No.: 3:24-bk-00496-BAJ | |
| | |
| Summary of Outflows for Genie Investments II, LLC | |
| During the Period January 25, 2023 through April 30, 2024 | |
| *(Sorted in Ascending Order)* | |
| | |
| **Payee** | **Amount** |
| Zoomeral Inc | $ (979,250.00) |
| Genie Investments NV LLC / Morgan Stanley Brokerage Account x2290 | (508,000.00) |
| Unknown Debits | (330,092.04) |
| Walker Law Office LLC | (103,316.89) |
| Better Methods I LLC | (100,000.00) |
| Spiegel and Utrera PA | (59,426.13) |
| Shaver Law Group LLC | (57,238.00) |
| Reputation.com | (32,500.00) |
| Jams Inc | (16,970.00) |
| Upwork | (16,340.95) |
| Customer 20 | (15,000.00) |
| Tower Transition Logistics | (15,000.00) |
| Customer 95 | (10,000.00) |
| Genie Investments ACH | (8,952.00) |
| Bold City Proper | (7,391.68) |
| Kenneth J Yesh II | (5,900.00) |
| Seamless AI | (5,064.00) |
| The Plan Writers | (3,000.00) |
| USPS PO | (2,554.37) |
| Warren Law Group | (2,400.00) |
| ZipRecruiter Inc | (1,919.20) |
| Mark John Pangil | (1,842.97) |
| Parasec | (1,351.25) |
| Instantly AI | (1,125.00) |
| Wire Transfer Fee | (990.00) |
| Godaddy.com | (651.80) |
| ABSABSTM | (646.00) |
| Google Domains | (624.00) |
| Gig Bookkeeping | (600.00) |
| Genie Investments LLC / TD Bank x2998 | (500.00) |
| Trademarken CMP | (499.00) |
| Ring Central Inc | (387.76) |
| The Holsters Com | (302.00) |
| Corporate Filings LLC | (269.00) |
| Craigslist | (250.00) |
| Private Eyes Screening Group | (212.00) |
| Take 5 | (207.43) |
| ABS MONITR FEE | (199.00) |
| ChatGPT | (160.00) |

*In re: Genie Investments NV, Inc.*
Case No.: 3:24-bk-00496-BAJ

Summary of Outflows for Genie Investments II, LLC

During the Period January 25, 2023 through April 30, 2024

*(Sorted in Ascending Order)*

| Payee | Amount |
|---|---|
| Bank Service Charge | (142.00) |
| Earthlink LLC | (127.90) |
| Overdraft Fee | (105.00) |
| Wyoming Secretary of State | (102.00) |
| Free Conference Call Glo | (65.68) |
| SBIB | (20.00) |
| Webull Technology | (17.94) |
| **Totals** | $ **(2,291,712.99)** |

*Sources:*

Bank records for TD Bank account ending x4873 held in the name of Genie Investments II LLC for the period of January 25, 2023 through April 30, 2024.

176. According to my review of the Debtor's bank records, there does not appear to have been any repayments of the loans by Genie II to the Debtor to date.

177. Genie II opened a bank account at TD Bank in January 2023, account x4873.

178. Based on my review of the Debtor's brokerage accounts for the period November 2022 through January 2024, Genie NV transferred $1,244,606 from its Genie Brokerage Account to Genie II.

179. Additionally, from my review of the Genie II bank records, it also appears that certain of the Debtor's creditors and customers deposited approximately $392,000 into Genie II's TD Bank account ending x4873. Genie NV's customers did not have a relationship with Genie II to justify depositing funds to a Genie II account.

180. Attached as **Exhibit 5** is a summary of the inflow of funds into the Genie II bank account and **Exhibit 6** is a summary of the outflow of funds out of the same Genie II account.

181. As reflected in **Exhibit 5,** the majority of the deposits in the Genie II account were from Genie NV customers or directly from the Genie Brokerage Account.

182. As reflected in **Exhibit 6**, and summarized in the table below, Genie II paid $1,079,250 to other businesses owned by the Debtor principals:

| Payee | Amount |
|---|---|
| Zoomeral Inc. | $ (979,250.00) |
| Better Methods I LLC | (100,000.00) |
| TOTAL | $(1,079,250.00) |

183. According to the Debtor's Amended SOFA (Doc. No. 61-1), the Debtor transferred $1,085,073 to Genie II as a "loan to an insider corporation".

# EXHIBIT 7

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

In re:

Genie Investments NV, Inc.,                    Case No.: 3:24-bk-00496-BAJ
                                               Chapter 11


                    Debtor.
_____/

## UNITED STATES TRUSTEE'S SECOND MOTION TO APPOINT CHAPTER 11 TRUSTEE, DISMISS CASE, OR CONVERT TO CHAPTER 7

---

### NOTICE OF OPPORTUNITY TO OBJECT AND REQUEST FOR HEARING

If you object to the relief requested in this paper you must file a response with the Clerk of Court at 300 North Hogan Street, Suite 3-150, Jacksonville, FL 32202, and serve a copy on the movant's attorney, Scott E. Bomkamp, Office of the United States Trustee, George C. Young Courthouse, 400 W. Washington Street, Suite 1100, Orlando, FL 32801 within 14 days from the date of the attached proof of service, plus an additional three days if this paper was served on any party by U.S. Mail.

If you file and serve a response within the time permitted, the Court will either notify you of a hearing date or the Court will consider the response and grant or deny the relief requested in this paper without a hearing. If you do not file a response within the time permitted, the Court will consider that you do not oppose the relief requested in the paper, and the Court may grant or deny the relief requested without further notice or hearing.

You should read these papers carefully and discuss them with your attorney if you have one. If the paper is an objection to your claim in this bankruptcy case, your claim may be reduced, modified, or eliminated if you do not timely file and serve a response.

---

Mary Ida Townson, United States Trustee for Region 21 (the "United States Trustee"), by and through the undersigned counsel, files this Second Motion to Appoint Chapter 11 Trustee, Dismiss Case, or Convert to Chapter 7, based on the filing of the recent

report of the Examiner ("Examiner's Report"; Doc. No. 146), Maria Yip ("Examiner"). In support, the United States Trustee states as follows.

## SUMMARY OF ARGUMENT

The Examiner's Report confirms that the worst fears about Genie Investments NV, Inc. ("Debtor") and demonstrates why the appointment of a chapter 11 trustee or conversion of this case to chapter 7 is critical. First, the Examiner's Report confirms that a trustee, as an independent fiduciary, must be appointed in this case because the Debtor engaged in fraud and gross mismanagement making numerous, thinly disguised fraudulent transfers prior to filing for bankruptcy. The Examiner also concludes that appointment of a fiduciary is in the best interest of creditors because only an outside fiduciary will adequately pursue the insider transfers. Second, the Examiner's Report confirms that a trustee must be appointed because the Debtor engaged in gross mismanagement, *at a minimum*, in its dealings with Velanos Principal Capital ("Velanos"). Third, the Examiner's Report confirms that there is cause to convert this case to chapter 7 because the Debtor does not have a legitimate, going concern business and does not have a viable path out of bankruptcy without a fiduciary to pursue insider transfers. For these reasons, the Court should immediately appoint a chapter 11 trustee or convert this case to chapter 7.

## BACKGROUND

1.    The United States Trustee's Expedited Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint an Examiner, Dismiss This Case, or Convert This Case to Chapter 7 ("First Motion"; Doc. No. 20) provides additional facts and background information related to the relief sought herein. The United States Trustee restates and

incorporates by reference herein the facts contained in the First Motion as if fully rewritten and restated at length in this motion.

2.      The First Motion also discusses the appropriate standard for the appointment of a chapter 11 trustee or conversion to chapter 7, which is also incorporated into this motion by reference as if fully rewritten and restated at length.

3.      On April 11, 2024, after a two-day trial, the Court granted the First Motion in part and denied the First Motion in part ordering the United States Trustee to appoint an Examiner ("Appointment Order"; Doc. No. 60). At the close of trial, the Court made clear that it would place great weight on the report of the Examiner.

4.      The Appointment Order directed the Examiner to investigate the financial affairs of the Debtor with an emphasis on the following categories of conduct:

   (i) the connection, if any, between the Debtor or its affiliates, and McMann Commercial Lending or its affiliates;

   (ii) the alleged fraudulent agreement with Velanos;

   (iii) the connection and transfers between the Debtor and any affiliates or Debtor entities; and

   (iv) any transfers between the Debtor, including its directors, officers, insiders, or affiliates over the last two years.

(Doc. No. 60).

5.      On April 16, 2024, the United States Trustee appointed Maria Yip as the Examiner (Doc. No. 63). On April 18, 2024, the Court approved the United States Trustee's selection of the Examiner. (Doc. No. 68).

6.     On June 28, 2024, the Examiner filed the Examiner's Report. The Examiner's Report includes the following findings that are relevant to this motion.

7.     First, the Examiner found that the Debtor transferred funds to its affiliates within the two years prior to filing. These affiliates are owned by insiders or former insiders of the Debtor including the following: (1) Zoomeral, Inc. (owned by current insiders of the Debtor, David Hughes and John Cohan); (2) Capitulum Homes (owned by Mr. Cohan); (3) Cald Holdings LLC (owned by current or former insider Caleb Davis); Genie Investments II, LLC (owned by Mr. Hughes and Mr. Cohan); Better Methods, LLC (owned by Mr. Hughes and Mr. Cohan); and Genie's Angels, LLC (non-profit established by Mr. Hughes and Mr. Cohan).

8.     The Examiner found that these transfers were made "under extremely favorable terms to the borrower and far outside the ordinary course"[1] of standard business loans. These transfers were (i) made pursuant to notes that charged .1% interest, (ii) were non-recourse, (iii) contained no personal guarantees, and (iv) did not require payments except for a balloon payment after approximately 5 years extendable to 15 years at the sole discretion of the borrower. These transfers occurred in 2022 and 2023 during the same period that the Debtor was failing to fund loans to ordinary customers and, with respect to the 2023 transfers, after Velanos' initial default in December 2022. Furthermore, the express purpose of the transfers to Better Methods was asset protection. (Doc. No. 146 at 44 ¶ 188).

9.     A summary of these transfer amounts are as follows. (Id. at 52 ¶ 230).

---

[1] See Doc. No. 146 at pp. 34 ¶126; 37 ¶146; 41 ¶161; 42 ¶174; 45 ¶194; 48 ¶210.

| (Payee) / Payor | 1-Year Period Net Amount | 2-Year Period Net Amount |
|---|---|---|
| Zoomeral Inc | $ (534,381) | $ (1,771,556) |
| Genie Investments II | (736,606) | (736,606) |
| Capitulum LLC | (77,784) | (517,410) |
| Cald Holdings LLC | (77,784) | (517,109) |
| Better Methods | (30,000) | (130,000) |
| Genies Angels | (25,000) | (25,000) |
| TOTAL | $ (1,481,556) | $ (3,697,681) |

10.    The Examiner's Report concludes that "Without the appointment of an independent fiduciary, it is unlikely that the Debtor-in-Possession can independently pursue avoidance of potential preference actions and potential fraudulent transfers against insiders to maximize recoveries for the creditors of the estate." (Id. at 53 ¶ 234).

11.    Second, the Examiner found that the Debtor engaged in gross mismanagement by transferring $9 million in funds to Velanos in October through December of 2022. (Id. at 54 ¶ 237).  Regarding the source of these funds, the Examiner's Report noted that "[c]learly, the source of the capital contributions to Velanos totaling $9,000,000 in the October through December 2022 time frame could not have been funded from the customers payments to the Debtor but rather from the customer's ICA and Bridge Interest deposits." (Id. at 23 ¶ 78). The Examiner found that the purpose of the ICA funds was to pre-pay interest amounts on customer loans. (Id. at ¶¶ 81-82). The Examiner also found that the Debtor provided contradictory statements regarding whether ICA funds were supposed to held in trust for customers or could be utilized in the ordinary course of the

5

Debtor's business. (Id. at 22 ¶ 77).

12.    The circumstances surrounding the Velanos transfer should have alerted the Debtor to the likelihood of fraud. "Neither Velanos nor Wearmouth were registered investment advisors and the returns promised by Velanos pursuant to the Velanos JVA were 100% in 30 days and profit participation that would have resulted in a 900% return, which should have raised a red flag." (Id. at 23 ¶ 83). The Examiner found that the Debtor continued to accept customer deposits after it knew that Velanos was in default in December 2022. (Id. at ¶ 79).

13.    Third, the Examiner confirmed that the Debtor does not have a legitimate going concern business. The Debtor has never established a business arrangement with a capital provider other than the ill-fated arrangement with Velanos. (Id. at 53 ¶ 235). The Debtor used funds from larger customers (along with funds from Michael Connor's IOTA account following his indictment) to fund relatively smaller loans. (Id. at 50 ¶ 222). The Examiner also found that the reputational damage to the Debtor was likely fatal to any attempt to remold the Debtor into a legitimate business. (Id. at 51 ¶ 225).

14.    Fourth, the Examiner expressed skepticism regarding the Debtor's settlement with Velanos as the basis for funding a path out of bankruptcy. Velanos defaulted on multiple settlements with the Debtor before the bankruptcy was filed. (Id. at 25 ¶ 88). Furthermore, the principals of Velanos are subject to a judgment exceeding one million dollars for a previous fraudulent enterprise, and that judgment holder may compete for any settlement

proceeds from Velanos. (Id. at 26-28 ¶¶ 89-94).[2] Finally, as of the status conference on July 8, 2024, Velanos was already in default of the current proposed settlement because it had only paid $250,000 of the total of $550,000 that would have been required by that date. (Id. at 24-25 ¶ 87).

15.    The Examiner expressed skepticism of the Debtor's ability to fund a plan based upon their existing loan portfolio. Even if taken at face value, the Debtor's loans to insiders will not become due during any period relevant to a proposed plan. According to the Examiner's analysis, the loans to non-affiliates would mostly become due after 2032, which is beyond the relevant time frame for plan repayment. (Id. at 52 ¶ 229).

<u>**LAW AND ARGUMENT**</u>

**A. The Affiliate Transfers Constitute Fraud and Gross Mismanagement**

16.    The affiliate transfers cannot seriously be defended as loans in the ordinary course of business. Although the fact pattern here is unusual, Courts have the authority to look to "substance" and not the "form" of a transaction and recharacterize it as appropriate. *E.g.*, *In re Fitness Holdings International, Inc.*, 714 F.3d 1141 (9th Cir. 2013) (recharacterizing loans to a corporation as equity). When viewed collectively, the many extraordinary provisions of these transfers (e.g., .1%, non-recourse, no payments other than a balloon after 15 years, no guarantees) make clear that these are fraudulent transfers and not true loans. Even taking these transfers at face value, they are still gratuitous transfers due to the time value of money and the lack of interest.

---

[2] Although not expressly stated by the Examiner, it is apparent that the Velanos joint venture is a fraudulent scheme which raises the possibility that any proposed repayment to the Debtor's creditors would be disrupted by government action.

17.    There is both direct and circumstantial evidence that these transfers are fraudulent. The direct evidence is the express purpose of the transfers to Better Methods as asset protection from the Debtor's creditors. (Doc. No. 146 at 44 ¶ 188).

18.    The overwhelming circumstantial evidence of fraud is based upon application of the badges of fraud. In determining whether the circumstantial evidence supports an inference of fraudulent intent, courts should look to the existence of certain badges of fraud. *In re XYZ Options, Inc.*, 154 F.3d 1262, 1271 (11th Cir. 1998). The badges of fraud include the following: (a) The transfer or obligation was to an insider; (b) The debtor retained possession or control of the property transferred after the transfer; (c) The transfer or obligation was disclosed or concealed; (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (e) The transfer was of substantially all the debtor's assets; (f) The debtor absconded; (g) The debtor removed or concealed assets; (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred; (j) The transfer occurred shortly before or shortly after a substantial debt was incurred; (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. *In re Levine*, 134 F.3d 1046, 1053 (11th Cir. 1998).

19.    In this case, the majority of these badges of fraud are present because the Debtor's funds were transferred (1) to insiders or affiliates; (2) while the Debtor was being sued or under threat of suit for failing to fund loans; (3) for less than the equivalent value

based on the non-market nature of the loans; and (4) in a concealed manner attempting to disguise the fraudulent transfers as loans. The Debtor transferred substantially all of its assets are based upon the cash balance in its operating report. In this case, it would appear that badges (a), (b), (c), (d), (e), (h), (i), and (j) are met with badges (f) and (k) not applicable under the circumstances of this case.

20.    While there is overwhelming evidence of fraud, these transfers also constitute gross mismanagement. The Debtor showed exceptionally poor business judgment by loaning money with such lenient terms to insiders while it was struggling to make market-based loans to ordinary customers. The terms of the affiliate loans put the Debtor's funds out of reach for years at a time when they were desperately needed.

21.    As set forth at length in the First Motion, the appointment of a chapter 11 trustee is mandatory under 11 U.S.C. § 1104(a)(1) upon a finding of fraud or gross mismanagement. Accordingly, the Court must appoint a chapter 11 trustee or convert this case to chapter 7 based upon the Debtor's fraudulent transfers to affiliates and/or extraordinary lack of business judgment in making below market loans.

**B.  A Chapter 11 Trustee is in the Best Interest of Creditors to Pursue Insider Transfers**

22.    The Examiner found that the appointment of a chapter 11 trustee or other fiduciary is in the best interest of creditors to pursue the insider transfers. (Doc. No. 146 at 53 ¶ 234). The United States Trustee agrees that insider transfers are a substantial asset of this bankruptcy estate, and the Debtor's insiders cannot be relied upon to recover transfers from their own companies. Therefore, the Court should appoint a chapter 11 trustee under 11 U.S.C. § 1104(a)(2) because appointment is in the best interests of the Debtor's creditors.

9

### C. The Debtor's Dealings with Velanos Demonstrates Gross Mismanagement

23.    The Examiner's Report appropriately concluded that the Debtor's dealings with Velanos constitutes gross mismanagement, and this is true regardless of whether the Debtor was entitled under its contracts to deposit ICA funds (a heavily contested point in this case). Any investment that promises a 100% return within 30 days for an ultimate return of 900% should immediately raise red flags. This was confirmed at trial by the testimony of Debtor's attorney, Adam Walker, who testified that he almost immediately identified the Velanos joint venture as fraudulent. The Debtor's gross mismanagement of funds is compounded by the fact that the Debtor continued to take customer deposits after Velanos defaulted. (Doc. No. 146 at 23 ¶ 79).

24.    The Examiner found that the customer's ICA funds were to be held in trust to pay customer interest. (Id. at ¶¶ 77-83). However, Mr. Hughes provided inconsistent statements on this point. (Id.). If the ICA funds were indeed to be held in trust, the misallocation of those funds also constitutes fraud.

25.    As set forth in the First Motion, a chapter 11 trustee is mandatory upon a finding of gross mismanagement under 11 U.S.C. § 1104(a)(1). At a minimum, the Debtor engaged in gross mismanagement by investing its funds in a transparently fraudulent scheme and continuing to accept customer funds after the Velanos default. The Debtor's conduct constitutes fraud to the extent that the Court finds that the ICA funds were intended to be held in trust for customers.

### D. Cause Exists to Convert this Case to Chapter 7

26.    Cause exists to convert this case to chapter 7 for all the foregoing reasons and

because the Debtor does not have the ability to reorganize, absent appointment of a fiduciary to pursue insider transfers. As the Examiner found, the Debtor does not have, and has never had, a third-party source of capital. The Debtor's only business consists of taking deposits from customers and using those deposits to fund loans. Of course, this business model cannot be successful because the Debtor must continuously find new customers and can only fund loans that are a small fraction of the loans that the Debtor has promised to new customers. The Debtor cannot fund a plan by operating its current business model because the Debtor does not have a legitimate business model.

27.     Furthermore, cause exists to convert this case to chapter 7 because the Debtor cannot rely on the settlement with Velanos who has already defaulted on the Debtor several times including *under the current settlement with the Debtor by the Debtor's own admission.* Likewise, there is a strong probability that Velanos will be unable to make the settlement payment because the operators of Velanos are subject to a prior judgment for a prior fraud and could be shut down by the government. It is nonsensical to base the feasibility of a chapter 11 plan on the purported honesty of an entity that all parties agree has a long history of being a fraudulent actor.

28.     Finally, the Debtor cannot rely on its current non-insider loan portfolio. The non-insider loans, even if they are taken at face value, will not mature for many years and most of the payments under the non-insider loans will not become due until after 2032. These loans cannot be the basis for a feasible plan of reorganization.

29.     Cause exists to convert this case for the same reasons that a chapter 11 trustee must be appointed. Cause also exists to convert this case to chapter 7 based upon the Debtor's

lack of a legitimate business, the abject untrustworthiness of Velanos as the counterparty to a settlement, and the lack of near term receivables. This corresponds to a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" under 11 U.S.C. § 1112(b)(4)(A) or other cause and warrants immediate conversion of the case.

## CONCLUSION

The Examiner's Report strongly supports appointment of a chapter 11 trustee or conversion of this case to chapter 7. The payments to affiliates are fraudulent transfers that are thinly disguised as loans, the Debtor's course of dealings with Velanos demonstrates gross mismanagement, and the only way for the Debtor to pay a dividend to unsecured creditors is through the appointment of a fiduciary. The Court should immediately appoint a chapter 11 trustee or convert this case to chapter 7.

WHEREFORE, the United States Trustee moves this Court for an order directing the United States Trustee to appoint a chapter 11 trustee in this case, or alternatively convert it to chapter 7, or for such other relief as the Court deems appropriate.

Dated: July 12, 2024.

Respectfully Submitted

Mary Ida Townson
United States Trustee for Region 21

/s/  Scott Bomkamp
Scott Bomkamp, Trial Attorney
Office of the United States Trustee
U.S. Department of Justice
400 W. Washington St., Suite 1100
Orlando, FL 32801
Telephone No.:  (407) 648-6301, Ext. 150
Facsimile No.:  (407) 648-6323
Email: scott.e.bomkamp@usdoj.gov
Indiana Bar No.: 28475-49

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion was served on July 12, 2024 on all parties appearing electronically via CM/ECF, or via First Class United States mail on the following:

Genie Investments NV, Inc.
Attention: John Michael Cohan
PO Box 60443
Jacksonville, FL 32236

/s/  Scott Bomkamp
Scott Bomkamp, Trial Attorney

# EXHIBIT 8

**Excerpts from Special Counsel, Adam Walker's DRAFT Reply Motion to UST Second Factually Unsupported Allegation of Fraud against Debtor and its Stakeholders (Exhibit ⬛)**

*(To protect attorney-client privilege, only selected excerpts are included.)*

---

### 1. The Examiner's Report Does Not Support the UST's Allegations

*"The UST's insistence that the Report 'confirms' key allegations from its initial motion not only shows its lack of concern for the Report's investigative and analytical rigor but also reveals its willingness to mischaracterize and embellish the Report's contents to suit its purposes. Nowhere in the 51-page Report is there any finding or conclusion that Genie engaged in fraud. The UST simply invented this 'confirmation' and attributed it to its hand-selected Examiner."*

- **How This Supports Our Argument:**
    - **UST misrepresented the Examiner's Report** to justify its motion.
    - **No fraud was found**, contrary to UST's claims.
    - **The motion should be dismissed** as it is based on false premises.

---

### 2. Genie Had No Obligation to Hold ICA Payments in Trust

*"The BELOC Agreement, which both the Examiner and the UST ignore, makes clear that ICA Payments received by Genie were not required to be held in trust and therefore did not constitute 'customer funds.'"*

*"Because Genie was never required to hold ICA Payments in trust for customers, those payments constituted revenue realized by Genie. The possibility that ICA Payments could later become refundable does not change that. Genie is no different from a retail store or service provider that promises refunds to unsatisfied purchasers. The funds Genie received in the form of ICA Payments were its own funds, not 'customer funds,' as the Examiner asserts."*

- **How This Supports Our Argument:**
    - **ICA Payments were revenue, not deposits,** meaning Genie had the right to use the funds.
    - **The Examiner and UST ignored the BELOC Agreement,** which contradicts their claims.
    - **UST's claims are legally unfounded,** and the motion should be dismissed.

### 3. The UST Failed to Engage with Relevant Contractual Provisions

*"Neither the Report nor the instant motion even feints at contract interpretation and, as such, neither offers any basis for a determination that Genie had an obligation to hold ICA Payments in trust as customer funds. That alone is grounds to deny the instant motion."*

- ◆ **How This Supports Our Argument:**
  - **UST's motion does not analyze contractual provisions**, making it legally deficient.
  - **UST failed to meet its burden of proof**, warranting dismissal.

### 4. Genie's Compliance with Section 13.7 and the Velanos Settlement

*"The BELOC Agreements openly anticipate the Lender using the ICA Payment, rather than holding it in trust. Section 13.7(a) sets forth when and under what conditions a Borrower may be due an ICA Payment refund. It states that the Lender has up to 40 days to return the ICA Payment after the Borrower properly terminates the BELOC Agreement and requests a refund of the ICA Payment. Section 13.7(c), however, states that this 40-day period is 'tolled during the pendency of a Force Majeure event,' including a wholesale lender's failure to perform its contractual obligations to Genie."*

- ◆ **How This Supports Our Argument:**
  - **Genie fully complied with Section 13.7**, contrary to UST's claims.
  - **The Velanos Settlement was a contractual requirement**, proving good faith.
  - **UST's arguments are contradicted by the actual contractual language.**

### 5. The Examiner's Report Failed to Consider Key Evidence on the Velanos Transaction

*"The Report excludes evidence that Genie had a good-faith belief, based in part on guidance and advice from a reputable law firm, that the Velanos transaction was a sound investment."*

- ◆ **How This Supports Our Argument:**
  - **Genie conducted legal due diligence before entering the Velanos transaction.**
  - **The Examiner's Report omitted critical exculpatory evidence.**
  - **UST's reliance on the Examiner's Report is flawed.**

### 6. The UST's Claims About Affiliate Loans Are Unsupported

*"The affiliate transfers identified in the Report were all made pursuant to loan agreements executed in September 2022. At that time, Genie had successfully funded dozens of loans, had never failed to*

*issue a properly requested refund of an ICA Payment, had not agreed to contribute any money to the joint venture with Velanos, and had never been sued or threatened with suit related to an alleged breach of a BELOC Agreement."*

- **How This Supports Our Argument:**
  - **Affiliate transfers were executed when Genie was solvent.**
  - **Loans were made under formal agreements, contradicting fraud claims.**
  - **The UST's timeline is inaccurate and misleading.**

### 7. Genie Received Reasonably Equivalent Value for the Loans

*"The UST alleges that Genie transferred funds to affiliates 'for less than the equivalent value based on the non-market nature of the loans.' The UST bases its allegation that the terms of these loans would not have been available to Genie's affiliates in the open market on the Report. For its part, the Report is devoid of any evidence regarding the terms that might have been available to the affiliate borrowers."*

- **How This Supports Our Argument:**
  - **The Examiner's Report provides no evidence that the loans were below market value.**
  - **UST failed to meet its burden of proof.**
  - **Indirect benefits from these loans provided reasonable equivalent value, as recognized in case law.**

# EXHIBIT 9

## Trustee, Examiner, and U.S. Trustee Claims Persuasive Summary Analysis

### Fraud Allegations against "Entity"

| Entity | Findings |
|---|---|
| Examiner | No proven fraud, but omitted key evidence and failed to conduct a complete financial review, raising concerns of negligence and bias. |
| Trustee | Fraudulent intent is indicated. The Trustee is making knowingly false claims about fraud despite losing on those issues twice. |
| U.S. Trustee | No ongoing fraud claims, but initially made misleading statements that led to the appointment of the Trustee. |

### Misrepresentation Allegations against "Entity"

| Entity | Findings |
|---|---|
| Examiner | Yes, misrepresented financial facts by omitting equivalent value contributions and falsely categorizing ICA payments. |
| Trustee | Yes, misrepresented insider loans, ignoring equivalent value and selectively presenting misleading evidence. |
| U.S. Trustee | Yes, originally mischaracterized the Examiner's findings and falsely claimed fraud in early filings. |

### Abuse of Power against "Entity"

| Entity | Findings |
|---|---|
| Examiner | Yes, selectively omitted evidence and allowed misleading conclusions, manipulating financial perceptions. |
| Trustee | Yes, repeated unsupported claims and legal harassment against stakeholders despite lacking substantial evidence. |
| U.S. Trustee | Yes, advocated for a Trustee appointment based on unfounded fraud allegations. |

### Lawsuit Justification against "Entity"

| Entity | Findings |
|---|---|
| Examiner | Yes, if it can be shown that evidence was knowingly omitted or a review was incomplete. |
| Trustee | Yes, repeated misrepresentations and abuse of process justify legal action. |
| U.S. Trustee | Yes, since the UST initiated fraudulent claims and led to unnecessary legal expenses. |

### Key Issues

| Issue | Findings |
|---|---|
| Discovery vs. Dismissal of Adversary Complaint | Dismiss the adversary complaint (No evidence disproving equivalent value of insider loans). |
| Retaliation by Chapter 7 Trustee | Confirmed (Shifting from fraud to fraudulent transfer claims after losing fraud allegations). |
| Suppression of Information Without Protective Order | Confirmed (Selective use of loan agreements while ignoring business contributions). |
| Protective Order for Stakeholders | Yes, necessary (Trustee engaging in selective enforcement without legitimate cause). |
| Damages from Trustee's Misconduct | Yes, strong case (Bad-faith litigation tactics causing financial harm and reputational damage). |
| Are the Insider Loans Fraudulent? | No, legitimate business transactions (In re Bay Plastics, Inc., In re Rodriguez, In re W.R. Grace & Co.). |
| Is the Trustee "Piggybacking" off the UST's Unsupported Claims (Fruit of the Poisonous Tree)? | Yes, entirely (Trustee recycling debunked fraud allegations and misusing fraudulent transfer laws). |

# EXHIBIT 10

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

### Submission Number 17121-698-589-057 was submitted on Wednesday, April 03, 2024 at 01:56:27 PM EDT

### This PDF was generated on Wednesday, April 03, 2024 at 02:01:12 PM EDT

Thank you for contacting the United States Securities and Exchange Commission. This automated response confirms that your submission has been received successfully. We are always interested in hearing from the public, and your submission will be given careful consideration in view of the Commission's overall responsibilities under the federal securities laws. Please note, however, that it is the Commission's policy to conduct its investigations on a non-public basis in order to preserve the integrity of its investigative process. Subject to the provisions of the Freedom of Information Act, we cannot disclose to you any information which we may gather, nor can we confirm the existence or non-existence of an investigation, unless such information is made a matter of public record in proceedings brought before the Commission or the courts. Therefore, this may be the only response that you receive. If you want to learn more about how the Commission handles inquiries or complaints, please visit http://www.sec.gov/complaint/info_tipscomplaint.shtml.

## What is your complaint about?

**Q: Please select the option that best describes your complaint.**

**A:** Fraudulent investment scheme, such as a Ponzi scheme or the promise of high-yield returns

**Q: Please select the specific category that best describes your complaint.**

**A:** High-yield investment

**Q: If a return on investment of any amount was guaranteed, what percentage was guaranteed?**

**A:** [ % ] Enter Percentage

**Q: Enter Percentage % (Enter whole numbers)**

**A:** 733

**Q: If you are alleging offering fraud, how was the offer made?**

**A:** Personal message (email, voicemail, phone call)



**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Is this supplemental information to a previous complaint?**

**A:** No

**Q: In your own words, describe the conduct or situation you are complaining about.**

**A:** Genie Investments NV, a Nevada corporation, was induced by individuals known as Joshua Wearmouth and Will Byrd to invest $9.0 million in the supposed trading of standby letters of credit (SBLCs) by Velanos Principal Capital, of which Wearmouth is the owner and CO. Wearmouth and Byrd represented that the SBLC trading would generate huge profits within a short period of time. Genie Investments' share of those profits was stated as $66 million. Wearmouth resides in Newport Beach, California. Byrd, whose legal name may be James William Byrd, is believed to be a resident of Texas. Although Genie has filed legal actions against Velanos, Wearmouth, and Byrd related to this activity, it is unlikely that these efforts will result in any meaningful recovery. Moreover, the individuals behind this fraudulent activity have victimized others besides Genie and are engaged in ongoing efforts to defraud other potential victims. We ask that you investigate the activity described in this letter and pursue all appropriate civil and criminal remedies against the persons who have conducted and benefited from it. As desired, we can provide significant additional details and stand ready to assist your investigation in any way possible. SUMMARY Genie is a Nevada corporation that provides capital to small and medium-sized businesses through lines of credit. It obtains capital from "warehouse lenders" and other sources and, in turn, lends those funds to borrowers at marginally higher rates. In late 2022, following failures by its previous warehouse lender, Genie sought new sources of affordable capital. At the time, Genie worked with a network of finders who introduced Genie to potential borrowers. One of those finders was Will Byrd. Upon learning that Genie wanted to find new sources of capital to lend, Byrd introduced Genie to Josh Wearmouth and Velanos in October 2022. Wearmouth told Genie that he used capital from business partners to monetize SBLCs by buying them at a discount and then selling them at a profit. He proposed a joint venture between Genie and Velanos wherein Velanos would use capital supplied by Genie to complete a series of prearranged trades of SBLCs. Wearmouth further represented that this would pose no risk to Genie's capital. Byrd, who has frequently acted as Wearmouth's spokesperson in communications with Genie, vouched for Wearmouth and supported his assertions. Wearmouth provided Genie with a draft Joint Venture Agreement (JVA) that called for Genie to contribute capital, for Velanos to use those capital contributions to trade SBLCs, and for Velanos to return the capital contributions and distribute resulting profits to Genie within 60 days. After Genie's then-lawyer reviewed the contract and supposedly vetted the underlying trading program, Genie and Velanos signed the JVA in October 2022. In November 2022, upon invitations from Wearmouth and Byrd, Genie contributed an additional $6.0 million in capital. In exchange, Velanos agreed to provide Genie with a total of $75 million ($9.0 million in capital contributions and $66.0 million in profits) within 60 days. The JVA, a copy of which is attached as Exhibit A, also required Velanos to deploy Genie's capital contributions "strategically and with discretion, including facilitating a systematic purchase and sale of financial instruments routine." Elsewhere, the JVA identified "SBLC (Standby Letter of Credit) HSBC London/Top Rated Issuer" as the "Transacting asset(s)." The JVA also included nondisclosure and non-circumvention clauses. Genie did not know at the time that these and many other aspects of the JVA and Wearmouth's description of the putative trading program were hallmarks of a type of fraudulent scheme well-known to law enforcement and securities regulators. Almost immediately, Wearmouth and Byrd began making false promises of imminent payments, followed by bogus excuses when those payments did not happen. When making those promises and excuses, Wearmouth and Byrd often invoked terms that Genie later learned were hallmarks of SBLC and similar scams. For example, in a letter to Genie dated December 30, 2022, Velanos claimed "that the $75,000,000.00 USD owed to you will be available on or

Page 2 of 15



before January 15th, 2023." The same letter identified an account Velanos purportedly had with HSBC Bank and asserted that the account held nearly 350 million Euros. Wearmouth also provided a screenshot of an email that he supposedly received from a representative of HSBC Bank "confirming" that Velanos "with accounts at HSBC bank located 79 Piccadilly, Mayfair, London are the lawful and legal owner of funds on deposit in the amount of… € 349,220,053.20…as of this date 19th of December, 2022." The document identified the supposed account number in which the funds were held, and stated: …these funds have been earned, being good, clean, and of a non-criminal origin, being free of and clear of any and all liens and encumbrances, and are freely assignable and transferable upon the instruction of the authorized account signatory. The phrase "good, clean, and of a non-criminal original" closely resembles language that law-enforcement agencies have identified as emblematic of "prime bank" or advance-fee frauds. n January 2023, Wearmouth told Genie that Velanos had wired $10.0 million from a Scotiabank account to Genie's account with Chase bank. Wearmouth provided Genie's lawyer with a screenshot that purported to show tracking details for the wire transfer. Genie, however, never received any portion of that supposed transfer. As of late March 2023, Wearmouth claimed that the transferred funds were and had been held by the "corresponding [sic] bank" – later identified as Wells Fargo – since January 2023. It is our understanding, based on consultations with banking experts, that correspondent banks cannot simply hold wire transfers on their whim. To the contrary, if a bank receives wire instructions and funds are available in the account, then the wire goes through almost immediately. The only thing that should hold up a wire transfer is if a party to the transfer is listed on the Sanctions list maintained by the Office of Foreign Asset Control. Neither Genie nor any of its principals is or has ever been on that list. In March 2023, Wearmouth sent Genie a letter stating that trade profits (ostensibly from trades effected with Genie's $9MM) were being held at HSBC in a "sub account." The letter outlined a supposed strategy for accessing those funds. One aspect of the strategy Wearmouth described was that "a major top 25 bank will open a line of credit…" This phrase is yet another hallmark of prime-bank and advance-fee scams. As of June 2023, Velanos still had not paid Genie any of the amounts due under the JVA. Wearmouth, who continued to blame various banks for his failure to deliver promised payments to Genie, proposed the following: Velanos would facilitate the creation of a commercial bank account in Genie's name at Nordic Trust Alliance KB in Miami, Florida, where Velanos also had an account, and subsequently deposit $9.5 million into the newly established Genie account by June 15, 2023, and an additional $50 million by June 30, 2023. Thereafter, Genie submitted an account application to Nordic Trust and received notification that an account in its name had been established. Genie received access to an online account portal. The online portal showed a $9.5 million credit to Velanos' account on June 20, 2023. When Genie attempted to transfer that amount or any portion of it to its account at Chase Bank, however, no money ever reached the Chase account. When Genie asked Nordic Trust to explain why it couldn't access the funds in its account, it received vague responses. In late June 2023, Nordic Trust asserted that Genie's outgoing wire transfer was awaiting European Central Bank approval, despite the fact that its account with Nordic Trust – a Swedish company – was ostensibly created through a Florida-based branch. Eventually, Nordic Trust stopped responding to any inquiries from Genie. Subsequent investigation indicates that Nordic Trust is not authorized to conduct banking activities in Florida or elsewhere in the United States. Given its conduct and its negligible online presence, we suspect that it is a front created or used to facilitate Wearmouth's SBLC fraud. In August 2023, Will Byrd told Genie's legal counsel that Genie's money was still held up at HSBC. He further claimed to know that the money in Genie's Nordic Trust "account" was held up because there were red flags associated with one of Genie's principals. Byrd claimed to have this information because Velanos had a contract with Nordic Trust and could therefore obtain information. In October 2023, Genie filed an arbitration against Velanos. In connection with that arbitration, Genie took Wearmouth's deposition in February 2024. In his testimony, Wearmouth gave his date of birth as September 24, 1982, and his residential address as 20101 Southwest Cypress Street, Newport Beach, California 92660. Wearmouth also testified that he served in the U.S. Navy from 2000 to 2003 and was stationed at a base in San Diego. In his deposition, Wearmouth defended the legitimacy of SBLC trading and continued his prior assertions that Velanos had used Genie's $9.0 million



**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

to purchase and sell SBLCs. Wearmouth claimed that this SBLC trading generated profits of 349 million dollars in approximately six weeks. He claimed to have acquired the SBLCs from a source whom he refused to name on the grounds that it constituted proprietary information. He further testified that those SBLCs were issued by HSBC, but claimed he no longer had access to records of those purchases or the subsequent sales. Regarding the supposed January 2023 wire transfer of $10 million from Velanos to Genie, Wearmouth testified that the money was held by the correspondent bank, which he identified as Wells Fargo. As of February 8, 2024, Wearmouth said, "I'm still waiting to get the funds back." Neither he nor Velanos has ever provided any documentation or other credible evidence to support this assertion. Likewise, neither Velanos nor Wearmouth has provided Genie any credible documentation or other evidence that Velanos used Genie's capital contributions as directed by the JVA, that Velanos generated a profit for the joint venture through SBLC trading, or that HSBC holds or held any trading profits to which Velanos had a rightful claim. When questioned about Nordic Bank, Wearmouth stated that a person named Daniel Fernandez provided documentation that purportedly showed that Nordic Trust had a bank license. He also testified that he later learned that Fernandez had a criminal background. Genie also filed a lawsuit against Wearmouth, Byrd, and Nordic Trust in the U.S. District Court for the Middle District of Florida in December. That case is unlikely to move forward. One notable result of the filing, however, is that the law firm that filed the suit subsequently received inquiries from multiple people claiming that they, too, were victims of similar scams by Velanos, Wearmouth, et al. Not only was Genie defrauded out of millions of dollars, but there are also significant downstream effects. As a direct result of the events described above, Genie became unable to fulfill obligations to a number of its customers, who had collectively demanded several million dollars' worth of refunds. Genie was subsequently named in multiple legal actions. The money lost to Velanos' malfeasance and the expense of both defending and pursuing legal actions has depleted essentially all of Genie's assets, and it recently filed for bankruptcy protection in the Middle District of Florida. Moreover, it appears that Velanos, Wearmouth, and Byrd are continuing to offer fraudulent investment opportunities based on a similar model. For example, Genie recently learned of postings on multiple websites by an entity called Cottonwood Holdings, LLC. These postings, which are similar if not identical, claim that persons with at least $10 million to invest can participate in "an off market private transaction, under the same regulations as any banking activity which is heavily regulated. This program buys and sells pre-negotiated debt from banks to pension funds and insurance companies." The postings promise a 500% return within 30 banking days. Genie believes that the individual identified on these posts – James Horton – is the same person they know as James "Will" Byrd. SUMMARY The conduct described in this letter strongly suggests a coordinated fraud by Velanos, Joshua Wearmouth, James William Byrd, and Nordic Trust Alliance. Besides the massive financial and reputational harm to Genie and its principals, Genie's customers have suffered significant adverse effects and there are likely other victims. Genie respectfully asks that you investigate this matter and obtain some measure of justice for the victims.

**Q: Are you having or have you had difficulty getting access to your funds or securities?**

**A:** Yes

**Q: Did you suffer a loss?**

**A:** Yes

**Q: Enter amount of loss to nearest dollar without characters (e.g., 15000, not $15,000.00).**

**Tips, Complaints, and Referrals**
Summary Page – Submitted Externally

**A:** 8500000

**Q: When did you become aware of the conduct? (m/d/yyyy)**

**A:** 07/20/2023

**Q: When did the conduct begin? (m/d/yyyy)**

**A:** 10/20/2022

**Q: Is the conduct ongoing?**

**A:** Yes

**Q: Has the individual or firm acknowledged the conduct?**

**A:** No

**Q: How did you learn about the conduct? You may select more than one answer.**

**A:** Conversations

**Q: Have you taken any action regarding your complaint? You may select more than one answer.**

**A:** Complained to firm; Legal action; Arbitration

**Q: Provide details.**

**A:** Genie spent many months attempting to resolve the situation. On multiple occasions, Velanos claimed its funds were held up by banks, or stated that it had initiated sizeable wire transfers to Genie that never materialized. In June 2023, Genie agreed to accept a reduced amount but Velanos did not perform its obligations under the amended agreement. Velanos has subsequently agreed to settle the dispute for $15 million but has, again, failed to perform. Genie Investments filed an arbitration case against Velanos Principal Capital in October 2023, asserting claims for breach of contract and conversion. That matter is pending. In December 2023, Genie sued Wearmouth, Byrd, and Nordic Trust KB (a business entity registered in Florida) in the U.S. District Court for the Middle District of Florida, asserting fraud claims. To date, very little has happened in that case.

## Who are you complaining about?

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Subject # 1**

**Q: Are you complaining about a person or a firm?**

**A:** Firm

**Q: Select the title that best describes the person or firm that you are complaining about.**

**A:** Private/Closely Held Company

**Q: Are you or were you associated with the person or firm when the alleged conduct occurred?**

**A:** No

**Q: Identifier Type**

**A:** Unknown

**Q: Are you a current or former Employee, Officer, Partner, or Employee Director of any entity you are complaining about?**

**A:** No

**Q: Are you a current or former Non-Employee Director, Consultant, Contractor or Trustee of any entity you are complaining about?**

**A:** No

**Q: Firm Name**
**A:** Velanos Principal Capital

**Q: Street Address**
**A:** 120 Adelaide Street West

**Q: Address (Continued)**

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**A:** Suite 2500

**Q: Zip / Postal Code**
**A:** M5H 1T1

**Q: City**
**A:** Toronto

**Q: State / Province**
**A:** Ontario

**Q: Country**
**A:** Canada

**Q: Mobile Phone**
**A:** 949-220-3555

**Q: Email Address**
**A:** jmw@velanos.org

**Q: Website**
**A:** https://velanosprincipalcapital.com/

**Q: If the complaint is about an entity or person that has custody or control of your investments, have you had difficulty contacting that entity or person?**
**A:** Yes

**Subject # 2**

**Q: Are you complaining about a person or a firm?**

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**A:** Person


**Q: Select the title that best describes the person or firm that you are complaining about.**
**A:** Other


**Q: Where is the person that you are complaining about employed?**
**A:** Velanos Principal Capital


**Q: Are you or were you associated with the person or firm when the alleged conduct occurred?**
**A:** No


**Q: Person's Title**
**A:** Mr


**Q: First Name**
**A:** Joshua


**Q: Middle Name**
**A:** Matthew


**Q: Last Name**
**A:** Wearmouth


**Q: Address (Continued)**
**A:** 20101 Southwest Cypress Street


**Q: Zip / Postal Code**
**A:** 92660

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: City**

**A:** NEWPORT BEACH

**Q: State / Province**

**A:** CA

**Q: Country**

**A:** US

**Q: Mobile Phone**

**A:** 9492203355

**Q: Email Address**

**A:** jwearmouth@velanosprincipalcapital.com

**Q: If the complaint is about an entity or person that has custody or control of your investments, have you had difficulty contacting that entity or person?**

**A:** Yes

**Subject # 3**

**Q: Are you complaining about a person or a firm?**

**A:** Person

**Q: Select the title that best describes the person or firm that you are complaining about.**

**A:** Unknown

**Q: Where is the person that you are complaining about employed?**

**A:** Unknown/self-employed

**Tips, Complaints, and Referrals**
Summary Page – Submitted Externally

**Q: Are you or were you associated with the person or firm when the alleged conduct occurred?**

**A:** No

**Q: Person's Title**

**A:** Mr

**Q: First Name**

**A:** James

**Q: Middle Name**

**A:** William

**Q: Last Name**

**A:** Byrd

**Q: City**

**A:** Dallas

**Q: State / Province**

**A:** Texas

**Q: Country**

**A:** United States

**Q: Mobile Phone**

**A:** 972-762-5929

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Email Address**

**A:** soteriapartners@gmail.com

**Q: If the complaint is about an entity or person that has custody or control of your investments, have you had difficulty contacting that entity or person?**

**A:** Yes

## Which investment products are involved?

**Q: Select the type of product involved in your complaint.**

**A:** Other

**Q: Please select the category that best describes the security product.**

**A:** High-yield investment programs

**Q: Enter the ticker symbol, if known.**

**A:** N/A

**Q: Enter the product name(s)**

**A:** Standby Letter of credit

## About you

**Submitter # 1**

**Q: Are you filing this tip under the SEC's whistleblower program?**

**A:** No

**Tips, Complaints, and Referrals**
Summary Page – Submitted Externally

**Q: Are you submitting this tip, complaint or referral anonymously? Being able to contact you for further information or clarification may be helpful.**

A: No

**Q: First Name**

A: David

**Q: Last Name**

A: Hughes

**Q: Street Address**

A: 2812 Pat Tillman Dr

**Q: Zip / Postal Code**

A: 62711

**Q: City**

A: SPRINGFIELD

**Q: State / Province**

A: IL

**Q: Country**

A: US

**Q: Home Telephone**

A: 2174165059

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Other Telephone**

A: 8162266476

**Q: Email Address**

A: dhughes@genieinvestments.com

**Q: What is the best way to reach you?**

A: Phone

**Q: Are you represented by an attorney in connection with this matter, or would you like to provide your attorney's contact information?**

A: Yes

**Q: Attorney Title**

A: Mr

**Q: Attorney First Name**

A: Adam

**Q: Attorney Last Name**

A: Walker

**Q: Attorney Firm Name**

A: AW Securities Law

**Q: Attorney Street Address**

A: 4050 Pennsylvania Ave

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

**Q: Attorney Address (Continued)**
**A:** Suite 115-10

**Q: Attorney Zip / Postal Code**
**A:** 64111

**Q: Attorney City**
**A:** KANSAS CITY

**Q: Attorney State / Province**
**A:** MO

**Q: Attorney Country**
**A:** US

**Q: Attorney Work Telephone**
**A:** 8162266476

**Q: Attorney Email Address**
**A:** adam@awsecuritieslaw.com

**Q: Select the profession that best represents you.**
**A:** Other

**Q: For Other, please specify.**
**A:** Owner and director of lending business and lending platform

**Tips, Complaints, and Referrals**
Summary Page - Submitted Externally

## Documents

| Document Name | Document Type |
|---|---|
| JVA - clean copy.pdf | application/pdf |
| 2022-12-30 Velanos letter to Genie ($75MM owed to you).pdf | application/pdf |
| Velanos Wire $3MM 10-20-22.pdf | application/pdf |
| Velanos Wire $3MM 11-30-22.pdf | application/pdf |
| Morgan Stanley.pdf | application/pdf |
| Amended arbitration demand.pdf | application/pdf |
| Velanos -WY corp record.pdf | application/pdf |
| 2023.01.31 Directors (adding James Hutchinson).pdf | application/pdf |
| 2023.10.13 Velanos response to Genie demand letter.pdf | application/pdf |

 FEDERAL BUREAU OF INVESTIGATION

# Victim Information

| | |
|---|---|
| Name: | Genie Investments NV |
| Are you reporting on behalf of a business? | Yes                - |
| Business Name: | Genie Investments NV |
| Is the incident currently impacting business operations? | Yes |
| Age: | |
| Is the victim aged 17 or under? | |
| Address: | 401 Ryland |
| Address (continued): | |
| Suite/Apt./Mail Stop: | Suite 200A |
| City: | Reno |
| County: | |
| Country: | United States of America |
| State: | Nevada |
| Zip Code/Route: | 89502 |
| Phone Number: | 2176701239 |
| Email Address: | dhughes@genieinvestments.com |
| Business IT POC, if applicable: | |
| Other Business POC, if applicable: | John Michael Cohan, (516) 547-2810, jmcohan@genieinvestments.com |

# Financial Transaction(s)

| | |
|---|---|
| Transaction Type: | WireTransfer |
| If other, please specify: | |
| Transaction Amount: | 3000000.00 |
| Transaction Date: | 10/20/2022 |
| Was the money sent? | Yes |
| | |
| Victim Bank Name: | J.P. Morgan Chase Bank NA |
| Victim Bank Address: | 7301 Baymeadows Way |
| Victim Bank Address (continued): | |

| | |
|---|---|
| Victim Bank Suite/Mail Stop: | |
| Victim Bank City: | Jacksonville |
| Victim Bank Country: | United States of America |
| Victim Bank State: | Florida |
| Victim Bank Zip Code/Route: | 32256 |
| Victim Name on Account: | Genie Investments NV |
| Victim Account Number: | xx8502 |

| | |
|---|---|
| Recipient Bank Name: | Bank of Nova Scotia / Scotia Bank |
| Recipient Bank Address: | 3401 Dufferin St |
| Recipient Bank Address (continued): | |
| Recipient Bank Suite/Mail Stop: | Mail Box 54 |
| Recipient Bank City: | TORONTO |
| Recipient Bank Country: | Canada |
| Recipient Bank State: | |
| Recipient Bank Zip Code/Route: | M5C 2R9 |
| Recipient Name on Account: | Velanos Principal Capital Inc. |
| Recipient Bank Routing Number: | |
| Recipient Account Number: | 221520007617 |
| Recipient Bank SWIFT Code: | NOSCCATT |

| | |
|---|---|
| Transaction Type: | WireTransfer |
| If other, please specify: | |
| Transaction Amount: | 3000000.00 |
| Transaction Date: | 11/21/2022 |
| Was the money sent? | Yes |

| | |
|---|---|
| Victim Bank Name: | Signature Bank |
| Victim Bank Address: | 565 Fifth Ave. |
| Victim Bank Address (continued): | 12th floor |

| | |
|---|---|
| Victim Bank Suite/Mail Stop: | |
| Victim Bank City: | New York |
| Victim Bank Country: | United States of America |
| Victim Bank State: | New York |
| Victim Bank Zip Code/Route: | 10017 |
| Victim Name on Account: | Genie Investments NV |
| Victim Account Number: | 00001505033341 |

| | |
|---|---|
| Recipient Bank Name: | Bank of Nova Scotia / Scotia Bank |
| Recipient Bank Address: | 3341 Dufferin St. |
| Recipient Bank Address (continued): | |
| Recipient Bank Suite/Mail Stop: | Mail Box 54 |
| Recipient Bank City: | Toronto |
| Recipient Bank Country: | Canada |
| Recipient Bank State: | |
| Recipient Bank Zip Code/Route: | M6A 2T9 |
| Recipient Name on Account: | Warren Law Group (escrow agent) |
| Recipient Bank Routing Number: | |
| Recipient Account Number: | 221520007617 |
| Recipient Bank SWIFT Code: | NOSCCATT |

| | |
|---|---|
| Transaction Type: | WireTransfer |
| If other, please specify: | |
| Transaction Amount: | 3000000.00 |
| Transaction Date: | 11/30/2022 |
| Was the money sent? | Yes |

| | |
|---|---|
| Victim Bank Name: | J.P. Morgan Chase Bank NA |
| Victim Bank Address: | 7301 Baymeadows Way |
| Victim Bank Address (continued): | |

IC3 Complaint Referral Form

Victim Bank
Suite/Mail Stop:
Victim Bank City:              Jacksonville
Victim Bank Country:           United States of America
Victim Bank State:             Florida
Victim Bank Zip                32256
Code/Route:
Victim Name on                 Genie Investments NV
Account:
Victim Account                 x8502
Number:


Recipient Bank Name:           Bank of Nova Scotia / Scotia Bank
Recipient Bank                 44 King Street West
Address:
Recipient Bank
Address (continued):
Recipient Bank
Suite/Mail Stop:
Recipient Bank City:           Toronto
Recipient Bank                 Canada
Country:
Recipient Bank State:
Recipient Bank Zip             M5H 1T1
Code/Route:
Recipient Name on              Velanos Principal Capital
Account:
Recipient Bank
Routing Number:
Recipient Account              221520007617
Number:
Recipient Bank SWIFT           NOSCCATTXXX
Code:

# Description of Incident

Provide a description of the incident and how you were victimized.
Provide information not captured elsewhere in this complaint form.

Genie is a Nevada corporation that provides capital to small and
medium-sized businesses through lines of credit. It obtains capital
from "warehouse lenders" and other sources and, in turn, lends those
funds to borrowers at marginally higher rates.

In late 2022, Genie sought new sources of affordable capital. At the time, Genie worked with a network of finders who introduced Genie to potential borrowers. One of those finders was Will Byrd. Upon learning that Genie wanted to find new sources of capital to lend, Byrd introduced Genie to Josh Wearmouth and Velanos in October 2022.

Wearmouth told Genie that he used capital from business partners to monetize SBLCs by buying them at a discount and then selling them at a profit. He proposed a joint venture between Genie and Velanos wherein Velanos would use capital supplied by Genie to complete a series of prearranged trades of SBLCs. Wearmouth further represented that this would pose no risk to Genie's capital. Byrd, who has frequently acted as Wearmouth's spokesperson in communications with Genie, vouched for Wearmouth and supported his assertions. Wearmouth provided Genie with a draft Joint Venture Agreement (JVA) that called for Genie to contribute capital, for Velanos to use those capital contributions to trade SBLCs, and for Velanos to return the capital contributions and distribute resulting profits to Genie within 60 days.

After Genie's then-lawyer reviewed the contract and supposedly vetted the underlying trading program, Genie and Velanos signed the JVA in October 2022. In November 2022, upon invitations from Wearmouth and Byrd, Genie contributed an additional $6.0 million in capital. In exchange, Velanos agreed to provide Genie with a total of $75 million ($9.0 million in capital contributions and $66.0 million in profits) within 60 days.

The JVA, a copy of which is attached as Exhibit A, also required Velanos to deploy Genie's capital contributions "strategically and with discretion, including facilitating a systematic purchase and sale of financial instruments routine." Elsewhere, the JVA identified "SBLC (Standby Letter of Credit) HSBC London/Top Rated Issuer" as the "Transacting asset(s)." The JVA also included nondisclosure and non-circumvention clauses. Genie did not know at the time that these and many other aspects of the JVA and Wearmouth's description of the putative trading program were hallmarks of a type of fraudulent scheme well-known to law enforcement and securities regulators.

Almost immediately, Wearmouth and Byrd began making false promises of imminent payments, followed by bogus excuses when those payments did not happen. When making those promises and excuses, Wearmouth and Byrd often invoked terms that Genie later learned were hallmarks of SBLC and similar scams.

For example, in a letter to Genie dated December 30, 2022, Velanos

claimed "that the $75,000,000.00 USD owed to you will be available on or before January 15th, 2023." The same letter identified an account Velanos purportedly had with HSBC Bank and asserted that the account held nearly 350 million Euros. Wearmouth also provided a screenshot of an email that he supposedly received from a representative of HSBC Bank "confirming" that Velanos "with accounts at HSBC bank located 79 Piccadilly, Mayfair, London are the lawful and legal owner of funds on deposit in the amount of...€ 349,220,053.20... as of this date 19th of December, 2022." The document identified the supposed account number in which the funds were held, and stated:

...these funds have been earned, being good, clean, and of a non-criminal origin, being free of and clear of any and all liens and encumbrances, and are freely assignable and transferable upon the instruction of the authorized account signatory.

The phrase "good, clean, and of a non-criminal original" closely resembles language that law-enforcement agencies have identified as emblematic of "prime bank" or advance-fee frauds. n January 2023, Wearmouth told Genie that Velanos had wired $10.0 million from a Scotiabank account to Genie's account with Chase bank. Wearmouth provided Genie's lawyer with a screenshot that purported to show tracking details for the wire transfer. Genie, however, never received any portion of that supposed transfer. As of late March 2023, Wearmouth claimed that the transferred funds were and had been held by the "corresponding [sic] bank" – later identified as Wells Fargo – since January 2023.

It is our understanding, based on consultations with banking experts, that correspondent banks cannot simply hold wire transfers on their whim. To the contrary, if a bank receives wire instructions and funds are available in the account, then the wire goes through almost immediately. The only thing that should hold up a wire transfer is if a party to the transfer is listed on the Sanctions list maintained by the Office of Foreign Asset Control. Neither Genie nor any of its principals is or has ever been on that list.

In March 2023, Wearmouth sent Genie a letter stating that trade profits (ostensibly from trades effected with Genie's $9MM) were being held at HSBC in a "sub account." The letter outlined a supposed strategy for accessing those funds. One aspect of the strategy Wearmouth described was that "a major top 25 bank will open a line of credit..." This phrase is yet another hallmark of prime-bank and advance-fee scams.

As of June 2023, Velanos still had not paid Genie any of the amounts

due under the JVA. Wearmouth, who continued to blame various banks for his failure to deliver promised payments to Genie, proposed the following: Velanos would facilitate the creation of a commercial bank account in Genie's name at Nordic Trust Alliance KB in Miami, Florida, where Velanos also had an account, and subsequently deposit $9.5 million into the newly established Genie account by June 15, 2023, and an additional $50 million by June 30, 2023.

Thereafter, Genie submitted an account application to Nordic Trust and received notification that an account in its name had been established. Genie received access to an online account portal. The online portal showed a $9.5 million credit to Velanos' account on June 20, 2023. When Genie attempted to transfer that amount or any portion of it to its account at Chase Bank, however, no money ever reached the Chase account. When Genie asked Nordic Trust to explain why it couldn't access the funds in its account, it received vague responses. In late June 2023, Nordic Trust asserted that Genie's outgoing wire transfer was awaiting European Central Bank approval, despite the fact that its account with Nordic Trust – a Swedish company – was ostensibly created through a Florida-based branch. Eventually, Nordic Trust stopped responding to any inquiries from Genie.

Subsequent investigation indicates that Nordic Trust is not authorized to conduct banking activities in Florida or elsewhere in the United States. Given its conduct and its negligible online presence, we suspect that it is a front created or used to facilitate Wearmouth's SBLC fraud.

In August 2023, Will Byrd told Genie's legal counsel that Genie's money was still held up at HSBC. He further claimed to know that the money in Genie's Nordic Trust "account" was held up because there were red flags associated with one of Genie's principals. Byrd claimed to have this information because Velanos had a contract with Nordic Trust and could therefore obtain information.

In October 2023, Genie filed an arbitration against Velanos. In connection with that arbitration, Genie took Wearmouth's deposition in February 2024. In his testimony, Wearmouth gave his date of birth as September 24, 1982, and his residential address as 20101 Southwest Cypress Street, Newport Beach, California 92660.  Wearmouth also testified that he served in the U.S. Navy from 2000 to 2003 and was stationed at a base in San Diego.

In his deposition, Wearmouth defended the legitimacy of SBLC trading and continued his prior assertions that Velanos had used Genie's $9.0 million to purchase and sell SBLCs. Wearmouth claimed that this SBLC

trading generated profits of 349 million dollars in approximately six weeks. He claimed to have acquired the SBLCs from a source whom he refused to name on the grounds that it constituted proprietary information. He further testified that those SBLCs were issued by HSBC, but claimed he no longer had access to records of those purchases or the subsequent sales.

Regarding the supposed January 2023 wire transfer of $10 million from Velanos to Genie, Wearmouth testified that the money was held by the correspondent bank, which he identified as Wells Fargo. As of February 8, 2024, Wearmouth said, "I'm still waiting to get the funds back." Neither he nor Velanos has ever provided any documentation or other credible evidence to support this assertion.

Likewise, neither Velanos nor Wearmouth has provided Genie any credible documentation or other evidence that Velanos used Genie's capital contributions as directed by the JVA, that Velanos generated a profit for the joint venture through SBLC trading, or that HSBC holds or held any trading profits to which Velanos had a rightful claim.

When questioned about Nordic Bank, Wearmouth stated that a person named Daniel Fernandez provided documentation that purportedly showed that Nordic Trust had a bank license. He also testified that he later learned that Fernandez had a criminal background.

Genie also filed a lawsuit against Wearmouth, Byrd, and Nordic Trust in the U.S. District Court for the Middle District of Florida in December. That case is unlikely to move forward. One notable result of the filing, however, is that the law firm that filed the suit subsequently received inquiries from multiple people claiming that they, too, were victims of similar scams by Velanos, Wearmouth, et al.

Not only was Genie defrauded out of millions of dollars, but there are also significant downstream effects. As a direct result of the events described above, Genie became unable to fulfill obligations to a number of its customers, who had collectively demanded several million dollars' worth of refunds. Genie was subsequently named in multiple legal actions. The money lost to Velanos' malfeasance and the expense of both defending and pursuing legal actions has depleted essentially all of Genie's assets, and it recently filed for bankruptcy protection in the Middle District of Florida.

Moreover, it appears that Velanos, Wearmouth, and Byrd are continuing to offer fraudulent investment opportunities based on a similar model. For example, Genie recently learned of postings on multiple websites, including pitchstreet.com and askforfunding.com,

IC3 Complaint Referral Form

by an entity called Cottonwood Holdings, LLC. These postings, which are similar if not identical, claim that persons with at least $10 million to invest can participate in "an off market private transaction, under the same regulations as any banking activity which is heavily regulated. This program buys and sells pre-negotiated debt from banks to pension funds and insurance companies." The postings promise a 500% return within 30 banking days. Genie believes that the individual identified on these posts – James Horton – is the same person they know as James "Will" Byrd.

## Information About The Subject(s) Who Victimized You

| | |
|---|---|
| Name: | |
| Business Name: | Velanos Principal Capital |
| Address: | 120 Adelaide Street W |
| Address (continued): | Suite 2500 |
| Suite/Apt./Mail Stop: | |
| City: | Toronto |
| Country: | Canada |
| State: | |
| Zip Code/Route: | M5H 1T1 |
| Phone Number: | 9492203555 |
| Email Address: | jwearmouth@velanosprincipalcapital.com |
| Website: | |
| IP Address: | |

| | |
|---|---|
| Name: | Joshua Wearmouth |
| Business Name: | Velanos Principal Capital |
| Address: | 20101 Southwest Cypress Street |
| Address (continued): | |
| Suite/Apt./Mail Stop: | |
| City: | Newport Beach |
| Country: | United States of America |
| State: | California |
| Zip Code/Route: | 92660 |
| Phone Number: | 9492203555 |
| Email Address: | jwearmouth@velanosprincipalcapital.com |
| Website: | www.velanosprincipalcapital.com |
| IP Address: | |

| | |
|---|---|
| Name: | James William Byrd a/k/a Will Byrd |

Business Name:   Soteria Group
Address:
Address (continued):
Suite/Apt./Mail Stop:
City:
Country:
State:
Zip Code/Route:
Phone Number:   9727625929
Email Address:   soteriapartners@gmail.com
Website:
IP Address:

Name:
Business Name:   Nordic Trust Alliance KB
Address:   121 S. Orange Ave
Address (continued):
Suite/Apt./Mail Stop:   Suite 1527
City:   Orlando
Country:   United States of America
State:   Florida
Zip Code/Route:   32801
Phone Number:   4073776837
Email Address:   info@nordictrustalliance.com
Website:   www.nordictrustalliance.com
IP Address:

# Other Information

If an email was used in this incident, please provide a copy of the entire email including full email headers.

Below is one of many relevant emails:

From: Joshua Wearmouth <jwearmouth@velanosprincipalcapital.com>
Sent: Friday, December 9, 2022 12:46 PM
To: David Hughes <dhughes@genieinvestments.com>;
soteriapartners@gmail.com
Subject: Return of 9M and full cycle
Gentlemen,
I hope all is well. I just wanted to provide some insight on the return of funds.
I requested the 9m and the balance of the account last Friday.
Late Monday I was told that at the request of the bank and Mr. Aziz no more instruments
would be provided this year. They had started the closing out the last

instrument and liquidate the
account. This is great news for you because all 75M will be available and I was told they have closed
the last instrument and are providing the liquid funds to us by today. I am waiting for the wire
confirmation as we speak. I told Will I'll throw in an extra 100k for the delay as a sign of good faith.
As soon as I have everything you will have a copy.

Thanks for your understanding and patience.

Look forward to pulling large contracts with you as the Capital partner starting at the beginning of the
year.

If you have any questions or need a call I am available.

Regards,
Joshua Wearmouth
Managing Partner

+1 (949) 220-3555

Are there any other witnesses or victims to this incident?

Genie has two current and one former principals, each of whom has knowledge of the subject matter. Those persons are David Hughes (current director), John Michael Cohan (current director), and Caleb Davis (former director).

Another witness is Genie's former legal counsel, Scott Oh. Mr. Oh resides in Illinois and is a partner with the Warren Law Group, which is based in New York, NY.

If you have reported this incident to other law enforcement or government agencies. please provide the name. phone number. email. date reported. report number, etc.

SEC regulatory complaint number 17121-698-589-057 was submitted April 3, 2024, via that agency's Tips, Complaints, and Referrals system.

Check here if this an update to a previously filed complaint: ☐

## Who Filed the Complaint

Were you the victim in the incident described above? No

## Digital Signature

By digitally signing this document, I affirm that the information I provided is true and accurate to the best of my knowledge. I understand that providing false information could make me subject to fine, imprisonment, or both. (Title 18, U.S.Code, Section 1001)

Digital Signature: Adam B. Walker

# AW SECURITIES LAW

April __, 2024

Federal Bureau of Investigation (via https://complaint.ic3.gov)
U.S. Securities and Exchange Commission (via www.sec.gov/tcr)
Federal Trade Commission (via www.reportfraud.ftc.gov)
Royal Canadian Mounted Police (via online submission)

To whom it may concern:

I am reporting a significant "prime bank" fraud of which my client, Genie Investments NV, is a victim.

The fraudulent scheme involves the supposed trading of standby letters of credit (SBLCs) by Velanos Principal Capital, a corporation registered both in Wyoming and Canada, and its owner/president, Joshua Wearmouth, who resides in Newport Beach, California. Wearmouth and Velanos, assisted by individuals and entities based in Texas, Florida, and elsewhere, induced Genie to invest $9.0 million in what was represented as a no-risk investment program that would generate huge profits within a short period of time. The fraudsters have failed to return all but $500,000 of Genie's money and lulled Genie into foregoing or delaying legal action with various lies and other fraudulent activity, as explained further below. Although Genie has filed legal actions against Velanos and others related to this activity, it is unlikely that these efforts will result in any meaningful recovery. Moreover, the individuals behind this fraudulent activity have victimized others besides Genie and are engaged in ongoing efforts to defraud other potential victims.

We ask that you investigate the activity described in this letter and pursue all appropriate civil and criminal remedies against the persons who have conducted and benefited from it. As desired, we can provide significant additional details and stand ready to assist your investigation in any way possible.

John Michael Cohan
Style Definition: Body Text

**Adam Walker**
This can go under my name or you all can send it directly whichever you prefer
April 02, 2024, 3:46 PM

**John Michael Cohan**
We want you to send it.
April 02, 2024, 8:17 PM

Reply



# AW SECURITIES LAW

Style Definition: Body Text

April ▇, 2024

Federal Bureau of Investigation (via https://complaint.ic3.gov)
U.S. Securities and Exchange Commission (via www.sec.gov/tcr)
Federal Trade Commission (via www.reportfraud.ftc.gov)
Royal Canadian Mounted Police (via online submission)

To whom it may concern:

I am reporting a significant "prime bank" fraud of which my client, Genie Investments NV, is a victim.

Commented [AW1]: This can go under my name or you all can send it directly, whichever you prefer

Commented [JC2R1]: We want you to send it.

The fraudulent scheme involves the supposed trading of standby letters of credit (SBLCs) by Velanos Principal Capital, a corporation registered both in Wyoming and Canada, and its owner/president, Joshua Wearmouth, who resides in Newport Beach, California. Wearmouth and Velanos, assisted by individuals and entities based in Texas, Florida, and elsewhere, induced Genie to invest $9.0 million in what was represented as a no-risk investment program that would generate huge profits within a short period of time. The fraudsters have failed to return all but $500,000 of Genie's money and lulled Genie into foregoing or delaying legal action with various lies and other fraudulent activity, as explained further below. Although Genie has filed legal actions against Velanos and others related to this activity, it is unlikely that these efforts will result in any meaningful recovery. Moreover, the individuals behind this fraudulent activity have victimized others besides Genie and are engaged in ongoing efforts to defraud other potential victims.

We ask that you investigate the activity described in this letter and pursue all appropriate civil and criminal remedies against the persons who have conducted and benefited from it. As desired, we can provide significant additional details and stand ready to assist your investigation in any way possible.

**SUMMARY**

Genie is a Nevada corporation that provides capital to small and medium-sized businesses through lines of credit. It obtains capital from "warehouse lenders" and other sources and, in turn, lends those funds to borrowers at marginally higher rates.

In late 2022, ~~following failures by its previous warehouse lender,~~ Genie sought new sources of affordable capital. At the time, Genie worked with a network of finders who introduced Genie

to potential borrowers. One of those finders was Will Byrd.[1] Upon learning that Genie wanted to find new sources of capital to lend, Byrd introduced Genie to Josh Wearmouth and Velanos in October 2022.

Wearmouth told Genie that he used capital from business partners to monetize SBLCs by buying them at a discount and then selling them at a profit. He proposed a joint venture between Genie and Velanos wherein Velanos would use capital supplied by Genie to complete a series of prearranged trades of SBLCs. Wearmouth further represented that this would pose no risk to Genie's capital. Byrd, who has frequently acted as Wearmouth's spokesperson in communications with Genie, vouched for Wearmouth and supported his assertions. Wearmouth provided Genie with a draft Joint Venture Agreement (JVA) that called for Genie to contribute capital, for Velanos to use those capital contributions to trade SBLCs, and for Velanos to return the capital contributions and distribute resulting profits to Genie within 60 days.

After Genie's then-lawyer reviewed the contract and supposedly vetted the underlying trading program, Genie and Velanos signed the JVA in October 2022. In November 2022, upon invitations from Wearmouth and Byrd, Genie contributed an additional $6.0 million in capital. In exchange, Velanos agreed to provide Genie with a total of $75 million ($9.0 million in capital contributions and $66.0 million in profits) within 60 days.

The JVA, a copy of which is attached as Exhibit A, also required Velanos to deploy Genie's capital contributions "strategically and with discretion, including facilitating a systematic purchase and sale of financial instruments routine." Elsewhere, the JVA identified "SBLC (Standby Letter of Credit) HSBC London/Top Rated Issuer" as the "Transacting asset(s)." The JVA also included nondisclosure and non-circumvention clauses. Genie did not know at the time that these and many other aspects of the JVA and Wearmouth's description of the putative trading program were hallmarks of a type of fraudulent scheme well-known to law enforcement and securities regulators.

Almost immediately, Wearmouth and Byrd began making false promises of imminent payments, followed by bogus excuses when those payments did not happen. When making those promises and excuses, Wearmouth and Byrd often invoked terms that Genie later learned were hallmarks of SBLC and similar scams.

For example, in a letter to Genie dated December 30, 2022, Velanos claimed "that the $75,000,000.00 USD owed to you will be available on or before January 15th, 2023." The same letter identified an account Velanos purportedly had with HSBC Bank and asserted that the account held nearly 350 million Euros. Wearmouth also provided a screenshot of an email that he supposedly received from a representative of HSBC Bank "confirming" that Velanos "with accounts at HSBC bank located 79 Piccadilly, Mayfair, London are the lawful and legal owner of funds on deposit in the amount of…€ 349,220,053.20…as of this date 19th of December, 2022." The document identified the supposed account number in which the funds were held, and stated:

> …these funds have been earned, being good, clean, and of a non-criminal
> origin, being free of and clear of any and all liens and encumbrances, and are

---

[1]    Our investigation indicates that Will Byrd's actual name is James William Byrd and that he lives or has recently lived in Dallas, Texas.

2

freely assignable and transferable upon the instruction of the authorized account signatory.

The phrase "good, clean, and of a non-criminal original" closely resembles language that law-enforcement agencies have identified as emblematic of "prime bank" or advance-fee frauds. n January 2023, Wearmouth told Genie that Velanos had wired $10.0 million from a Scotiabank account to Genie's account with Chase bank. Wearmouth provided Genie's lawyer with a screenshot that purported to show tracking details for the wire transfer. Genie, however, never received any portion of that supposed transfer. As of late March 2023, Wearmouth claimed that the transferred funds were and had been held by the "corresponding [sic] bank" – later identified as Wells Fargo – since January 2023.

It is our understanding, based on consultations with banking experts, that correspondent banks cannot simply hold wire transfers on their whim. To the contrary, if a bank receives wire instructions and funds are available in the account, then the wire goes through almost immediately. The only thing that should hold up a wire transfer is if a party to the transfer is listed on the Sanctions list maintained by the Office of Foreign Asset Control. Neither Genie nor any of its principals is or has ever been on that list.

In March 2023, Wearmouth sent Genie a letter stating that trade profits (ostensibly from trades effected with Genie's $9MM) were being held at HSBC in a "sub account." The letter outlined a supposed strategy for accessing those funds. One aspect of the strategy Wearmouth described was that "a major top 25 bank will open a line of credit…" This phrase is yet another hallmark of prime-bank and advance-fee scams.

As of June 2023, Velanos still had not paid Genie any of the amounts due under the JVA. Wearmouth, who continued to blame various banks for his failure to deliver promised payments to Genie, proposed the following: Velanos would facilitate the creation of a commercial bank account in Genie's name at Nordic Trust Alliance KB in Miami, Florida, where Velanos also had an account, and subsequently deposit $9.5 million into the newly established Genie account by June 15, 2023, and an additional $50 million by June 30, 2023.

Thereafter, Genie submitted an account application to Nordic Trust and received notification that an account in its name had been established. Genie received access to an online account portal. The online portal showed a $9.5 million credit to Velanos' account on June 20, 2023. When Genie attempted to transfer that amount or any portion of it to its account at Chase Bank, however, no money ever reached the Chase account. When Genie asked Nordic Trust to explain why it couldn't access the funds in its account, it received vague responses. In late June 2023, Nordic Trust asserted that Genie's outgoing wire transfer was awaiting European Central Bank approval, despite the fact that its account with Nordic Trust – a Swedish company – was ostensibly created through a Florida-based branch. Eventually, Nordic Trust stopped responding to any inquiries from Genie.

Subsequent investigation indicates that Nordic Trust is not authorized to conduct banking activities in Florida or elsewhere in the United States. Given its conduct and its negligible online presence, we suspect that it is a front created or used to facilitate Wearmouth's SBLC fraud.

3

In August 2023, Will Byrd told Genie's legal counsel that Genie's money was still held up at HSBC. He further claimed to know that the money in Genie's Nordic Trust "account" was held up because there were red flags associated with one of Genie's principals. Byrd claimed to have this information because Velanos had a contract with Nordic Trust and could therefore obtain information.

In October 2023, Genie filed an arbitration against Velanos. In connection with that arbitration, Genie took Wearmouth's deposition in February 2024. In his testimony, Wearmouth gave his date of birth as September 24, 1982, and his residential address as 20101 Southwest Cypress Street, Newport Beach, California 92660.[2] Wearmouth also testified that he served in the U.S. Navy from 2000 to 2003 and was stationed at a base in San Diego.

In his deposition, Wearmouth defended the legitimacy of SBLC trading and continued his prior assertions that Velanos had used Genie's $9.0 million to purchase and sell SBLCs. Wearmouth claimed that this SBLC trading generated profits of 349 million dollars in approximately six weeks. He claimed to have acquired the SBLCs from a source whom he refused to name on the grounds that it constituted proprietary information. He further testified that those SBLCs were issued by HSBC, but claimed he no longer had access to records of those purchases or the subsequent sales.

Regarding the supposed January 2023 wire transfer of $10 million from Velanos to Genie, Wearmouth testified that the money was held by the correspondent bank, which he identified as Wells Fargo. As of February 8, 2024, Wearmouth said, "I'm still waiting to get the funds back." Neither he nor Velanos has ever provided any documentation or other credible evidence to support this assertion.

Likewise, neither Velanos nor Wearmouth has provided Genie any credible documentation or other evidence that Velanos used Genie's capital contributions as directed by the JVA, that Velanos generated a profit for the joint venture through SBLC trading, or that HSBC holds or held any trading profits to which Velanos had a rightful claim.

When questioned about Nordic Bank, Wearmouth stated that a person named Daniel Fernandez provided documentation that purportedly showed that Nordic Trust had a bank license. He also testified that he later learned that Fernandez had a criminal background.

Genie also filed a lawsuit against Wearmouth, Byrd, and Nordic Trust in the U.S. District Court for the Middle District of Florida in December. That case is unlikely to move forward. One notable result of the filing, however, is that the law firm that filed the suit subsequently received inquiries from multiple people claiming that they, too, were victims of similar scams by Velanos, Wearmouth, et al.

Not only was Genie defrauded out of millions of dollars, but there are also significant downstream effects. As a direct result of the events described above, Genie became unable to fulfill obligations to a number of its customers, who had collectively demanded several million dollars' worth of refunds. Genie was subsequently named in multiple legal actions. The money lost to

Commented [AW3]: Need confirmation that this is accurate

Commented [JC4R3]: Yes, this is accurate

---

[2]    According to one real-estate website, this property has an estimated value of approximately $12 million.

Velanos' malfeasance and the expense of both defending and pursuing legal actions has depleted essentially all of Genie's assets, and it recently filed for bankruptcy protection in the Middle District of Florida.

Moreover, it appears that Velanos, Wearmouth, and Byrd are continuing to offer fraudulent investment opportunities based on a similar model. For example, Genie recently learned of a postings on www.pitchstreet.com multiple websites by an entity called Cottonwood Holdings, LLC. These This postings, which are is similar if not identical, claims that persons with at least $10 million to invest can participate in "an off market private transaction, under the same regulations as any banking activity which is heavily regulated. This program buys and sells pre-negotiated debt from banks to pension funds and insurance companies." The postings promises a 500% return within 30 banking days. Genie believes that the individual identified on these this posts – James Horton – is the same person they know as James "Will" Byrd.

## CONCLUSION

The conduct described in this letter strongly suggests a coordinated fraud by Velanos, Joshua Wearmouth, James William Byrd, and Nordic Trust Alliance. Besides the massive financial and reputational harm to Genie and its principals, Genie's customers have suffered significant adverse effects and there are likely other victims. Genie respectfully asks that you investigate this matter and obtain some measure of justice for the victims.

Sincerely,

Adam Walker
AW Securities Law

5

# EXHIBIT

# 11

John Michael Cohan
iustusprocessus@outlook.com
(516) 547-2810

05-09-2025

FBI Jacksonville – Public Corruption Unit
6061 Gate Parkway
Jacksonville, Florida 32256
Jacksonville@ic.fbi.gov

Subject: Formal Complaint – Audio Tampering, Obstruction of Justice, and Misconduct by U.S. Trustee Scott Bomkamp

Dear Sir or Madam,

I am submitting this formal complaint to report a serious violation of a protective order by Peace Ekuta, and serious misconduct, audio tampering, and obstruction of justice by United States Trustee (UST), Scott Bomkamp, in connection with Case No. 3:24-bk-00496-BAJ, a federal corporate bankruptcy proceeding in which I, as a principal, am directly affected—whereby an independent Examiner report found no fraud after four 341 meetings, two trials, an exhaustive line of questioning, and reviewing all bank records and documentation, yet baseless fraudulent allegations fabricated by the UST are still being pursued. Before making this complaint, I would like to bring to your attention that I have been investigated over 40 times by New Jersey Division of Child Protection and Permanency (DCPP) and law enforcement — as confirmed by one of the New Jersey Camden County Family Court Judge, Thomas Booth, (FD-04-000180-22), every investigation prompted by Peace Ekuta, all of which were deemed unfounded. Although these matters are interrelated, I demand immediate intervention, as courts have consistently held that separate legal matters cannot be conflated to obscure or obstruct lawful remedies—See United States v. McVeigh, 153 F.3d 1166, 1191 (10th Cir. 1998) (holding that unrelated legal controversies cannot justify suppression or distortion of due process).

1. Prior Notice to Trustee of Restraining Order Violation

Immediately following a bankruptcy trial held on 04-09-2024, prior to the fourth [5 total] scheduled 341 meeting on 04-17-24, I informed Mr. Bomkamp that one of the purported "creditors" in the case—presenting herself as "Agent Amber Adams" of "Securities Law LLC" in the previous 341 meetings—was in fact my former partner, Peace Ekuta aka Peace Freedom, a person against whom I hold a final restraining order (FV-04-002494-22) issued by Camden County, New Jersey. [Peace Ekuta has a documented history of violating the order, changing names, using false names and aliases, including "Peace Freedom" and "Agent Amber Adams." During our time together, she routinely went by the name "Alexa," and her Facebook page is still listed under the name "Peace Alexa." She also wrote a letter into one of the Camden County family courts posing as an agent and instructed the court to send all future correspondence to the "White House"—Mr. Louis Guzzo, Esq., my counsel, barred in New Jersey, can affirm that another one of the judges in the FD matter, Judge Linda Eynon, read this letter into the record.

Additionally, Ms. Ekuta sent a letter to me using the Jacksonville FBI address as her return address—which I reported directly to the Jacksonville FBI.]

The identification on 04-09-24 of Ms. Ekuta to Mr. Bomkamp was made in front of my corporate legal counsel, Bryan Mickler, and my business partner, David Hughes, and included:

• Disclosure of the restraining order itself;

• A photograph of Ms. Ekuta;

• A clear statement that she was using a false identity to participate in the proceedings and that I recognized her voice after a 10-year relationship.

Despite receiving this information, Mr. Bomkamp permitted "Ms. Adams" to participate in the additional 341 meeting, which he explicitly gave her five minutes to speak at the end of the hearing.

Florida Statutes § 741.31(4)(a); Florida Statutes § 741.30(9)(a); Federal Rule of Civil Procedure 65(d); 11 U.S.C. § 523(a)(2)(A); 15 U.S.C. § 1692e; 28 U.S.C. § 586; Bankruptcy Rule 9011; UCC § 9-610; UCC § 9-611; UCC § 9-613; UCC § 9-615; Florida Statutes § 679.6101; Florida Statutes § 679.6111; Florida Statutes § 679.6131; Florida Statutes § 679.6151; 11 U.S.C. § 704; 11 U.S.C. § 105; 11 U.S.C. § 554; Federal Rule of Bankruptcy Procedure 2004; Federal Rule of Bankruptcy Procedure 3001; Florida Rules of Civil Procedure 1.610

2. Evidence of Audio Tampering

I requested the audio recordings of the hearings directly from Mr. Bomkamp when I gave him notice. He replied stating he would provide the audio to me "for free," as if he was doing me some sort of favor. Mr. Bomkamp through Bryan Mickler, provided the files via USB (see attached email chain confirming delivery).

During that subsequent 341 meeting, Ms. Ekuta joined the 341 meeting once again and again posing as "Ms. Amber Adams." Despite being informed of the restraining order, Mr. Bonkamp allowed "Ms. Adams" to act as a creditor in the proceedings, knowing full well that her participation was unlawful. In addition, he specifically gave her 5 minutes at the end of the hearing to speak. The four parties that are aware that "Ms. Adams" is indeed Ms. Ekuta were Mr. Hughes, Mr. Bomkamp, Mr. Mickler and myself and in the context of the audio this is clear.

If matters weren't bad enough already, I distinctly remember making a statement during the fourth 341 meeting, on 04-17-24, that included a warning to Mr. Bomkamp that I would pursue a lawsuit if the misconduct continued—"Scott, if this is allowed to continue, I'm going to have a lawsuit." *That warning is now missing from the audio.* As I reviewed the audio, I found it very peculiar that I could not hear this key statement. So I listened more closely. Throughout the entire time Ms. Ekuta was allowed to speak, she can be heard talking over everyone, including the UST, the Examiner, Mr. Hughes, Mr. Mickler, and myself. She made it clear she intended to

speak over others, which prompts others to try to speak over her. This key when reviewing the audio and the next statements made in this brief.

Upon reviewing the hearing recordings in May of 2025, when Ms. Ekuta's violations started again, I discovered clear signs of audio manipulation that appear to be deliberate.

- At approximately **40:27**, I began a sentence with, "Scott, I say this respectfully," but the remainder of my sentence is suppressed or distorted in a way that makes it virtually inaudible.
- At approximately **40:42**, I began to speak again with, "Scott, if…" while another party also began speaking—this is consistent with a pattern of interruption during the hearing.
- At **40:43**, both of our voices are abruptly cut mid-sentence, with no natural pause or overlap. Immediately after, Mr. Bomkamp speaks over the cut with, "Alright, alright, alright, I just want to ask for everyone to stop talking," and quickly ends the meeting. During his interruption, a faint voice—previously cut—can still be heard underneath, which suggests this was not a clean handoff or organic audio transition.

I reviewed this multiple times, slowed the playback, and zoomed in on the waveform. I clearly witnessed a distortion at the moment my voice was cut. While I'm not a certified forensic audio technician, I don't need to be one to know what I said, heard and saw: my voice was cut off, and the audio was manipulated.

This was not accidental interference, normal crosstalk, or a technical glitch. The sequence of events and the nature of the audio distortion make it clear that this was a deliberate suppression of my speech. The fact that Mr. Bomkamp immediately spoke over the interruption and ended the hearing only reinforces this conclusion.

I am stating this unequivocally: the audio was tampered with, and it was done to silence my statements at a critical moment.

The fact that the only thing missing is the very warning I gave the UST about a potential lawsuit against him—despite everything else being preserved—proves tampering. I attest under penalty of perjury that I made this warning to Mr. Bomkamp.

Jacksonville Sheriff's Office's Officer Morman (Badge No. 79063, Complaint # 25-257523), to whom I initially reported the incident, remarked that the abrupt conclusion of the hearing sounded like an admission of wrongdoing on Mr. Bomkamp's part. There has been 3 police calls that I have had this week with Jacksonville Sherriff's office, Case Number: 25-260908-Badge # S6397, Case Number: 25-264454-Badge # 87248 and Badge # 82376.

18 U.S.C. § 1512(c); 18 U.S.C. § 1519; 18 U.S.C. § 2071; 18 U.S.C. § 1001; 18 U.S.C. § 1621; 18 U.S.C. § 371; 11 U.S.C. § 105(a); 11 U.S.C. § 521(a)(3); 11 U.S.C. § 707(a); 28 U.S.C. § 586; Federal Rule of Bankruptcy Procedure 5007; Federal Rule of Bankruptcy Procedure 9011; Federal Rules of Evidence 1002; Federal Rules of Evidence 901; Federal Rules of Evidence 403; Florida Statutes § 839.13; Florida Statutes § 918.13; Florida Statutes § 934.03; Florida Statutes § 837.06; Florida Statutes § 831.01

3. Obstruction of Justice and Tampering Motive

The timing and specificity of this tampering clearly suggest intent. The section removed includes my statement placing Mr. Bomkamp on formal notice of his liability for allowing a restrained individual to engage in federal proceedings under a false identity.

This audio tampering was an attempt to remove evidence of that notice, thereby shielding Mr. Bomkamp from later accountability. This is not a technical glitch—it is deliberate suppression of testimony and interference with evidence in a federal proceeding.

18 U.S.C. § 1512(b), 18 U.S.C. § 1519, 18 U.S.C. § 1001, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1621, 18 U.S.C. § 371, 18 U.S.C. § 1503, 18 U.S.C. § 4, 28 U.S.C. § 453, 11 U.S.C. § 105, 11 U.S.C. § 362, 11 U.S.C. § 541, 11 U.S.C. § 542, 11 U.S.C. § 548, , Fla. Stat. § 838.022, Fla. Stat. § 817.569, Fla. Stat. § 839.13, Fla. Stat. § 112.3173, Fla. Stat. § 95.11, Fla. Stat. § 90.956, Fla. Stat. § 117.107, UCC § 1-103, UCC § 3-104, UCC § 3-305, UCC § 9-203, UCC § 9-210, UTC § 105, UTC § 802, UTC § 1001, UTC § 1002, UTC § 1008, UTC § 1010, UTC § 813, 5 U.S.C. § 552a, 5 U.S.C. § 706, 44 U.S.C. § 3101, 31 U.S.C. § 3729, 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 1986, 2 CFR § 200.334, Florida Rules of Civil Procedure Rule 1.540, Florida Evidence Code § 90.804, 28 C.F.R. § 600.4, 31 C.F.R. § 103.11, Florida Administrative Code § 60GG-2.006(3), Florida Bar Rule 4-3.3, Florida Judicial Code Canon 3, Fed. R. Civ. P. 11, Fed. R. Civ. P. 26, Fed. R. Civ. P. 37, Fed. R. Civ. P. 60(b)(3), Fed. R. Civ. P. 65, Fed. R. Bankr. P. 2004, Fed. R. Bankr. P. 3001(c), Fed. R. Bankr. P. 4001, Fed. R. Bankr. P. 7001, Fed. R. Bankr. P. 9011, Fed. R. Bankr. P. 9024

## Demand for Investigation

Given the seriousness of the conduct, I formally demand immediate intervention to investigate the following:

1. Audio Tampering – A forensic analysis of the hearing audio to detect redactions or signal interruptions and to identify "Ms. Adams."

2. Misconduct by Trustee Scott Bomkamp – For knowingly permitting a party subject to a restraining order to appear under a false name, and for selectively altering or allowing alteration of the official hearing record.

3. Obstruction of Justice – For suppressing critical testimony and evidence of prior notice regarding the unlawful appearance of Ms. Ekuta in federal proceedings and tampering of key evidence.

4. A violation of a restraining order on Federal grounds.

5. Any and all other crimes that can be found.

This is not the first reported instance of Mr. Bomkamp engaging in bad faith misconduct in this case, including but not limited to, Adam Walker's Internal report (see attached), Case No. 3:24-bk-00496-BAJ, Doc. 327, Adv. Pro. No. 3:25-ap-00011-BAJ, Doc. 21, but it is by far the most blatant. His actions represent a gross abuse of public authority and a fundamental violation of constitutional due process. I urge your offices to act promptly and ensure accountability as his actions have demonstrated a false narrative that have tainted the proceedings.

I am enclosing:

• [A] A copy of the audio file in question;
• [B] A short video of Ms. Ekuta in a different story to match her voice to.
• [C] Correspondence confirming delivery of the audios from Mr. Bomkamp;
• [D] A copy of the restraining order against Ms. Ekuta along with a letter from my counsel confirming its existence;
• [E] David Hughes' Sworn Affidavit
• [F] Statement in regards to Adam Walker's Internal Report Finding the UST Committed Fraud in Order to Make the Fraudulent Accusations Against the Debtor
• [G] Email Correspondences from David Hughes to Bryan Mickler Instructing Him To Include that the UST Committed Fraud In His Response Motion to Second Baseless Conversion Motion—Which Mr. Mickler Ignored
• [H] Bryan Mickler's Response Motion Omitting Accusations After Specific Instructions to Include It (Case No. 3:24-bk-00496-BAJ, Doc. 182)
• [I] Adam Walker's Declaration regarding Warren Law Group and Scott Oh ("SO") demonstrating a "colorable case of malpractice" which has led me to this point.

Probable cause has been established for an investigation into both Scott Bomkamp and Peace Ekuta based on their involvement in multiple criminal acts within the confines of this case. Mr. Bomkamp knowingly allowed Ms. Ekuta, a person against whom I hold a restraining order, to participate in federal bankruptcy proceedings, violating 18 U.S.C. § 1503 (obstruction of justice) and Florida Statutes § 741.31(4)(a). Despite clear evidence and prior notice, he permitted her to speak at the hearing, disregarding the restraining order and further obstructing justice. Additionally, Bomkamp is implicated in audio tampering by intentionally distorting or suppressing key statements in official hearing recordings, in violation of 18 U.S.C. § 1512 (witness tampering and evidence destruction). These actions, compounded by his failure to fulfill his fiduciary duties, point to serious misconduct and violation of federal and state law, warranting immediate investigation.

Brinegar v. United States, 338 U.S. 160 (1949), Illinois v. Gates, 462 U.S. 213 (1983), 18 U.S.C. § 3052, State v. Stevens, 354 So. 2d 1244 (Fla. 4th DCA 1978), State v. Gonzalez, 526 So. 2d 1311 (Fla. 2d DCA 1988), Florida Statutes § 901.15(3), Florida Statutes § 741.31(4)(a), Florida Statutes § 741.30(9)(a), Florida Statutes § 679.6101, Florida Statutes § 679.6111, Florida Statutes § 679.6131, Florida Statutes § 679.6151, 11 U.S.C. § 105, 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. § 554, 11 U.S.C. § 704, 28 U.S.C. § 586, 15 U.S.C. § 1692e, Federal Rule of Civil Procedure 65(d), Federal Rule of Bankruptcy Procedure 2004, Federal Rule of Bankruptcy Procedure 3001, Bankruptcy Rule 9011, Uniform Commercial Code § 9-610, § 9-611, § 9-613, § 9-615, Uniform Trust Code § 801, § 802, § 803, § 804, § 1001, § 1002, § 1008, United States v.

McVeigh, 153 F.3d 1166, 1191 (10th Cir. 1998)

Please contact me at your earliest convenience for any clarification or further documentation. I have retained duplicate recordings in case of spoliation. I strongly recommend your office obtain an official version of the audios from Mr. Bomkamp's office for comparison, as this will help ensure integrity in the investigation. I believe framing the request as part of the inquiry into Ms. Ekuta's actions will help safeguard against any potential evidence being tampered with.

Thank you for your immediate attention to this matter.

Sincerely,

John Michael Cohan

without recourse UCC 1-308, 1-103

Related Cases: 6:2024cv00271
3:2024cv02392
3:2025cv00164

# EXHIBIT A

Exhibit A - A copy of the audio file in question has been attached to the Email.

# EXHIBIT B

Exhibit B - A short video of Ms. Ekuta in a different story to match her voice to has been attached to the Email.

# EXHIBIT C

 **Outlook**

---

**FW: Genie Investments NV, Inc.; 24-00496-BAJ**

---

**From** Bryan Mickler <bkmickler@planlaw.com>

**Date** Wed 4/17/2024 4:01 PM

**To**  John from Genie Investments <jmcohan@genieinvestments.com>; David from Genie Investments <dhughes@genieinvestments.com>

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

**From:** Bryan Mickler
**Sent:** Wednesday, April 17, 2024 4:01 PM
**To:** 'Bomkamp, Scott E. (USTP)' <Scott.E.Bomkamp@usdoj.gov>
**Subject:** Genie Investments NV, Inc.; 24-00496-BAJ

Scott

Both Mr. Hughes and Mr. Cohan are extremely upset at the events of the Meeting of Creditors today. It was entirely inappropriate to mention that a former attorney was indicted for acts that had no relationship with the debtor and only serve to inflame the emotions of the mob that is out to destroy the business of Genie.

Please take all immediate steps to ensure that there are no internet postings by the members of the 341 group which serve to link Genie and the despicable actions of Mr. Conners. Genie (through my office) would like to be copied on any emails that are sent to the group to ensure that everyone is on notice of the prohibition on further internet postings related to the Conners episode. Any related postings by the group will be met with an immediate sanctions motion by Genie for violations of the stay and the court's examiner order allowing the Debtor to continue to conduct business.

We also request that the Trustee's office send the audio recordings of all 341 meetings to my office as soon as possible.

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

 Outlook

---

**Re: Genie Investments (3:24-bk-496-BAJ) 341 audio**

---

**From** Bryan Mickler <bkmickler@planlaw.com>

**Date** Wed 4/24/2024 8:56 AM

**To** John from Genie Investments <jmcohan@genieinvestments.com>

**Cc** David from Genie Investments <dhughes@genieinvestments.com>

Ordered today.

Bryan Mickler
Sent from my iPhone

> On Apr 18, 2024, at 3:11 PM, John from Genie Investments <jmcohan@genieinvestments.com> wrote:

CAUTION: This message was sent from outside the company

Bryan,

Only the last two dates (when alleged creditor Adams appeared). Thank you.

Sincerely,

<image001.png>

### John Michael Cohan
Genie Investments, Director
<image002.jpg>

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity. DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710    AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm

PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.

This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

**From:** Bryan Mickler <bkmickler@planlaw.com>
**Sent:** Thursday, April 18, 2024 2:36 PM
**To:** John from Genie Investments <jmcohan@genieinvestments.com>; David from Genie Investments <dhughes@genieinvestments.com>
**Subject:** FW: Genie Investments (3:24-bk-496-BAJ) 341 audio

Let me know which dates you need?

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

**From:** Bomkamp, Scott E. (USTP) <Scott.E.Bomkamp@usdoj.gov>
**Sent:** Thursday, April 18, 2024 2:00 PM
**To:** Sinclair, Pat A. (USTP) <Pat.A.Sinclair@usdoj.gov>
**Cc:** Bryan Mickler <bkmickler@planlaw.com>
**Subject:** Genie Investments (3:24-bk-496-BAJ) 341 audio

CAUTION: This message was sent from outside the company

Hi Pat,

Please coordinate with Mr. Mickler regarding the 341 audio in this case.

The dates of the 341 meetings were: 3/20/24, 3/27/24, 4/3/24; and 4/17/24.

Mr. Mickler can clarify whether he would like all the audio, or only the last two dates (when alleged creditor Adams appeared).

Thanks,

Scott Bomkamp

 Outlook

## Copies

**From** Bryan Mickler <bkmickler@planlaw.com>

**Date** Wed 6/5/2024 2:10 PM

**To** John from Genie Investments <jmcohan@genieinvestments.com>; David from Genie Investments <dhughes@genieinvestments.com>

Certified copies of Docket and VP at my office along with audio files of 341 meetings. Ready for pickup whenever.

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

# EXHIBIT D

State of New Jersey

# Prevention of Domestic Violence Act

Page 1 of 4

__CAMDEN__  County, Superior Court, Chancery Division, Family Part

[✓] **Final Restraining Order (FRO)**     [ ] **Amended Final Restraining Order**

| Docket Number<br>**FV-04-002494-22** | | Plaintiff's Date of Birth<br>07/05/1989 | Defendant's Sex<br>F | Defendant's Race<br>**BLACK** | |
|---|---|---|---|---|---|
| In the Matter of Plaintiff<br>**COHAN JOHN M** | | Defendant's Social Security Number<br>XXX-XX-3105 | Date of Birth<br>01/15/1993 | Height<br>5 07 | Weight<br>120 |
| Defendant<br>**FREEDOM PEACE M** | | | Eye Color<br>**BROWN** | Hair Color<br>**BROWN** | |
| Home Phone Number<br>********** | Work Phone Number<br>********** | | Distinguishing Features (Scars, Facial Hair, Etc.) | | |
| Home Address<br>*** CONFIDENTIAL *** | | | Driver's License Number<br>E49656206151934 | | |
| Work Address<br>*** CONFIDENTIAL *** | | | State | Driver's License Expiration Date | |

The Court having considered plaintiff's Complaint dated      02/10/2022      seeking an ORDER under the Prevention of Domestic Violence Act, having established jurisdiction over the subject matter and the parties pursuant to *N.J.S.A.* 2C:25-17 et seq., and having found that defendant has committed an act of domestic violence, and all other statutory requirements having been satisfied:

It is on this   03   day of  March        2022   , ORDERED that:

| Sought | Granted | Part I - Relief |
|---|---|---|

**DEFENDANT:**

1. [✓] [✓] You are prohibited against future acts of domestic violence.

2. [✓] [✓] You are barred from the following locations:

   [✓] **Residence(s) of Plaintiff**      [✓] **Place(s) of employment of Plaintiff**

   [ ] Other

3. You are prohibited from having **any** oral, written, personal, electronic, or other form of contact or communication with:

   [✓] [✓] Plaintiff

   [ ] [ ] Other(s) (List names & relationship to Plaintiff):

4. You are prohibited from making or causing anyone else to make harassing communications to:

   [✓] [✓] Plaintiff

   [ ] [ ] Other(s) (Same as above or list names & relationship to Plaintiff):

5. You are prohibited from stalking, following, or threatening to harm, to stalk or to follow:

   [✓] [✓] Plaintiff

   [ ] [ ] Other(s) (Same as above or list names & relationship to Plaintiff):

6. You must pay emergent monetary relief (describe amount and method):

   [ ] [ ] Plaintiff: $_____  Effective: _____

   [ ] [ ] Dependents: $_____  Effective: _____

7. [ ] [ ] Other appropriate relief:
   Defendant (including substance abuse, mental health or other evaluations and subsequent treatment):

8. [✓] [✓] Psychiatric evaluation:
   DEF MUST COMPLETE PSYCHIATRIC EVALUATION AND DCP&P EVALUATION BEFORE APPLYING FOR UNSUPERVISED PT

9. [ ] [ ] Intake monitoring of conditions and restraints (specify):

**NOTICE TO DEFENDANT:** A violation of any of the provisions listed in this order may constitute either civil or criminal contempt pursuant to *N.J.S.A.* 2C:25-30 and may result in your arrest, prosecution, and possible incarceration, as well as an imposition of a fine or jail sentence. **Only a court can modify any of the terms or conditions of this court order.**

Revised: 4/2017, CN: 10211 (DVFRO)

**Prevention of Domestic Violence Act**

Page 2 of 4

| ☑ | **Final Restraining Order (FRO)** | ☐ | **Amended Final Restraining Order** | **FV-04-002494-22** |

| Sought | Granted | **Part I – Relief** continued |
|---|---|---|

**DEFENDANT:**

10. ☑  ☑  **PROHIBITIONS AGAINST POSSESSION OF WEAPONS:** You are prohibited from possessing **any and all fire-arms or other weapons** and must immediately surrender these firearms, weapons, permits to carry, applications to purchase firearms and firearms purchaser ID card to the officer serving this court Order. Failure to do so can result in your arrest and incarceration.

Other Weapon(s) (describe)    NONE PERMITTED

**PLAINTIFF:**

11. ☑  ☑  You are granted exclusive possession of (residence or alternate housing, list address only if specifically known to defendant):

111 RICH AVE, BERLIN NJ 08009

12. ☑  ☑  Plaintiff is granted temporary custody of (specify name(s)):
AURA FREEDOM PURSUANT TO FD-04-180-22

13. ☐  ☐  Other appropriate relief:

Plaintiff (describe)

Child(ren) (describe)

**LAW ENFORCEMENT OFFICER**

You are to accompany to scene, residence, shared place of business, other (indicate address, time, duration & purpose):

☐  ☐  Plaintiff:

☐  ☐  Defendant:

**WARRANT TO SEARCH FOR AND TO SEIZE WEAPONS FOR SAFEKEEPING**

☐  **To any law enforcement officer having jurisdiction** – this Order shall serve as a warrant to search for and seize any issued permit to carry a firearm, application to purchase a firearm and firearms purchaser identification card issued to the defendant and the following firearm(s) or weapon(s).

1. **You are hereby commanded to** search the premises for the above described weapons and/or permits to carry a firearm, application to purchase a firearm and firearms purchaser ID card and to serve a copy of this Order upon the person at the premises or location described as:

2. **You are hereby ordered** in the event you seize any of the above described weapons, to give a receipt for the property so seized to the person from whom they were taken or in whose possession they were found, or in the absence of such person to have a copy of this Order together with such receipt in or upon the said structure from which the property was taken.

3. **You are** to execute this Order immediately or as soon thereafter as is practicable.
    ☐ Anytime    ☐ Other: _____

4. **You are further ordered,** after the execution of this Order, to promptly provide the Court with a written inventory of the property seized per this Order.

**NOTICE TO DEFENDANT:** A violation of any of the provisions listed in this order may constitute either civil or criminal contempt pursuant to N.J.S.A. 2C:25-30 and may result in your arrest, prosecution, and possible incarceration, as well as an imposition of a fine or jail sentence. Only a court can modify any of the terms or conditions of this court order.

Revised: 4/2017, CN: 10211 (DVFRO)

**Prevention of Domestic Violence Act**

Page 3 of 4

| ☑ | **Final Restraining Order (FRO)** | ☐ | **Amended Final Restraining Order** | FV-04-002494-22 |
|---|---|---|---|---|

| Sought | Granted | **Part II – Relief** |
|---|---|---|

**DEFENDANT:**

1. ☐ ☐ You acknowledge parentage of: _____

2. ☐ ☐ You must submit to genetic testing: _____

3. ☐ ☐ No parenting time (visitation) until further order; _____

4. ☐ ☐ Parenting time (visitation) pursuant to (prior FV, FM, or FD Order) #  — _____ is
suspended, a hearing is scheduled for: _____

5. ☑ ☑ Parenting time (visitation) is ordered as follows: (specify drop-off and pick-up times and locations, participation of
or supervision by designated third party):
PURSUANT TO FD-04-180-22, DEF SHALL ENJOY SUPERVISED PARENTING TIME BY DEF'S FATHER, JETHRO EKUTA; PARENTING TIME TO BE
ARRANGED BETWEEN PLA AND DEF'S FATHER

6. ☐ ☐ Risk assessment ordered (specify by whom): _____
Return Date: _____

7. ☐ ☐ You must provide compensation as follows: (Appropriate notices have been attached as part of this Order):
   ☐ ☐ Emergent support – Plaintiff: $ _____
   ☐ ☐ Emergent support – Dependent(s): $ _____
   ☐ Interim support – Plaintiff: $ _____
   ☐ Interim support – Dependent(s): $ _____
   ☐ ☐ Ongoing Plaintiff support: $ _____ Effective: _____
   Paid via income withholding through the: _____ Probation Div. _____
   ☐ ☐ Other: _____
   ☐ ☐ Ongoing child support: $ _____ Effective: _____
   Paid via income withholding through the: _____ Probation Div. _____
   ☐ ☐ Other: _____

8. ☐ ☐ Medical coverage for plaintiff: _____
9. ☐ ☐ Medical coverage for dependent(s): _____
10. ☐ ☐ Compensatory damages to plaintiff: $ _____
11. ☐ ☐ Punitive damages (describe): $ _____
12. ☐ ☐ You must pay compensation to (specify third party and/or VCCO, and describe):

13. ☐ ☐ You must participate in a batterers' intervention program (specify):

14. ☐ ☐ You must make   ☐ rent   ☐ mortgage   payments (specify amount(s) due date(s) and payment manner):

15. ☐ ☐ Defendant is granted temporary possession of the following personal property (describe):

16. ☐ ☐ Defendant is granted temporary custody of (specify name(s)):

☑ **You must submit to fingerprinting and other identification procedures as required by law pursuant to *N.J.S.A.* 53:1-15.**

☐ You must pay a civil penalty of $ _____ ($50.00 to $500.00 per *N.J.S.A.* 2C:25-29) to:
_____ within _____ days. You will be charged a $2.00 transaction fee for each
payment or partial payment that you make.

☑ Waived due to extreme financial hardship because:   PER JUDGE'S ORDER _____

| Sought | Granted |
|---|---|

**PLAINTIFF:**

17. ☐ ☐ Plaintiff is granted temporary possession of the following personal property (describe):

**NOTICE TO DEFENDANT:** A violation of any of the provisions listed in this order may constitute either civil or criminal contempt pursuant to
*N.J.S.A.* 2C:25-30 and may result in your arrest, prosecution, and possible incarceration, as well as an imposition of a fine or jail sentence.
Only a court can modify any of the terms or conditions of this court order.

Revised: 4/2017, CN: 10211 (DVFRO)

**Prevention of Domestic Violence Act**

Page 4 of 4

| ☑ **Final Restraining Order (FRO)** | ☐ **Amended Final Restraining Order** | **FV-04-002494-22** |

**Comments:**
THE DEFENDANT WAS PRESENT AT THE TIME THE FRO/AFRO WAS ISSUED ON  03/03/2022

**Addendum:**

This Order is to become effective immediately and shall remain in effect until further Order of the Superior Court, Chancery Division, Family Part.

| 03/03/2022    10:26 AM | s/ LINDA W. EYNON |
| Date | Honorable |

# All Law Enforcement Officers Will Serve and Fully Enforce This Order. The Plaintiff Shall Not Be Arrested for a Violation of This Restraining Order.

- This Final Restraining Order Was Issued After Defendant Was Provided with Notice and the Opportunity to Be Heard and Should Be Given Full Faith and Credit Pursuant to the Violence Against Women Act of 1991, Sec. 40221, Codified at 18 U.S.C.A. S2265(A) and S2266.

- If Ordered, Sufficient Grounds Have Been Found By This Court for the Search and Seizure of Firearms and Other Weapons as Indicated in This Court Order.

- Defendant Shall Not Be Permitted to Possess any Weapon, ID Card or Purchase Permit While This Order Is in Effect, or for Two Years, Whichever Is Greater.

## Notice to Plaintiff and Defendant

**IMPORTANT:** The parties cannot themselves change the terms of this Order on their own. This Order may only be changed or dismissed by the Family Court. The named defendant **cannot** have any contact with the plaintiff without permission of the court. If you wish to change the terms of this Order and/or you resume living together, you **must** appear before this court for a rehearing.

## Notice to Defendant

A violation of any of the provisions listed in this Order or a failure to comply with the directive to surrender all weapons, firearm permits, application or identification cards may constitute criminal contempt pursuant to *N.J.S.A.* 2C:29-9(b), and may also constitute violations of other state and federal laws which can result in your arrest and/or criminal prosecution. This may result in a jail sentence.

## Return of Service

☑ Plaintiff was given a copy of the Order by:

| SERVED IN COURT B.SMITH | 10:28 AM   03/03/2022 | CAMDEN COUNTY FAMILY COURT |
| Print Name | Time and Date | Signature / Badge Number / Department |

☑ I hereby certify that I served the within Order by delivering a copy to the defendant personally:

| SERVED IN COURT B.SMITH | 10:26 AM   03/03/2022 | CAMDEN COUNTY FAMILY COURT |
| Print Name | Time and Date | Signature / Badge Number / Department |

☐ I hereby certify that I served the within Order by use of substituted service as follows:

| Print Name | Time and Date | Signature / Badge Number / Department |

☐ Defendant could not be served (explain):

| Print Name | Time and Date | Signature / Badge Number / Department |

The Courthouse is accessible to those with disabilities.  Please notify the Court if you require assistance.

Distribution:    Family Part,    Plaintiff,    Defendant,    Sheriff,    Other

Revised: 4/2017, CN: 10211 (DVFRO)

# GUZZO LAW FIRM

89 N. Haddon Avenue
Haddonfield, NJ 08033
www.guzzolawfirm.com
(856) 795-0020 (phone)
(856) 795-9776 (fax)

Louis G. Guzzo*
guzzolawfirm@gmail.com

Edward H. Hill*
Direct Dial (856) 296-1838
Edward.H.Hill@gmail.com

Octavia Melendez, J.S.C. (Ret.)
Special Counsel*
*Admitted in NJ
^Admitted in NJ and PA

Lauren R. Guzzo (of counsel)^

Eric R. Foley (of counsel)^
Direct Dial (215) 570-0641
EricRFoley@gmail.com

Natasha Scott^
NatashaScottEsq.@gmail.com

May 8, 2025

VIA JEDS:
Camden County Superior Court of New Jersey
Chancery Division – Family Part (INTAKE)
101 S. 5th Street
Camden, NJ  08103
Attn:   DV Unit

Re:   John M. Cohan v Peace M. Freedom
      Docket No.:  FV-04-2494-22

To Whom It May Concern:

As the court is aware, this matter there was a Final Restraining Order (FRO) entered with reference to the above captioned matter.

My client is requesting a certified copy of the FRO as he needs to register this Order out-of-state.  I have enclosed a copy of the filed FRO. Please charge my JACS account $15.00 for the fee for same.

Thank you for your time and attention to this matter.

Sincerely,

LOUIS G. GUZZO, ESQUIRE

LGG//jlo
Encl.
Cc:   John Cohan – EMAIL (w/out encl.)

# EXHIBIT E

## AFFIDAVIT OF WITNESS – PROOF OF SERVICE TO U.S. TRUSTEE

### TO WHOM IT MAY CONCERN:

I, **David C. Hughes**, declare under penalty of perjury as follows:

On **April 9, 2024**, at the **Jacksonville federal courthouse**, I personally witnessed my business partner, **John M. Cohan**, showed a copy of his **Order of Protection** to **Mr. Bomkamp**, the United States Trustee assigned to our bankruptcy matter. The Order of Protection involved Mr. Cohan's former partner, **Peace**, whom he had previously identified to Mr. Bomkamp during an earlier proceeding as a party who should not be permitted access to future calls or meetings.

Mr. Cohan clearly instructed Mr. Bomkamp to ensure that Peace would not be present on any future conference calls or 341 proceedings due to legitimate safety concerns for himself and his daughter.

However, during a subsequent 341 meeting held **on or about April 17, 2024**, I personally heard that John, was very upset that **Peace was again present on the call**, and Mr. Cohan once more brought this to Mr. Bomkamp's attention. Despite prior notice, her presence didn't appear to be restricted by Mr. Bomkamp.

There is no question in my mind that **Mr. Cohan acted responsibly and in good faith**, and that he has legitimate fears for the safety of himself and his child. It is deeply concerning and perplexing that Mr. Bomkamp failed to ensure that a person subject to a valid court-issued protective order was not excluded from subsequent proceedings.

I swear that the above statements are true and accurate to the best of my knowledge and belief, under penalty of perjury under the laws of the United States and the State of Florida.

Respectfully submitted,

**David C. Hughes**
2812 Pat Tillman Drive
Springfield, IL 62711
Email: davidchoatehughes@gmail.com

Dated: 5/9/2025

# EXHIBIT F

**EXHIBIT [F] – Statement Regarding Internal Findings by Counsel Adam Walker**

I am submitting this statement to clarify and interpret, to the best of my ability while holding a Paralegal Certification, the critical findings of Adam Walker, a 12-year veteran FINRA attorney who routinely investigated fraud and served as my company's special legal counsel during the relevant proceedings. Mr. Walker prepared internal documentation that substantiates serious misconduct by the United States Trustee, including acts constituting fraud.

Mr. Walker's internal reports conclude the following:

1. The Trustee knowingly relied on a baseless examiner report that misrepresented key facts.

2. That report, authored by a CPA, included legal conclusions and contract interpretations without the benefit of a law license.

3. The CPA's analysis was outside the scope of their expertise and rendered the report invalid as a legal basis for UST action.

4. Mr. Walker documented that the Trustee used the flawed report to justify improper litigation and misrepresentations to the court.

The incomplete and speculative nature of the Examiner report was never corrected, and supplements were never issued.

While I am not attaching Mr. Walker's full internal report due to attorney-client privilege, we may be willing to provide the report under seal if absolutely necessary for federal investigation or enforcement purposes.

Mr. Walker's findings were a turning point that requires careful analyzation in identifying the UST's reckless conduct. The UST's unfounded conclusions support my allegations of abuse of process, fraud on the court, and civil rights violations connected to the UST's actions.

# EXHIBIT G

 Outlook

---

**RE: Updated edits to draft opposition**

---

**From** David from Genie Investments <dhughes@genieinvestments.com>

**Date** Tue 7/23/2024 3:40 PM

**To** John from Genie Investments <jmcohan@genieinvestments.com>; Adam Walker <adam@awsecuritieslaw.com>; Bryan Mickler <bkmickler@planlaw.com>

Would just like to add: As support for this allegation, the UST cites paragraph 188 of the Examiner's Report, which states, in its entirety, "According to [John Michael] Cohan, Better Methods is an asset management company set up to protect the Debtor's assets and the assets of the Debtor's clients." The "express purpose" alleged by the UST as direct evidence of fraud is itself a fraud, fabricated by the UST and unsupported by any evidence in the Report or elsewhere in the record of this case.

And making sure that the judge knows that we did not use clients funds to refund other clients like she said she found a few examples of.

Sincerely,

---

**David Hughes**
**Genie Investments, Director**



A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.
DISCLAIMER: The sender (dhughes@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. The sender is a Consultant and makes no warranties or representations as to the Buyer, Seller, or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, the Recipient must return any and all documents in their original receipted condition to the Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710    AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm
PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.
This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

**From:** John from Genie Investments <jmcohan@genieinvestments.com>
**Sent:** Tuesday, July 23, 2024 1:58 PM
**To:** Adam Walker <adam@awsecuritieslaw.com>; Bryan Mickler <bkmickler@planlaw.com>; David from Genie

Investments <dhughes@genieinvestments.com>
**Subject:** RE: Updated edits to draft opposition

Adam and Bryan,

I like this version. I made one simple edit via a comment. I'm sure David would like to add a few things, but thank you both.

Sincerely,

**John Michael Cohan**
Genie Investments, Director



A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.
DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710    AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm
PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.
This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

**From:** Adam Walker <adam@awsecuritieslaw.com>
**Sent:** Tuesday, July 23, 2024 12:27 PM
**To:** Bryan Mickler <bkmickler@planlaw.com>; David from Genie Investments <dhughes@genieinvestments.com>; John from Genie Investments <jmcohan@genieinvestments.com>
**Subject:** Updated edits to draft opposition

This version includes edits to the final section. Let me know what you think.

To see what it would do to the overall length of the document, I also incorporated the changes I suggested yesterday. If we went with those -- and I'm not assuming we necessarily will -- it would put the body of the document at about 10 1/2 pages. That's pretty close to where we need to be.

David/John -- please chime in on anything major you think isn't covered.


Adam Walker
AW Securities Law

www.awsecuritieslaw.com
(816) 226-6476

 Outlook

---

### RE: Kristin's restraining order and tone

---

**From** David from Genie Investments <dhughes@genieinvestments.com>

**Date** Fri 7/26/2024 9:31 AM

**To**    John from Genie Investments <jmcohan@genieinvestments.com>; Bryan Mickler <bkmickler@planlaw.com>; Adam Walker <adam@awsecuritieslaw.com>

Thanks, Bryan, it's just the more I read her report and his findings the more disgusted I get. He picked his bottom-barrel firm willing to blatantly make fiction up completely by ignoring our contract language and adding her words in our contract which exists NOWHERE! The UST knows it and writes his second report. All accusations he wrote in both reports are wrong, as Adam said in the second report by using her false report and then making his new accusations... that was deliberate FRAUD on his part!. He did commit FRAUD! These two think they can lie, cheat, and do whatever they want at the risk and expense of John and I's families and to the detriment of the creditors by going in for a professional fee unethical money grab while knocking out the non-refundables if they got their way.

They are both disgusting.

Sincerely,

---

**David Hughes**
**Genie Investments, Director**



A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.
DISCLAIMER: The sender (dhughes@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. The sender is a Consultant and makes no warranties or representations as to the Buyer, Seller, or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, the Recipient must return any and all documents in their original receipted condition to the Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710    AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.
This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

**From:** John from Genie Investments <jmcohan@genieinvestments.com>
**Sent:** Friday, July 26, 2024 8:19 AM
**To:** Bryan Mickler <bkmickler@planlaw.com>; David from Genie Investments <dhughes@genieinvestments.com>; Adam Walker <adam@awsecuritieslaw.com>
**Subject:** Re: Kristin's restraining order and tone

Bryan,

(1) Please send us the final version for our approval.
(2) When is the motion for Kristin due?
(3) Serge asked when the suit will be filed against Tucker so he can inform JAMS.
(4) Do you have a template for our plan yet?

Sincerely,

## John Michael Cohan

Genie Investments, Director

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.
DISCLAIMER: Sender)(jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710 AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm
PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.
This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

---

**From:** Bryan Mickler <bkmickler@planlaw.com>
**Sent:** Friday, July 26, 2024 9:13:28 AM
**To:** David from Genie Investments <dhughes@genieinvestments.com>
**Cc:** John from Genie Investments <jmcohan@genieinvestments.com>
**Subject:** RE: Kristin's restraining order and tone

Understood. I'll clean it up and file today.

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
https://urldefense.proofpoint.com/v2/url?u=http-
3A__www.planlaw.com&d=DwIGaQ&c=euGZstcaTDllvimEN8b7jXrwqOf-
v5A_CdpgnVfiiMM&r=dy6HGkbX8QdR0_VthdvbIQsEZ5a7Ad4Om8cspuVY6lo&m=Otd0kxvNDPK_bcgp
A9yK0dHmswbO5uN0y_uJ9qDq0dg7gFLnWCL0gSY2Tn11kmr-
&s=yIRNagyIAz_raJwzjPThTUZrAvU6Qe2X8hDIFEAFv9Q&e=

——Original Message——
From: David from Genie Investments <dhughes@genieinvestments.com>
Sent: Thursday, July 25, 2024 7:10 PM
To: Bryan Mickler <bkmickler@planlaw.com>
Cc: John from Genie Investments <jmcohan@genieinvestments.com>
Subject: Kristin's restraining order and tone

CAUTION: This message was sent from outside the company

Bryan,

I spoke with John and yes we want harsh tone and language. The trustee hired his go to examiner which went out of her way to lie so that he could then continue false allegations putting my family at risk. They both intentionally did this.

Kristin , just gotta make sure we can continue our suits period. They extorted us, false claims, criminal claims etc... without their actions we wouldn't even be in bk... goes for the PATEL's andceach and every other one of them.
Sent from my iPhone

# EXHIBIT H

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

IN RE: GENIE INVESTMENTS NV, INC.

    Debtor (s).

CASE NO.: 3:24-bk-00496-BAJ

_____/

## OPPOSITION TO SECOND MOTION TO APPOINT CHAPTER 11 TRUSTEE OR IN THE ALTERNATIVE, APPOINT AN EXAMINER, DISMISS THIS CASE OR CONVERT THIS CASE TO CHAPTER 7 FILED BY UNITED STATES TRUSTEE

GENIE INVESTMENTS NV (GENIE or Debtor), in opposition to the above-referenced motion filed by United States Trustee (Doc. No. 154), states:

### INTRODUCTION

GENIE vehemently disputes the factual and legal basis upon which the Trustee relied in its Second Motion to Appoint a Trustee or Convert this case. The Trustee's Motion makes no attempt to justify the appointment of a Trustee except by recitations of selected portions of the Examiner's Report. As seen below, the Report by the Examiner was flawed due to the incorrect financial assumptions and speculative nature of any future actions by GENIE and/or its Principals.

On March 5, 2024, the U.S. Trustee (Trustee) filed it's first Motion in this case seeking various forms of relief, including appointment of a Chapter 11 trustee. In that motion, the Trustee has falsely asserted that Genie was a fraudulent enterprise that "simply stole" money from its customers and other ostensible creditors and invested $9.0 million of "other people's money" in an "obviously suspect" transaction. See Doc. 20 ¶¶ 16-17. The Trustee based these false allegations solely on the misguided statements of 18 small-business owners. Following a two day trial on the motion, the Court granted only the request to appoint an Examiner.

1

The Trustee subsequently selected and appointed an Examiner. After a lengthy investigation, the Examiner issued a Report. According to the UST, the Examiner's Report ("Report") (Doc. 146) fully supports the UST's earlier allegations. The Trustee then filed it's Second Motion to Appoint a Chapter 11 Trustee or Convert at Doc. No. 154 and claimed that the Examiner's Report showed that an appointment of a Trustee or conversion to a Chapter 7 would be appropriate. Nothing could be further from the truth.

The Trustee has relied upon the findings of the Examiner without any inquiry into the veracity of the Report. The Report is rife with inaccuracies, unsupported conclusions, and omissions of material and pertinent evidence. Among other things, the Report inaccurately describes fundamental aspects of Genie's business. It falsely states, for example, that Genie required a borrower seeking a Business Expansion Line of Credit ("BELOC") to enter a separate Due Diligence Agreement and that, "In some instances, borrowers paid McMann [Commercial Lending] an upfront initial application fee related to a loan with Genie NV." Report ¶¶ 20, 37. In addition, despite noting that fees charged pursuant to the Due Diligence Agreement were non-refundable, the Report improperly conflates the BELOC Agreement and Due Diligence Agreement by stating that customers whose BELOCs were not funded "did not receive a refund of their Due Diligence Fees or ICA funding." Report ¶ 38.

The Report contains numerous other errors, many of them attributable to the Examiner's decision to ignore foundational documents (e.g., contracts) and other evidence that would be crucial to any reasonable analysis. As a result, the Report persistently mischaracterizes Genie's operating history, revenues, management, the terms of its relationships with borrowers and business partners, and its future prospects. This taints the entire Report and undermines the instant motion. The Trustee's Motion simply cherry-picks snippets that support the appointment of a

Trustee without bothering to determine whether the Examiner correctly based such passages on relevant documentary evidence or analysis.

The UST's false insistence that the Report "confirms" key allegations from its initial motion shows that the Trustee's investigative and analytical rigor is lacking due to the numerous errors and omissions contained in the Report. This is most notable in connection with the UST's allegations of fraud. At the very outset of its motion, the Trustee claims that the Report "confirms" that a trustee "must be appointed in this case because the Debtor engaged in fraud and gross mismanagement..." Second Motion, at 2. But nowhere in the 51-page Report is there any finding or conclusion that Genie engaged in fraud. The Trustee simply invented this "confirmation" and attributed it to its hand-selected Examiner.

## I.    THE BELOC AGREEMENT MAKES CLEAR THAT ICA PAYMENTS RECEIVED BY GENIE WERE NOT REQUIRED TO BE HELD IN TRUST AND THEREFORE DID NOT CONSTITUTE "CUSTOMER FUNDS."

Much of the Report proceeds from a false premise: that Genie was required to hold ICA Payments in trust for the borrowers who paid them. It is indisputable that the BELOC Agreement between Genie and its borrowers governs what ICA Payments are and how they are treated. Nowhere in that agreement does it require or suggest that ICA Payments will be held in escrow or in trust. The Report and the Trustee's Motion offer no analysis of the relevant portions of the BELOC Agreement to support the above allegation.

The Report instead cites an email, a demand letter, and a borrower affidavit as support for the perfunctory conclusion that ICA Payments remained "customer funds" after their receipt by Genie. Report ¶¶ 81, 39, 82. It should go without saying that the opinions of interested parties cannot override the unambiguous language of a written contract. As already noted, the Report simply ignores the actual contract language. Worse yet, the Report attempts to support its flawed

premise by inventing and repeating improper terminology – i.e., "ICA reserves" and "ICA deposits" – despite the fact that those terms never appear in the BELOC Agreement in connection with ICA Payments. *See, e.g.*, Report ¶¶ 25, 29, 39, 77, 79, 80. In this way, Genie is no different from a retail store or service provider which promises refunds to unsatisfied purchasers. Nordstrom and Wal-Mart do not have to set aside money received from customers until all opportunity for a refund has passed and neither did Genie. Thus, the funds Genie received in the form of ICA Payments were its own funds, not "customer funds," as the Examiner asserts.

This shoddy methodology results in a fatally flawed Report. Because Genie was never required to hold ICA Payments in trust for customers, those payments constituted revenue realized by Genie much like any other business which takes in customer money and later issues refunds from a pool of revenue. The possibility that ICA Payments could later become refundable does not change the nature of the transaction or the contractual language.

Based on the wrongful interpretation of the contractual obligations by the Examiner, the Trustee continued to ignore the relevant contractual language when its motion stated that the Examiner, "*found* that the purpose of the ICA funds was to pre-pay interest amounts on customer loans." Second Mot., at 5 (¶ 11) (emphasis added). Discerning the "purpose" of ICA Payments[1] is, however, purely a matter of contract interpretation. Because the instant motion does not address the relevant contract language or question the wrongful conclusion of the Examiner, it offers no basis for determining that Genie had an obligation to hold ICA Payments in trust as customer funds.

---

[1]    The term "ICA funds" is a misnomer – that phrase never appears in the BELOC Agreement – and presumably refers to "ICA Payments."

II.    **THE REPORT EXCLUDES EVIDENCE THAT GENIE HAD A GOOD-FAITH BELIEF, BASED ON GUIDANCE AND ADVICE FROM A REPUTABLE LAW FIRM, THAT THE VELANOS TRANSACTION WAS A SOUND INVESTMENT.**

In October 2022, Genie received an offer to enter into a joint venture with Velanos Principal Capital (Velanos). The proposal called for Genie to provide $3.0 million in capital that Velanos, the joint venture's manager, would use to purchase and sell standby letters of credit (SBLCs) at a substantial profit. Before deciding whether to accept the offer, Genie engaged Scott Oh of Warren Law Group (WLG) to perform due diligence on the proposed deal, advise Genie on risks associated with it, and, if necessary, review and revise the joint-venture agreement. According to WLG's website, Oh "often advise[d] and facilitate[d] his clients in identifying, analyzing, and structuring...private placement opportunities, joint ventures, and other private capital transactions, conventional/unconventional asset-based credit facilities, credit enhancements, and corporate debt transactions."

Oh represented Genie from October 2022 to July 2023. During that time, he regularly consulted with Genie about the joint venture, reviewed multiple amendments to the Joint Venture Agreement, and communicated frequently with Velanos on Genie's behalf. At no time did Oh express to Genie any concern that the joint venture was fraudulent. In fact, Oh advised Genie that SBLC trading was legitimate and that he was familiar with at least one person for whom Velanos and/or its CEO syndicated. In late 2022, when Genie twice increased its capital contribution to the joint venture to a total of $9.0 million, Oh did not advise Genie against doing so. And when Velanos failed to make the payments required under the Joint Venture Agreement, Oh never told Genie that Velanos' various excuses were dubious.

Although the Report states that the Examiner reviewed WLG's bank records, it does not appear that the Examiner interviewed Oh or WLG regarding the substance of Oh's work for Genie. The Report castigates Genie for entering into the joint venture with Velanos but does not

5

acknowledge that Genie hired a professional to apprise it of risks and concerns raised by the joint venture. Instead, the Examiner lays all the blame for the Velanos transaction at the feet of Genie and simply concludes that Genie's decision to enter the joint venture constituted "gross mismanagement." The Trustee not only seizes on this incorrect conclusion, but expands on it, stating that "Debtor engaged in gross mismanagement, *at a minimum*, in its dealings with Velanos…" Second Mot., at 2.

## III.   THE TRUSTEE CANNOT MEET ITS BURDEN OF DEMONSTRATING THAT GENIE'S LOANS TO AFFILIATED ENTITIES CONSTITUTED EITHER FRAUD OR GROSS MISMANAGEMENT.

The Trustee starts its argument by stating that the transfers to the insider entities are presumptively fraudulent despite there being no financial backing to support such a premise. See Doc. No. 154; Page 7 of 13; Subsection A. The Trustee's argument is devoid of any financial information save for the value of the insider loans made by GENIE in the amount of $3,697,681.00 See Page 5 of 13. No court has conducted a trial or any analysis to determine whether those loans should be avoided under section 548 at this point. Asking the Court to appoint a trustee only because a trustee *might* be expected to pursue some transfers that *might* be avoidable is premature and not supported by any findings of actual fraud committed by GENIE.

Instead, the Trustee recites the "badges of fraud" often employed by Federal courts in determining, for purposes of 11 U.S.C. § 548, whether a debtor "intended to hinder, delay, or defraud" creditors. The UST's motion only addresses some of those factors, however, and does so in an extremely cursory fashion. Nonetheless, the Trustee declares that all of the alleged badges of fraud are present in the affiliate-loan transactions.

The only "badge of fraud" correctly noted by the Trustee is that the underlying transactions were to insider corporations. GENIE did not, as the Trustee alleges, retain control over the funds

after transferring them; the recipients used those funds for legitimate business purposes. Nor did GENIE conceal any of the transfers but, in fact, documented them in writing, recorded them in its books, and disclosed them in its initial Chapter 11 filings and subsequent amendments.

The Trustee asserts that "Debtor's funds were transferred (1) to insiders or affiliates; (2) while the Debtor was being sued or under threat of suit for failing to fund loans…" Second Mot. ¶ 19. This is statement is false and ignores the undisputed facts that have been testified to and supported by documentary evidence at trial. The affiliate transfers identified in the Report were all made pursuant to loan agreements executed in September 2022. At that time, Genie had successfully funded dozens of loans, had never failed to issue a properly requested refund of an ICA Payment, had not agreed to contribute any money to the joint venture with Velanos, and had never been sued or threatened with suit related to an alleged breach of a BELOC Agreement.

Further, as detailed in the Report, these transfers happened piecemeal over the course of many months, with nearly all of them taking place between September 2022 and July 2023. Report, Exh. 4, ¶¶ 147, 159. The schedules contained in the Report show that nearly all of Genie's transfers to affiliated entities occurred before Genie was insolvent, before it had any reason to believe that it would soon become insolvent,[2] and before any putative creditor had sued Genie or threatened suit against it.

Conveniently, while examining the insider transactions, the Trustee ignores the value of the underlying GENIE loan portfolio of approximately $4M in non-insider loans that existed on the date of the transfers, the $15M settlement against Velanos and other related claims against former attorneys for GENIE related to the Velanos transaction that could result in recovery of $1M as

---

[2] As discussed above, Genie had a good-faith belief until at least July 2023 that it would shortly receive a payment of at least $9.5 million from Velanos pursuant to the Joint Venture Agreement.

estimated. This nearly $20M in assets is not mentioned in relation to the alleged fraudulent transfers badges as listed by the Trustee. There is also no evidence that the insider loans will not be paid back to GENIE.

The Trustee further alleges that Genie transferred funds to affiliates "for less than the equivalent value based on the non-market nature of the loans." Second Motion ¶ 19. In doing so, the Trustee fails to note that each of the loans at issue requires repayment in full of the loan's principal amount and that the loans are not forgivable.

It is common in any industry that shareholder loans are made to insiders on favorable terms and later repaid with minimal interest. See https://www.walzgroupcpa.com/post/how-to-avoid-tax-pitfalls-when-making-corporate-loans-to-shareholders/ (discussing "when a corporation loans money to a shareholder at what the tax law considers an inadequate interest rate — meaning below the applicable federal rate (AFR) — additional interest generally must be "imputed" under the below-market loan rules set forth in the federal tax code.") The insider or corporate entity may face an additional tax consequence as a result of the below market loan rate charged, but such a low rate in no way makes the loan fraudulent from a tax perspective. The Examiner (herself a CPA) never bothers to discuss such tax issues in her Report. Instead, the loans are immediately described as potentially avoidable due to the low interest rate charged.

Moreover, even assuming that the loan terms were more favorable than the affiliate borrowers could have found elsewhere, this fact alone cannot prove that Genie received less than "reasonably equivalent value" in exchange for the money lent. When evaluating the value received in exchange for allegedly fraudulent transfers, Courts recognize various "indirect" benefits – i.e., benefits that may not be easily reduced to a specific dollar value. Here, the indirect benefits of the affiliate loans are real and were shared with the Examiner. Zoomeral, for example, used the funds

8

borrowed from Genie to hire programmers to improve its software platform, which was central to Genie's communication with potential borrowers, ongoing client management, education, reporting, and data storage and to create an advertising campaign. Genie reasonably expected these improvements to Zoomeral's technical abilities would result in increased growth and better overall customer experience for Genie.

Finally, the Examiner pointed out that a $5M refund payment was made to 1P Ventures, LLC in May of 2023. See Examiner Report at page 28. The Examiner has attempted to portray that customer refund as further evidence of fraud by stating, "We have been unable to locate a corresponding deposit in the amount of $5,000,000 for 1P Ventures, LLC. According to Cohan and Hughes, this investor is related to Paul Kirkoff, who connected Genie NV to potential borrowers. According to Cohan, "In some instances, entities were created for the purposes of our program. It was very common for companies to send in their funds from a different company that they own or from a personal account. They also sometimes received their refunds in different accounts as well." Examiner Report pages 28-29.

This is simply another example of the Examiner reaching a conclusion by either ignoring facts or fabricating facts in order to justify that conclusion. Again, the Trustee has failed to investigate or even question the motives and/or facts related to the conclusion by the Examiner. In the case of 1P Ventures, the customer by the name of DC1 Labs is Yumi, 1P Ventures and Caer Inc. DC1 Labs deposited $5M into the account of Genie at Chase Bank (Genie Investments NV Chase ***8502). The Examiner was provided with the corresponding contract for the -payment of $5M from 1P Ventures, LLC (Through DC1 Labs) to substantiate the fact that this refund was a legitimate customer refund and not an indication of fraud as alluded to by the Examiner. Genie has no connection to DC1 Labs, 1P Ventures, Plutus or any of the individuals associated with those

entities.

## IV. GENIE IS THE ONLY ENTITY THAT WILL BE ABLE TO PURSUE VELANOS WITHOUT INCURRING EXCESSIVE ADMINISTRATIVE COSTS.

Pending before the Court is the Debtor's Motion to Approve the Velanos settlement in the amount of $15M (Doc. No. 107). The settlement was the result of almost two years of effort and litigation by the principals of GENIE and its legal team to recover $9.0 million that GENIE had transferred to Velanos in 2022.

In hindsight, Genie determined that the Velanos transaction was a fraud, but that was not evident to GENIE or its Directors in 2022. GENIE had enlisted a reputable attorney and firm to conduct due diligence related to the transaction. GENIE then took extraordinary steps to attempt to recover the funds from Velanos during 2023 and 2024. The steps taken by GENIE have resulted in a secured $15 million settlement with Velanos. Moreover, the settlement agreement provides various incentives for Velanos to comply, including that Velanos stipulated to a $20 million arbitration judgment, which GENIE shall have the right to enforce in the event Velanos defaults on its payment obligations. None of the above was given more than a cursory dismissal by the Report.

The settlement agreement requires Velanos to make an initial installment payment of $50,000.00 upon signing. That payment was made to Genie. The initial payment was to be followed by quarterly payments of significantly larger amounts beginning June 30, 2024. Velanos recently made the second installment payment in full, bringing its total settlement payments to date to $550,000.00. The third installment, in the amount of $1,000,000.00, is due by September 30, 2024.

Moreover, the Settlement Agreement would be voided if the Court appointed a Chapter 11 Trustee or converted the case to a Chapter 7 case. Paragraph 15 of the Settlement Agreement states:

Pendency of Bankruptcy Proceedings. The Parties acknowledge that this Settlement Agreement is contingent upon the approval of this Settlement Agreement and confirmation of the Genie Chapter 11 plan in case number 3:24-bk-00496-BAJ pending in the Middle District of Florida Jacksonville Division of the United States Bankruptcy Court. To the extent that there is a Trustee appointed in that bankruptcy case, the Settlement Agreement is not approved by the Court, and/or Genie's Chapter 11 Plan is not confirmed with the essential terms of this Settlement Agreement incorporated into such confirmation, then the Settlement Agreement shall be voided as to any remaining obligations by all parties.

*See* Doc. No. 107; Page 15 of 18.

Any Chapter 11 or Chapter 7 Trustee would have to start the entire Velanos litigation over if the court granted the relief requested in the instant motion based on the above explicit contractual language. Doing so would take significant time and would involve enormous administrative expenses charged to the bankruptcy estate – all with no guarantee that the trustee would obtain a favorable result, much less an outcome as favorable as the settlement agreement already in place. To date, the Chapter 11 estate has already incurred nearly $200,000.00 in administrative costs for examiner fees, creditor committee fees, and related expenses. Any further increase in the costs of administration would greatly diminish the prospective recovery of any creditors of the estate.

In contrast to the above, GENIE has already recovered the $15M sum from Velanos and has agreed to continue to work on any pursuit of assets from Velanos for no salary during the course of the Chapter 11 Plan.

## V.    GENIE HAS A VIABLE PLAN FOR REORGANIZATION UNDER CHAPTER 11.

Genie has a viable reorganization plan to repay 100% of all legitimate creditors' claims in this case. Genie would fund this plan with (1) the $8 million currently in its loan portfolio, (2) the $15 million settlement with Velanos, payable in quarterly installments through June 2026, and (3) any recovery obtained in a malpractice claim against GENIE's former attorney. These sources are more than sufficient to fund the legitimate claims, which total approximately $9 million, and Genie

11

expects that the creditors would be paid in full within thirty-six months of any confirmation based on the Velanos payment schedule and other avenues of recovery.

Moreover, Genie will emerge from Chapter 11 as a sound and profitable business. Although the Trustee alleges that Genie "does not have a legitimate business model" and, therefore, is not a legitimate business, *see* Doc. 20 ¶¶ 26, 29, this allegation relies on inaccuracies in the Report and speculation. The Report states, for example, that Genie's "principals have failed to obtain third party funding which they admit is required for operation of [Genie]," but this is false. As Genie's principals informed the Examiner, they financed several loans using third-party funding in 2021 and 2022.

The Report also states, "It is unlikely that future borrowers...would enter into a lending relationship with [Genie] after the substantial amount of reputational damage" done to it. Report ¶ 225. This is pure speculation and entirely inaccurate. In recent weeks, multiple former borrowers – who are fully informed about the ongoing bankruptcy and the events that led to it – have contacted Genie about borrowing substantial amounts of new funds. In addition, Genie's Principals have access to an extensive database containing tens of thousands of family offices, accredited investors, and other potential sources of funding for future loans.

The Trustee's most egregious statement regarding Genie's future viability is that its "only business consists of taking deposits from customers and using those deposits to fund loans." This, as discussed in Section I, is simply incorrect. Such a statement ignores the clear contractual language of the BELOC Agreement in order to allege that Genie took "deposits" from customers.

The Report makes a speculative assertion that a trustee may be necessary to "pursue avoidance of *potential* preference actions and *potential* fraudulent transfers against insiders to maximize recoveries for the creditors of the estate." Report ¶ 234. This, too, is built on a host of

incorrect assumptions and unwarranted conclusions. For example, it assumes that the total dollar amount of claims filed in this case – $30.9 million – is accurate. Report ¶ 226. It is indisputable, however, that many creditors have filed inflated claims that include alleged speculative damages. Such speculative damages are never appropriate in a Chapter 11 claim. The prime example of this is Claim 5 of Blake Stringer. After originally filing a claim for $400,000 – the amount of funds he provided to GENIE prior to its Chapter 11 petition, Stringer recently amended his claim to over $14 million based upon unsupported documents alleging a loss of value in the sale of his real estate. There are multiple other examples of speculative and inflated claims that the Debtor has filed objections to which have no basis in any financial reality. In short, a single individual's wildly inflated claim, which accounts for nearly half of the $30.9 million total claimed against the bankruptcy estate, is self-evidently invalid. Yet the Examiner and the Trustee rely on these fanciful figures to denigrate Genie's ability to pay legitimate claims and emerge from reorganization as a viable business.

## CONCLUSION

The Trustee and the Examiner have both endeavored to portray GENIE in the worst possible light by alleging that GENIE willfully committed fraud against it's customers. This is entirely untrue and based upon no sound financial data. Instead, GENIE filed this case in good faith as an attempt by GENIE to pay back 100% of its obligations to customers and other parties affected by a fraud perpetrated on GENIE by unscrupulous third parties. GENIE is the best positioned party to pursue the multiple avenues of recovery against the third parties in order to recover funds that may be turned over to the customers as a 100% distribution under the terms of any confirmed plan.

Law Offices of Mickler & Mickler, LLP


By:__/s/ Bryan K. Mickler_____
    Bryan K. Mickler
Florida Bar No. 091790
Attorney for the Debtor(s)
5452 Arlington Expressway
Jacksonville, FL 32211
(904) 725-0822
(904) 725-0855 FAX
bkmickler@planlaw.com

## CERTIFICATE OF SERVICE

I DO HEREBY CERTIFY that a copy of the foregoing was furnished to the United States

Trustee and all creditors by CM/ECF filing this __26__ day of July, 2024.


Bryan K. Mickler
Attorney

docs\bankrupt\chap 11\genie\response to trustee motion

# EXHIBIT I

# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

In re:

GENIE INVESTMENTS NV, INC.

Debtor.

Case No.: 3:24-bk-00496-BAJ

Chapter 11

## DECLARATION OF ADAM B. WALKER

STATE OF MISSOURI

COUNTY OF JACKSON

The undersigned, ADAM B. WALKER, declares as follows:

1. I, ADAM B. WALKER, am an attorney licensed to practice in Missouri. I am the owner and manager of Walker Law Office, LLC d/b/a AW Securities Law. I previously worked for more than 12 years as an enforcement lawyer for the Financial Industry Regulatory Authority (FINRA), where I routinely investigated fraudulent and potentially fraudulent investment activity.

2. I began representing Genie Investments in or around July 2023 at the request of one of its owners, David Hughes. I had previously done legal work for another business in which Mr. Hughes also has an ownership interest. Before July 2023 I was aware that Genie existed and that it was in the lending business, but I had no other knowledge of or involvement with Genie.

3. In July 2023, Genie asked me to help resolve a contract dispute between it and Velanos Principal Capital. I learned that Genie and Velanos had executed a "Joint Venture Agreement" (JVA) in October 2022 and subsequently amended it three times. Through conversations with

Genie's principals and review of the JVA and its amendments, I learned the essential terms of the agreement, which were:

- Genie and Velanos agreed to form a joint venture.
- Genie agreed to contribute $9.0 million in capital to the joint venture.
- Velanos agreed to use the $9.0 million capital contribution to buy and sell standby letters of credit (SBLCs).
- Velanos agreed to distribute profits from the SBLC transactions to Genie within 60 days of Genie's capital contributions.
- The JVA, as amended, stated that Velanos would return a total of $75 million to Genie, consisting of the $9.0 million capital contribution and $66 million in profits.

4. As of July 2023, Velanos had not distributed any profits to Genie and had returned only $500,000 of its capital contributions. Velanos was, therefore, in material breach of the JVA.

5. I also learned that Genie, shortly before executing the JVA, retained an attorney, referred to herein as "SO," to represent it with respect to what was then the "proposed joint venture" between Genie and Velanos. SO was and still is a partner with an established New York-based law firm.

6. Almost immediately after talking with Genie about the Velanos transaction and reviewing the JVA, I strongly suspected that the SBLC-trading program offered by Velanos was fraudulent. With minimal research, I found numerous judicial opinions, press releases, and other materials supporting my suspicions. The U.S. Securities and Exchange Commission, Federal Bureau of Investigation, Federal Trade Commission, and U.S. Department of Treasury, in addition to other regulators and law-enforcement agencies, have in recent years issued warnings to the public about fraudulent prime-banking scams, including many involving fictitious SBLC trading.

7. On or about July 24, 2023, I spoke with SO by telephone for approximately one hour to talk, among other things, about his review of the JVA, his knowledge of and experience with

2

SBLC trading, and whether he viewed the investments as potentially fraudulent or had any other reservations about Genie entrusting its capital to Velanos for the purposes described in the JVA.

8. SO told me that he had extensive background with SBLCs, which he characterized as a legitimate investment used in "high level trade finance." He described SBLC trading as a "financing mechanism" that arose from the 1944 Bretton-Woods agreement, which created the World Bank and the International Monetary Fund.

9. SO represented that Velanos, as promised, had used the $9.0 million in capital that Genie contributed to the joint venture to make profitable SBLC trades. SO acknowledged, however, that he had never received detailed information about any SBLC transactions that Velanos supposedly made.

10. I asked SO to describe how SBLC trading could generate massive profits in a matter of weeks. His response lacked detail. He stated only that it was a "rinse and repeat" process of buying SBLCs at a discount with ensuing profitable sales already prearranged. SO also repeatedly stated that there is "just a lot of leverage that's involved" or some variation thereof.

11. I asked SO if he was aware that SBLC trading was a frequent subject of fraud alerts and enforcement actions, both civil and criminal, by the federal government; he said that he was, but contended nonetheless that what Velanos promised Genie was not fraud. When I asked him how he knew that what Velanos promised was different from the numerous and well-publicized instances of fraud involving SBLCs, he stated that Velanos had "syndicated" the funds. He added, however, that he did not know the particulars of Velanos' ostensible syndication arrangement.

12. I have conducted extensive research into SBLC and other "prime banking" scams. In doing so, I learned that certain phrases, terms, and references are common among SBLC scams. The JVA contains several such phrases and terms. Likewise, SO described SBLC trading to me as

3

"royal-family type stuff" that happens every day, although not in the United States. According to SO, the U.S. government does not want its citizens involved in SBLC trading. Such assertions are often cited by law enforcement and regulators as markers of SBLC and other varieties of prime-banking fraud.

13. The JVA contains other "red flags" of fraud. For example, Velanos promised to generate an extremely high rate of return — more than 800% — in a matter of weeks. It is also, in my professional opinion, very poorly drafted, with some passages best described as gibberish.

14. Genie terminated its representation by SO and his law firm on or around July 24, 2023. On Genie's behalf, I requested all records from SO's representation of Genie. After several weeks' delay, SO provided what he described as the complete client file. That file, which I have reviewed, contains no documentation indicating that SO:

- conducted any meaningful investigation into Velanos, its principals, or its affiliates,

- noted any red flags in the JVA or any potential that the proposed investment was fraudulent,

- advised Genie of any appreciable risk of losing all or a portion of its principal, or

- mentioned to Genie that the transaction bore similarities to a well-known and heavily publicized type of investment fraud.

15. Based on my investigation and analysis of the JVA and my research into prime-banking fraud, I believe the SBLC trading Velanos promised to conduct with Genie's money was at all times fictitious and blatantly fraudulent.

16. Based on my communications with SO and my review of the client file obtained from him, I believe that SO's review of the JVA was inadequate; that he failed to conduct an appropriate and thorough investigation of the transaction, Velanos, and/or its principals and affiliates; and that, as a result, he likely did not discharge his professional obligations to Genie. For these reasons, it

4

is my opinion that Genie has a colorable claim against its former lawyer and law firm for professional malpractice. I am not equipped, however, to estimate any potential recovery if Genie were to pursue such an action.

17. Although many outside observers now impugn Genie's business judgment and competence for having invested in a fraudulent enterprise, it is critical to acknowledge that Genie did so only after receiving the advice of a licensed attorney from a well-regarded law firm, which it retained specifically to guard against placing its money in an illegitimate investment. Whatever one might say with the benefit of hindsight, the proper lens for evaluating Genie's competence to manage its affairs requires consideration of its entire operating history and the fact that it sought, paid for, and relied on the assistance of legal counsel that, by all appearances, had the experience and knowledge to advise it appropriately.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 14, 2024.

Adam B. Walker

WALKER LAW OFFICE, LLC d/b/a AW
SECURITIES LAW

5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
JOHN MICHAEL COHAN, living,
Plaintiff,
v.
UNITED STATES TRUSTEE PROGRAM,
UNITES STATES TRUSTEE SCOTT BOMKAMP, in his official capacity,
and
SCOTT BOMKAMP, in his individual capacity,
JOHN AND JANE DOES 1-100,
Defendants.
Case No. _____

CIVIL COVER SHEET

## I. PLAINTIFF(S)

Name: John Michael Cohan

Email: iustusprocessus@outlook.com

## II. DEFENDANT(S)

1. United States Trustee Program (Federal Agency)

   Address: Executive Office for U.S. Trustees, 441 G St NW, Washington, DC 20530

2. Scott Bomkamp (Official Capacity)

   Address: 400 W. Washington St., Suite 100, Orlando, FL 32801

3. Scott Bomkamp (Individual Capacity)

   Address: 400 W. Washington St., Suite 100, Orlando, FL 32801

4. John/Jane Does 1–25 (Unknown Parties, Officially and Individually)

## III. BASIS OF JURISDICTION

☑ Federal Question (28 U.S.C. § 1331) – Claims under:

- *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971)

RECEIVED
Mailroom

JUN 2 6 2025

Angela D. Caesar, Clerk of Clerk
U.S. District Court, District of Columbia

- 42 U.S.C. § 1983 (Due Process Violations)

- 18 U.S.C. § 1503 (Obstruction of Justice)


IV. CITIZENSHIP OF PRINCIPAL PARTIES

Plaintiff: Domiciled in the Florida State Republic

Defendants:

- UST Program (United States Federal Entity)

- UST Scott Bomkamp (United States Trustee, officially and individually)

- Unknown John and Jane Does


V. NATURE OF SUIT

☑ Civil Rights (440) – Fraud, Due Process Violations, Obstruction of Justice


VI. CAUSE OF ACTION

42 U.S.C. § 1983 (Civil Rights Violations)

Bivens Claim (Constitutional Torts)

18 U.S.C. § 1503 (Obstruction of Justice)


VII. REQUESTED RELIEF

☑ Compensatory Damages

☑ Punitive Damages

☑ Injunctive Relief

☑ Criminal Referrals to DOJ

## VIII. RELATED CASES

U.S. Bankruptcy Court Case(s): 3:24-bk-00496-BAJ
New Jersey Final Restraining Order: FV-04-002494-22

## IX. JURY DEMAND

☑ Yes

☐ No

## X. CLASS ACTION

☐ Yes

☑ No

## XI. FILING FEE STATUS

☑ $405 PAID

## CERTIFICATION

I certify that the information provided is accurate to the best of my knowledge.

Dated: 06-23-2025

Respectfully submitted in good faith,

John Michael Cohan, without prejudice, without recourse, UCC 1-308, 1-103

iustusprocessus@outlook.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
JOHN MICHAEL COHAN, living,
Plaintiff,
v.
UNITED STATES TRUSTEE PROGRAM,
UNITES STATES TRUSTEE SCOTT BOMKAMP, in his official capacity,
and
SCOTT BOMKAMP, in his individual capacity,
JOHN AND JANE DOES 1-100,
Defendants.
Case No. _____

## SUMMONS IN A CIVIL ACTION

**TO:**

**United States Trustee Program**
Office of the United States Trustee
United States Trustee
400 W. Washington St., Suite 100
Orlando, Florida 32801

**AND**

**Scott Bomkamp** (Official Capacity)
United States Trustee
400 W. Washington St., Suite 100
Orlando, Florida 32801

**AND**

**Scott Bomkamp** (Individual Capacity)
400 W. Washington St., Suite 100
Orlando, Florida 32801

**YOU ARE HEREBY SUMMONED** to respond to the attached **Complaint for Fraud, Due Process Violations, and Obstruction of Justice** within **21 days** after service of this summons (or **60 days** if you are the United States or an officer/agency thereof under **Fed. R. Civ. P. 12(a)(2))**.

**FAILURE TO RESPOND WILL RESULT IN A DEFAULT JUDGMENT AGAINST YOU.**

**Issued by:**
**Clerk of Court**
U.S. District Court for the District of Columbia
E. Barrett Prettyman U.S. Courthouse
333 Constitution Ave NW Suite 1225
Washington, D.C. 20001

**Date Issued:** _____


**By:** _____


_____
[Printed Clerk Name]


Serve an Answer/Response by email: iustusprocessus@outlook.com