UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
JOHN MICHAEL COHAN, living,
Plaintiff,
v.
SCOTT BOMKAMP, in his individual capacity,
JOHN AND JANE DOES 1-10 acting in concert,
Defendants.
Case No. 25-cv-2009

## AMENDED COMPLAINT FOR DAMAGES

INTRODUCTION

1. This is an action for damages under the principle of Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971), against Defendant Scott Bomkamp for personal, unconstitutional acts undertaken outside the scope of his employment. The Defendant, a federal attorney, engaged in a retaliatory campaign of evidence tampering and intimidation to suppress proof that his official case was a malicious fraud. His conduct—felonious, personal, and far outside his duties—strips him of any immunity.

JURISDICTION AND VENUE

2. This Court has federal question jurisdiction under 28 U.S.C. § 1331.

3. Venue is proper in this District under 28 U.S.C. § 1391(e) as Defendant is a federal officer employed by an agency headquartered in this District.

PARTIES

4. Plaintiff John Michael Cohan is the principal of Genie Investments NV, Inc.

5. Defendant Scott Bomkamp is a Trial Attorney for the U.S. Trustee Program and is sued solely in his individual capacity; The Plaintiff specifically includes 'John and Jane Does' in this action to capture any yet-unnamed co-conspirators or participants, if any.



RECEIVED

OCT 09 2025

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

FACTUAL ALLEGATIONS

A. The Genesis of the Bankruptcy and the U.S. Trustee's Mandate

6. In 2023, Genie Investments NV, Inc. ("Genie") filed a voluntary petition for Chapter 11 bankruptcy.

7. Defendant Scott Bomkamp, a Trial Attorney with the United States Trustee Program ("USTP"), was assigned to the case.

8. The USTP's role is that of a neutral fiduciary and an officer of the court, tasked with ensuring the integrity of the bankruptcy system, not acting as an adversary. See In re AFI Holding, Inc., 530 F.3d 832, 845 (9th Cir. 2008) (describing the U.S. Trustee as a "watchdog" who "represents the public interest").


B. The Walker Report: Catalyst for Retaliation and Proof of a Baseless Case

9. In July 2023, Plaintiff retained Adam B. Walker, a former FINRA enforcement attorney with over twelve years of experience, to conduct an independent analysis.

10. Mr. Walker's sworn declaration and draft report (**Exhibit II**) systematically dismantled the foundation of Bomkamp's case, proving Genie was a victim of a "blatantly fraudulent" prime-banking scam, not a perpetrator.

11. Walker's key conclusions included:

   a. Genie lost $9 million as a fraud victim, directly refuting Bomkamp's core allegation of a fraudulent enterprise.

   b. Liability rightly lay with the Warren Law Group for providing legally inadequate counsel, eviscerating Bomkamp's claims of gross mismanagement.

   c. The Examiner's Report, which Bomkamp championed, was "rife with inaccuracies and omissions."

   d. Bomkamp had fabricated a finding of "direct evidence" of fraud, falsely attributing it to the Examiner.

12. Plaintiff provided the Walker Declaration to the Court and Defendant Bomkamp.

13. The filing of the Walker Declaration served as an expert-backed, incontrovertible rebuttal to the UST's fraud theory, proving Bomkamp's case was malicious. This evidence directly triggered his retaliatory animus against the Plaintiff who exposed him.

14. The Walker Declaration posed an existential threat to Bomkamp's personal campaign, proving he was maliciously prosecuting a fraud victim. This directly triggered his retaliatory animus.

C. Evidence Tampering to Conceal Personal Liability and Retaliate

15. A meeting of creditors pursuant to 11 U.S.C. § 341 was held on April 17, 2024.

16. Prior to the §341 meeting, Plaintiff notified Defendant Bomkamp in person (after 04-09-2025 trial) of the active restraining order against Peace Ekuta and warned him that allowing her to participate would violate the court's order.

17. During this meeting, Plaintiff stated on the record to Defendant Bomkamp: "If this conduct is going to be allowed to continue, I'm going to have a lawsuit."

18. The USTP is the official custodian of the audio recording. The official recording provided by the USTP is the sole version that exists.

19. A visual analysis of the audio waveform of this official recording reveals clear evidence of tampering (attached as **Exhibit I**):

   a. The waveform at the critical timestamp displays an abrupt digital "flatline"—a period of absolute digital silence that is physically impossible in a live recording of a human voice with multiple parties present.

20. This "flatline" is a digital artifact consistent with the deletion of audio data. Its precise location confirms that the specific threat to sue Bomkamp personally for violating the restraining order was deliberately spliced out and removed from the official record.

21. The official recording provided to/by the USTP is therefore a tampered and fraudulent document. The deliberate and targeted nature of this evidence tampering is corroborated by the sworn affidavit of David C. Hughes (**Exhibit IV**), an eyewitness to the underlying events. Mr. Hughes attests that: (1) on April 9, 2024, he personally witnessed Plaintiff show the restraining order to Defendant Bomkamp and instruct him to exclude Peace Ekuta from future proceedings; and (2) during the April 17, 2024 §341 meeting, he personally heard Plaintiff become "very upset that Peace was again present on the call" and again brings this to Bomkamp's attention. This sworn testimony proves that the specific, spoliated threat—which referenced Bomkamp's knowing violation of the court order—was indeed made, and that Bomkamp had clear, prior notice of his misconduct.

D. Knowingly Violating a Court Order to Intimidate

22. A valid restraining order was issued against Peace Ekuta (**Exhibit III**).

23. Plaintiff notified Defendant Bomkamp of this active restraining order prior to the April 17, 2025 §341 meeting.

24. Despite this knowledge, Defendant Bomkamp permitted an individual he knew to be Peace Ekuta to testify under the alias "Agent Amber Adams."

25. This act was a personal, intentional facilitation of a court order violation, undertaken to intimidate Plaintiff and corrupt the proceedings.

E. A Pattern of Using Government Authority as a Shield for Personal Misconduct

26. Defendant Bomkamp engaged in a consistent pattern of wielding his federal authority not for governmental purposes, but to insulate himself from personal liability and retaliate.

27. This pattern includes:

   a. Weaponizing the Examiner: Corrupting the neutral process by fabricating a finding of "fraud" that the Examiner never made.

   b. Abandoning Neutrality: Filing his first motion to convert the case—accusing Genie of having "simply stolen" customer funds—without ever contacting Genie's counsel to inquire about exculpatory evidence, a fundamental betrayal of his duty as a neutral fiduciary.

   c. Exploiting Proceedings to Violate a Court Order: Using the §341 meeting as a shield to facilitate the intimidation of a barred party.

   d. Spoliating Evidence Using Government Property: Using his control over a government record (the audio) to destroy evidence of his personal liability.

   e. Evading Service: Instructing his staff to refuse service of this lawsuit under the false pretense of a "federal shutdown," a blatant use of his government status to avoid personal accountability.

   f. Maintaining an Unlawful and Prejudicial Position of Power & Anticipated Use of Shutdown to Avoid Recusal: To highlight the irreconcilable conflict of interest created by this lawsuit, Plaintiff filed in this Court a Motion for Order to Show Cause why Defendant Bomkamp should not be recused from the underlying bankruptcy matter. Plaintiff directly confronted Bomkamp's counsel of record in this action about this ethical breach. The motion was docketed a full week before the onset of the federal funding lapse. To date, Defendant Bomkamp has provided no response. Given his established pattern of using the "federal shutdown" as a pretext to evade service of this lawsuit, Plaintiff anticipates he will use the same pretext to justify his failure to address this critical ethical conflict. This ongoing silence allows him to continue wielding his official power over the very bankruptcy estate whose principal is now suing him personally. His continued involvement in the bankruptcy matter, despite the direct, personal nature of this lawsuit and the pending recusal motion, constitutes a blatant violation of 5 C.F.R. § 2635.502 and demonstrates a conscious choice to exploit his government position to prejudice a party who is actively litigating against him, fundamentally corrupting the bankruptcy process and violating fundamental principles of due process.

F. Conduct Outside the Scope of Federal Employment

28. The misconduct alleged—evidence tampering, violating a court order, and the corrupt pattern described above—constitutes illegal acts. As a matter of law, an official's scope of employment does not include the commission of such felonies and torts. See D.C. Code § 1-617.08 (defining scope of District government employment for tort purposes as "exclud[ing] conduct which is criminal or fraudulent, or which constitutes malice"); see also Kimbro v. Velten, 30 F.3d 1501, 1509 (D.C. Cir. 1994) (applying common-law principle that intentional torts are generally outside the scope of employment).

29. Defendant Bomkamp had no official duty to violate the law. His actions were a fundamental betrayal of his mandated role as a neutral officer of the court.

30. These acts were driven by personal animus and a specific desire to retaliate against Plaintiff for threatening to expose his misconduct, separating his actions from any conceivable official objective. Cf. Barr v. Matteo, 360 U.S. 564, 575 (1959) (scope of employment turns on whether act is "the kind [the employee] is employed to perform," occurring "within the outer perimeter" of duties).


LEGAL CLAIMS

COUNT I – BIVENS CLAIM (Violation of Fifth Amendment Due Process – Evidence Tampering)

(Against Defendant Bomkamp in His Individual Capacity)

31. Plaintiff incorporates paragraphs 1–30 as if fully set forth herein.

32. The Fifth Amendment prohibits the federal government from depriving persons of property without due process of law.

33. Defendant Bomkamp, acting under color of federal law but outside the scope of his employment, deprived Plaintiff of his property and liberty interests by corrupting the bankruptcy proceeding through the deliberate spoliation of material evidence.

34. The right to be free from a government officer's deliberate fabrication and spoliation of evidence in a judicial proceeding is a clearly established due process right. See, e.g., Blakeney v. United States, 73 A.3d 128, 139 (D.C. 2013) ("[T]he destruction of evidence by the government, when the government is on notice that the evidence is relevant to litigation, violates due process.").

35. A reasonable federal attorney would know that deliberately tampering with an official court recording to destroy evidence of his own personal liability violates this clearly established right.

36. Defendant Bomkamp is not entitled to qualified immunity for this conduct.

37. As a direct result, Plaintiff suffered the loss of his companies and professional reputation.

COUNT II – BIVENS CLAIM (Violation of Fifth Amendment Due Process – Violation of Court Order)

(Against Defendant Bomkamp in His Individual Capacity)

38. Plaintiff incorporates paragraphs 1–30 as if fully set forth herein.

39. The Fifth Amendment guarantees protections against arbitrary government action that shocks the conscience. See Cty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998).

40. Defendant Bomkamp, acting under color of federal law but outside the scope of his employment, engaged in conscience-shocking behavior by knowingly using the authority of a federal proceeding to facilitate the violation of a valid state court restraining order.

41. A reasonable official would know that deliberately flouting one court's order to intimidate a litigant in another proceeding is a blatant abuse of power and a violation of fundamental fairness.

42. Defendant Bomkamp is not entitled to qualified immunity for this conduct.

43. As a direct result, Plaintiff suffered severe emotional distress and was denied a fair proceeding.

COUNT III – BIVENS CLAIM (Retaliation and Denial of Access to Courts)

(Against Defendant Bomkamp in His Individual Capacity)

44. Plaintiff incorporates paragraphs 1–30 as if fully set forth herein.

45. This claim arises under the Fifth Amendment and 42 U.S.C. § 1983 principles applied through Bivens.

46. Plaintiff had a constitutional right to petition the federal government for redress of grievances and to meaningfully access the courts to defend his property and business interests. See Calhoun v. United States, 69 F.4th 915, 919 (D.C. Cir. 2023) (recognizing a Bivens claim for "retaliation for exercising... Fifth Amendment right to equal protection" and noting the viability of a "denial-of-access-to-the-courts claim").

47. Defendant Bomkamp, acting under color of federal law, knowingly and intentionally interfered with that right by:

a. Tampering with the §341 audio recording to remove Plaintiff's personal threat of suit (Paragraphs 15–20); b. Permitting Peace Ekuta to testify in violation of the restraining order (Paragraphs 21–24);

c. Using his position to obstruct service of Plaintiff's legal filings and evade accountability (Paragraph 26.e).

48. These acts were undertaken in retaliation for Plaintiff's attempts to hold Defendant Bomkamp personally accountable and to challenge his misconduct. Cf. Hartman v. Moore, 547 U.S. 250, 256 (2006) (setting forth elements for a retaliation claim against non-prosecuting officials).

49. These actions were deliberate, personal, and outside the scope of his federal employment.

50. As a direct and proximate result of Defendant Bomkamp's retaliatory and obstructive conduct, Plaintiff was denied meaningful access to the courts, suffered substantial emotional distress, loss of property rights, and professional injury.


PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Michael Cohan respectfully requests that the Court:

i. Award compensatory damages against Defendant Bomkamp in his individual capacity in an amount a jury awards no less than $10,000,000;

ii.    Award punitive damages against Defendant Bomkamp in his individual capacity in an amount a jury awards no less than $15,000,000;

iii.   Award costs and attorney's fees pursuant to applicable law; and

iv.   Grant any other relief the Court deems just and proper.


JURY DEMAND

v.              Plaintiff demands a trial by jury on all issues so triable.


Dated: 10-09-2025

Respectfully submitted in good faith,

John Michael Cohan, without prejudice, without recourse, UCC 1-308, 1-103
iustusprocessus@outlook.com

CERTIFICATE OF SERVICE

I hereby certify that on 10-09-2025, I served a true and correct copy of this document upon the Defendants, by placing the documents in the United States mail and/or email.

**EXHIBIT LIST**

## I. CORE EXHIBITS TO THIS COMPLAINT

- **Evidence Tampering & Spoliation:**

  - **Exhibit I:** Forensic Audio Analysis & Waveform and Chain of Custody - Demonstrates deliberate tampering with the §341 meeting audio.

  - **Supporting Docs:** Flash Drive of 341 audio that the plaintiff and defendant each have in their possession.

- **Retaliatory Motive & Exculpatory Evidence:**

  - **Exhibit II:** Adam B. Walker Declaration & Internal Report - Proves Genie was a fraud victim, exposes the baselessness of the UST's case, and triggered the retaliatory campaign.

- **Knowing Violation of Court Order & Intimidation:**

  - **Exhibit III:** Florida Restraining Order (FV-04-002494-22) & Related Proof - Establishes Bomkamp knowingly allowed a barred witness ("Amber Adams") to testify.

- **Fabrication of Evidence by UST:**

  - **Exhibit IV:** David Hughes Affidavit - Corroborates the repeated, knowing misconduct and the specific, on-the-record threat that was subsequently spoliated.

# EXHIBIT I



 **Outlook**

---

**FW: Genie Investments NV, Inc.; 24-00496-BAJ**

---

**From** Bryan Mickler <bkmickler@planlaw.com>

**Date** Wed 4/17/2024 4:01 PM

**To**   John from Genie Investments <jmcohan@genieinvestments.com>; David from Genie Investments
        <dhughes@genieinvestments.com>

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

**From:** Bryan Mickler
**Sent:** Wednesday, April 17, 2024 4:01 PM
**To:** 'Bomkamp, Scott E. (USTP)' <Scott.E.Bomkamp@usdoj.gov>
**Subject:** Genie Investments NV, Inc.; 24-00496-BAJ

Scott

Both Mr. Hughes and Mr. Cohan are extremely upset at the events of the Meeting of Creditors today. It
was entirely inappropriate to mention that a former attorney was indicted for acts that had no relationship
with the debtor and only serve to inflame the emotions of the mob that is out to destroy the business of
Genie.

Please take all immediate steps to ensure that there are no internet postings by the members of the 341
group which serve to link Genie and the despicable actions of Mr. Conners. Genie (through my office)
would like to be copied on any emails that are sent to the group to ensure that everyone is on notice of
the prohibition on further internet postings related to the Conners episode. Any related postings by the
group will be met with an immediate sanctions motion by Genie for violations of the stay and the court's
examiner order allowing the Debtor to continue to conduct business.

We also request that the Trustee's office send the audio recordings of all 341 meetings to my office as
soon as possible.

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

 Outlook

---

**Re: Genie Investments (3:24-bk-496-BAJ) 341 audio**

---

**From** Bryan Mickler <bkmickler@planlaw.com>
**Date** Wed 4/24/2024 8:56 AM
**To** John from Genie Investments <jmcohan@genieinvestments.com>
**Cc** David from Genie Investments <dhughes@genieinvestments.com>


Ordered today.

Bryan Mickler
Sent from my iPhone


> On Apr 18, 2024, at 3:11 PM, John from Genie Investments
> <jmcohan@genieinvestments.com> wrote:
>
>> CAUTION: This message was sent from outside the company
>
> Bryan,
>
> Only the last two dates (when alleged creditor Adams appeared). Thank you.
>
>
> Sincerely,
>
> <image001.png>
>
> ### John Michael Cohan
> Genie Investments, Director
> <image002.jpg>
>
> A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity. DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710    AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see:
> http://www.ftc.gov/privacy/glbact/glbsub1.htm

PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.

This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

**From:** Bryan Mickler <bkmickler@planlaw.com>
**Sent:** Thursday, April 18, 2024 2:36 PM
**To:** John from Genie Investments <jmcohan@genieinvestments.com>; David from Genie Investments <dhughes@genieinvestments.com>
**Subject:** FW: Genie Investments (3:24-bk-496-BAJ) 341 audio

Let me know which dates  you need?

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

**From:** Bomkamp, Scott E. (USTP) <Scott.E.Bomkamp@usdoj.gov>
**Sent:** Thursday, April 18, 2024 2:00 PM
**To:** Sinclair, Pat A. (USTP) <Pat.A.Sinclair@usdoj.gov>
**Cc:** Bryan Mickler <bkmickler@planlaw.com>
**Subject:** Genie Investments (3:24-bk-496-BAJ) 341 audio

        CAUTION: This message was sent from outside the company

Hi Pat,

Please coordinate with Mr. Mickler regarding the 341 audio in this case.

The dates of the 341 meetings were: 3/20/24, 3/27/24, 4/3/24; and 4/17/24.

Mr. Mickler can clarify whether he would like all the audio, or only the last two dates (when alleged creditor Adams appeared).

Thanks,

Scott Bomkamp

 Outlook

## Copies

**From** Bryan Mickler <bkmickler@planlaw.com>

**Date** Wed 6/5/2024 2:10 PM

**To**   John from Genie Investments <jmcohan@genieinvestments.com>; David from Genie Investments
         <dhughes@genieinvestments.com>

Certified copies of Docket and VP at my office along with audio files of 341 meetings. Ready for pickup
whenever.

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

# EXHIBIT II

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

GENIE INVESTMENTS NV, INC.

        Debtor.

Case No.: 3:24-bk-00496-BAJ

Chapter 11

### DECLARATION OF ADAM B. WALKER

STATE OF MISSOURI

COUNTY OF JACKSON

The undersigned, ADAM B. WALKER, declares as follows:

1. I, ADAM B. WALKER, am an attorney licensed to practice in Missouri. I am the owner and manager of Walker Law Office, LLC d/b/a AW Securities Law. I previously worked for more than 12 years as an enforcement lawyer for the Financial Industry Regulatory Authority (FINRA), where I routinely investigated fraudulent and potentially fraudulent investment activity.

2. I began representing Genie Investments in or around July 2023 at the request of one of its owners, David Hughes. I had previously done legal work for another business in which Mr. Hughes also has an ownership interest. Before July 2023 I was aware that Genie existed and that it was in the lending business, but I had no other knowledge of or involvement with Genie.

3. In July 2023, Genie asked me to help resolve a contract dispute between it and Velanos Principal Capital. I learned that Genie and Velanos had executed a "Joint Venture Agreement" (JVA) in October 2022 and subsequently amended it three times. Through conversations with

Genie's principals and review of the JVA and its amendments, I learned the essential terms of the agreement, which were:

- Genie and Velanos agreed to form a joint venture.

- Genie agreed to contribute $9.0 million in capital to the joint venture.

- Velanos agreed to use the $9.0 million capital contribution to buy and sell standby letters of credit (SBLCs).

- Velanos agreed to distribute profits from the SBLC transactions to Genie within 60 days of Genie's capital contributions.

- The JVA, as amended, stated that Velanos would return a total of $75 million to Genie, consisting of the $9.0 million capital contribution and $66 million in profits.

4.    As of July 2023, Velanos had not distributed any profits to Genie and had returned only $500,000 of its capital contributions. Velanos was, therefore, in material breach of the JVA.

5.    I also learned that Genie, shortly before executing the JVA, retained an attorney, referred to herein as "SO," to represent it with respect to what was then the "proposed joint venture" between Genie and Velanos. SO was and still is a partner with an established New York-based law firm.

6.    Almost immediately after talking with Genie about the Velanos transaction and reviewing the JVA, I strongly suspected that the SBLC-trading program offered by Velanos was fraudulent. With minimal research, I found numerous judicial opinions, press releases, and other materials supporting my suspicions. The U.S. Securities and Exchange Commission, Federal Bureau of Investigation, Federal Trade Commission, and U.S. Department of Treasury, in addition to other regulators and law-enforcement agencies, have in recent years issued warnings to the public about fraudulent prime-banking scams, including many involving fictitious SBLC trading.

7.    On or about July 24, 2023, I spoke with SO by telephone for approximately one hour to talk, among other things, about his review of the JVA, his knowledge of and experience with

2

SBLC trading, and whether he viewed the investments as potentially fraudulent or had any other reservations about Genie entrusting its capital to Velanos for the purposes described in the JVA.

8.  SO told me that he had extensive background with SBLCs, which he characterized as a legitimate investment used in "high level trade finance." He described SBLC trading as a "financing mechanism" that arose from the 1944 Bretton-Woods agreement, which created the World Bank and the International Monetary Fund.

9.  SO represented that Velanos, as promised, had used the $9.0 million in capital that Genie contributed to the joint venture to make profitable SBLC trades. SO acknowledged, however, that he had never received detailed information about any SBLC transactions that Velanos supposedly made.

10.  I asked SO to describe how SBLC trading could generate massive profits in a matter of weeks. His response lacked detail. He stated only that it was a "rinse and repeat" process of buying SBLCs at a discount with ensuing profitable sales already prearranged. SO also repeatedly stated that there is "just a lot of leverage that's involved" or some variation thereof.

11.  I asked SO if he was aware that SBLC trading was a frequent subject of fraud alerts and enforcement actions, both civil and criminal, by the federal government; he said that he was, but contended nonetheless that what Velanos promised Genie was not fraud. When I asked him how he knew that what Velanos promised was different from the numerous and well-publicized instances of fraud involving SBLCs, he stated that Velanos had "syndicated" the funds. He added, however, that he did not know the particulars of Velanos' ostensible syndication arrangement.

12.  I have conducted extensive research into SBLC and other "prime banking" scams. In doing so, I learned that certain phrases, terms, and references are common among SBLC scams. The JVA contains several such phrases and terms. Likewise, SO described SBLC trading to me as

3

"royal-family type stuff" that happens every day, although not in the United States. According to SO, the U.S. government does not want its citizens involved in SBLC trading. Such assertions are often cited by law enforcement and regulators as markers of SBLC and other varieties of prime-banking fraud.

13. The JVA contains other "red flags" of fraud. For example, Velanos promised to generate an extremely high rate of return – more than 800% – in a matter of weeks. It is also, in my professional opinion, very poorly drafted, with some passages best described as gibberish.

14. Genie terminated its representation by SO and his law firm on or around July 24, 2023. On Genie's behalf, I requested all records from SO's representation of Genie. After several weeks' delay, SO provided what he described as the complete client file. That file, which I have reviewed, contains no documentation indicating that SO:

- conducted any meaningful investigation into Velanos, its principals, or its affiliates,

- noted any red flags in the JVA or any potential that the proposed investment was fraudulent,

- advised Genie of any appreciable risk of losing all or a portion of its principal, or

- mentioned to Genie that the transaction bore similarities to a well-known and heavily publicized type of investment fraud.

15. Based on my investigation and analysis of the JVA and my research into prime-banking fraud, I believe the SBLC trading Velanos promised to conduct with Genie's money was at all times fictitious and blatantly fraudulent.

16. Based on my communications with SO and my review of the client file obtained from him, I believe that SO's review of the JVA was inadequate; that he failed to conduct an appropriate and thorough investigation of the transaction, Velanos, and/or its principals and affiliates; and that, as a result, he likely did not discharge his professional obligations to Genie. For these reasons, it

4

is my opinion that Genie has a colorable claim against its former lawyer and law firm for professional malpractice. I am not equipped, however, to estimate any potential recovery if Genie were to pursue such an action.

17. Although many outside observers now impugn Genie's business judgment and competence for having invested in a fraudulent enterprise, it is critical to acknowledge that Genie did so only after receiving the advice of a licensed attorney from a well-regarded law firm, which it retained specifically to guard against placing its money in an illegitimate investment. Whatever one might say with the benefit of hindsight, the proper lens for evaluating Genie's competence to manage its affairs requires consideration of its entire operating history and the fact that it sought, paid for, and relied on the assistance of legal counsel that, by all appearances, had the experience and knowledge to advise it appropriately.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 14, 2024.

_____

Adam B. Walker

WALKER LAW OFFICE, LLC d/b/a AW SECURITIES LAW

5

 Outlook

## Rough draft -- opposition to US Trustee's 2d motion

**From** Adam Walker <adam@awsecuritieslaw.com>

**Date** Fri 7/19/2024 6:09 PM

**To** David from Genie Investments <dhughes@genieinvestments.com>; John from Genie Investments
     <jmcohan@genieinvestments.com>

📎 1 attachment (42 KB)
Opp UST's 2d Motion Appt Trustee.docx;

Attached is the current draft opposition to the US Trustee's motion. It's far from complete -- needs to
be bulked up in places and I'll add much more polish to it. This lets you see where I'm heading with it
and how I see it coming together.

Let me know if you have concerns, questions, suggestions, etc.


Adam Walker
AW Securities Law
www.awsecuritieslaw.com
(816) 226-6476

On March 5, 2024, the U.S. Trustee (UST) filed a motion seeking various forms of relief, including appointment of a Chapter 11 trustee. In that motion, the UST asserted that Genie was a fraudulent enterprise that "simply stole" money from its customers and other ostensible creditors and invested $9.0 million of "other people's money" in an "obviously suspect" transaction. *See* Doc. 20 ¶¶ 16-17. The UST based these allegations solely on the statements of 18 small-business owners. Following a hearing on the motion, the Court granted only the request to appoint an Examiner. The UST subsequently selected and appointed an Examiner. After a lengthy investigation, the Examiner issued a Report. According to the UST, the Examiner's Report[1] ("Report") fully supports the UST's earlier allegations. Nothing could be further from the truth.

Insisting that the Report corroborates its entrenched position reveals much more about the UST than about Genie. For starters, it demonstrates that the UST has failed to review the Report with a critical eye. Had it done so, it would have realized that the Report is rife with inaccuracies, unsupported conclusions, and omissions of material and pertinent evidence. Among other things, the Report inaccurately reports fundamental aspects of Genie's business. It states falsely, for example, that Genie required a borrower seeking a Business Expansion Line of Credit ("BELOC") to enter a separate Due Diligence Agreement,[2] and that, "In some instances, borrowers paid McMann [Commercial Lending] an upfront initial application fee related to a loan with Genie NV."[3]

The Report contains numerous other errors, many of them attributable to the Examiner's decision to ignore foundational documents (e.g., contracts) and other evidence that would be crucial to any reasonable analysis. As a result, the Report persistently mischaracterizes Genie's operating history, revenues, management, the terms of its relationships with borrowers and business partners, and its future

---

[1]    Doc. 146.

[2]    Report ¶ ▮. In fact, Genie only required borrowers who sought bridge loans to complete the Due Diligence Agreement, which is evident upon even a cursory review of the relevant contracts.

[3]    Report ¶ ▮. This never happened. Any borrower who paid fees of any kind to McMann did not have a BELOC Agreement with Genie but was presumably in a lender-borrower relationship with McMann.

prospects. This taints the entire Report and undermines the instant motion, in which the UST cherry-picks snippets that support its existing positions without bothering to determine whether those passages are supported by evidence or analysis.

The UST's insistence that the Report "confirms" key allegations from its initial motion not only shows its lack of concern for the Report's investigative and analytical rigor, but also reveals its willingness to mischaracterize and embellish the Report's contents to suit its purposes. This is most notable in connection with the UST's allegations of fraud. At the very outset of its motion, the UST brazenly claims that the Report "confirms" that a trustee "must be appointed in this case because the Debtor engaged in fraud and gross mismanagement…"[4] But nowhere in the 51-page Report is there any finding or conclusion that Genie engaged in fraud. The UST simply invented this "confirmation" and attributed it to its hand-selected Examiner.

1. **_The BELOC Agreement, which both the Examiner and the UST ignore, makes clear that ICA Payments received by Genie were not required to be held in trust and therefore did not constitute "customer funds."_**

Much of the Report proceeds from a false premise: that Genie was required to hold ICA Payments in trust for the borrowers who paid them. It is indisputable that the BELOC Agreement between Genie and its borrowers governs what ICA Payments are and how they are treated. The Report, however, offers no analysis of the relevant portions of the BELOC Agreement. It never acknowledges, for example, that the BELOC Agreement does not require or even suggest that ICA Payments will be held in escrow or in trust. The Report does, however, reference an email from McMann's principal, a demand letter from McMann's law firm, and an affidavit from one borrower as support for the Examiner's conclusion that ICA Payments remained "customer funds" after their receipt by Genie.[5] It should go without saying that the opinions of interested parties are insufficient, standing alone, to override the unambiguous language of

---

[4]    Second Motion, at 2.

[5]    Report ¶¶ 81, 39, 82.

a written contract. As already noted, however, the Report simply ignores the actual contract language. Worse yet, the Report attempts to support its flawed premise by inventing and repeating improper terminology – i.e., "ICA reserves" and "ICA deposits"[6] – despite the fact that those terms do not appear anywhere in the BELOC Agreement in connection with ICA Payments.

This shoddy methodology results in a fatally flawed Report. Because Genie was never required to hold ICA Payments in trust for customers, those payments constituted revenue realized by Genie. The possibility that ICA Payments could later become refundable does not change that. In this way, Genie is no different from a retail store or service provider that promises refunds to unsatisfied purchasers. Nordstrom and Wal-Mart do not have to set aside money received from customers until all opportunity for a refund has passed and neither did Genie. Thus, the funds Genie received in the form of ICA Payments were its own funds, not "customer funds," as the Examiner asserts.

The UST displays a similar lack of interest in engaging with the relevant source material. Its motion contains this bewildering passage:

> The Examiner *found* that the purpose of the ICA funds was to pre-pay interest amounts on customer loans. The Examiner also *found* that the Debtor provided contradictory statements regarding whether ICA funds were supposed to held in trust for customers or could be utilized in the ordinary course of the Debtor's business.[7]

The "purpose" of ICA Payments[8] is not, however, a question of fact for the Examiner to "find," but a matter of contract interpretation. Statements by any person, whether a party to the BELOC Agreement or not, cannot change its intrinsic meaning.[9]

---

[6]    *E.g.*, Report ¶¶ 25, 29, 39, 77, 79, 80.

[7]    Second Mot., at 5-6 (¶ 11) (emphases added).

[8]    The term "ICA funds" is a misnomer – that phrase never appears in the BELOC Agreement – and presumably refers to "ICA Payments."

[9]    Further, the UST mischaracterizes both the Report and the testimony cited therein when it refers to Genie's statements as "contradictory."

Neither the Report nor the instant motion even feints at contract interpretation and, as such, neither offers any basis for a determination that Genie had an obligation to hold ICA Payments in trust as customer funds. That alone is grounds to deny the instant motion. Nonetheless, a brief discussion of the relevant contract provisions dispels the faulty premise that ICA Payments were to be held in trust and that they therefore constituted "customer funds."

Regarding the ICA Payments, the BELOC Agreements only require the Lender to create an Interest Credit Account "on the books and records of the Lender," note "a credit equal to the ICA Payment" in the Interest Credit Account, use the Interest Credit Account to satisfy interest payments as they become due, and refund ICA Payments if and when specified preconditions are satisfied.[10] The BELOC Agreement does not restrict how the Lender may use ICA Payment funds between their receipt and a potential termination by the Borrower. As such, the Lender has no obligation to hold those funds in trust.

Further, the BELOC Agreements openly anticipate the Lender using the ICA Payment, rather than holding it in trust. Section 13.7(a) sets forth when and under what conditions a Borrower may be due an ICA Payment refund. It states that the Lender has up to 40 days to return the ICA Payment after the Borrower properly terminates the BELOC Agreement and requests a refund of the ICA Payment. Section 13.7(c), however, states that this 40-day period is "tolled during the pendency of a Force Majeure event" and defines as one such event the "failure of the Lender's wholesale lender from performing [sic] under the terms of the agreement between the Lender and the wholesale lender." This tolling provision protects the Lender in the event of illiquidity caused by certain occurrences beyond its control, including the failure of a wholesale lender to perform its contractual obligations. If the BELOC Agreement required the Lender to hold ICA Payments in trust, then there would be no need to protect the Lender against a wholesale lender's failure to perform. But the BELOC Agreements clearly anticipated a situation where

---

[10]    BELOC Agmt. §§ 1.1, 3.5 13.7.

the Lender's ability to refund ICA Payments depends on a wholesale lender performing its contractual obligations to the Lender. Otherwise, the tolling provision in section 13.7(c) would be superfluous.

Courts applying Illinois law "look to the contract as a whole" and "attempt to give meaning to every provision of the contract and avoid a construction that would render a provision superfluous." *Land of Lincoln Goodwill Indus. v. PNC Fin. Servs. Group*, 762 F.3d 673, 679 (7ᵗʰ Cir. 2014) (citations omitted). The interpretation the UST urges on the Court – that the BELOC Agreements require the Lender to hold the ICA Payments in trust and untouched – not only has no affirmative basis in the contracts' language but also ignores the provisions of Section 13.7(c) discussed above.

[add conclusion]

2. ***The Report excludes evidence that Genie had a good-faith belief, based in part on guidance and advice from a reputable law firm, that the Velanos transaction was a sound investment.***

In October 2022, Genie received an offer to enter into a joint venture with Velanos Principal Capital (Velanos). The proposal called for Genie to provide $3.0 million in capital that Velanos, the joint venture's manager, would use to purchase and sell standby letters of credit (SBLCs) at a substantial profit. Before deciding whether to accept the offer, Genie engaged Scott Oh, a lawyer with Warren Law Group (WLG), to perform due diligence on the proposed deal, advise Genie on risks associated with it, and, if necessary, review and revise the joint-venture agreement. According to his firm's website, Oh was an experienced attorney who "often advise[d] and facilitate[d] his clients in identifying, analyzing, and structuring... private placement opportunities, joint ventures, and other private capital transactions, conventional/unconventional asset-based credit facilities, credit enhancements, and corporate debt transactions." Oh advised Genie that SBLC trading was legitimate and that he was familiar with at least one person for whom Velanos and/or its CEO syndicated. Oh notably did not warn Genie either that the promised returns were too good to be true or that SBLC trading was a frequent vehicle for financial fraud.

Oh represented Genie from October 2022 to July 2023. During that time, he regularly consulted with Genie about the joint venture, reviewed multiple amendments to the Joint Venture Agreement, and communicated frequently with Velanos on Genie's behalf. At no time did Oh express to Genie any

concern that the joint venture was fraudulent. In late 2022, when Genie twice increased its capital contribution to the joint venture to a total of $9.0 million, Oh did not advise Genie against doing so. And when Velanos failed to make the payments required under the Joint Venture Agreement, Oh never told Genie that Velanos' various excuses were of questionable validity.

Although the Report states that the Examiner reviewed WLG's bank records, it does not appear that the Examiner interviewed Oh or WLG regarding the substance of Oh's work for Genie. The Report castigates Genie for entering into the joint venture with Velanos. "Neither Velanos nor Wearmouth were registered investment advisors and the returns promised by Velanos pursuant to the Velanos JVA were 100% in 30 days and profit participation that would have resulted in a 900% return, which should have raised a red flag."[11] The Report gives no consideration to the fact that Genie sought out and hired a professional to apprise it of risks and concerns raised by the joint venture. Oh claimed to have a history of helping clients "joint ventures," "conventional/unconventional asset-based credit facilities," and other transactions, which suggests he was an appropriate choice for the job. The Report nonetheless concludes that Genie's decision to enter the joint venture constitutes "gross mismanagement." In doing so, it discounts the effect on Genie of obtaining what it believed to be competent legal guidance from a partner with a reputable law firm.

The UST not only seizes on this conclusion, but expands on it, stating that "Debtor engaged in gross mismanagement, *at a minimum*, in its dealings with Velanos…"[12]

---

[11]     Report ¶ 83.

[12]     Second Mot., at 2.

**3.** **_The UST cannot meet its burden of demonstrating that Genie's loans to affiliated entities constituted either fraud or gross mismanagement._**

The UST's motion brands loans from Genie to six affiliated entities as "fraudulent transfers and not true loans."[13] The UST alleges, almost in passing, direct evidence of fraudulent intent in the transfers from Genie to its affiliate, Better Methods. This allegation falls well short of the movant's burden of proof ad, moreover, misstates the Report's findings. According to the UST, "The direct evidence is the express purpose of the transfers to Better Methods as asset protection from the Debtor's creditors."[14] As support for this allegation, the UST cites paragraph 188 of the Examiner's Report, which states, in its entirety, "According to [John Michael] Cohan, Better Methods is an asset management company set up to protect the Debtor's assets and the assets of the Debtor's clients." The "express purpose" alleged by the UST as direct evidence of fraud is itself a fraud, fabricated by the UST and unsupported by any evidence in the Report or elsewhere in the record of this case.

The UST also asks the Court to find circumstantial evidence of fraudulent intent. The UST recites the "badges of fraud" often employed by Federal Courts of Appeals in determining, for purposes of 11 U.S.C. § 548, whether a debtor "intended to hinder, delay, or defraud" creditors. The UST's motion only addresses some of those factors, however, and does so in an extremely cursory fashion. It states, for example:

- The transfers at issue occurred "while the Debtor was being sued or was under threat of suit for failing to fund loans."[15]

- Genie received "less than the equivalent value based on the non-market nature of the loans."[16]

- The funds were transferred "in a concealed manner attempting to disguise the fraudulent transfers as loans."[17]

---

[13]    Second Mot. ¶ 16.

[14]    Second Mot. ¶ 17.

[15]    Second Mot. ¶ 19.

[16]    Second Mot. ¶ 19.

[17]    Second Mot. ¶ 19.

The UST does not even bother to cite the Report or any other evidence for these claims. That alone should doom the Motion, as unsupported, conclusory statements cannot establish fraud. But because the UST also urges the Court to find that the loans to affiliates constituted "gross mismanagement," a proper analysis of the factors referenced in the motion is warranted.

### The timing of Genie's transfers to affiliates does not support a finding of constructive fraud.

The UST asserts that "Debtor's funds were transferred (1) to insiders or affiliates; (2) while the Debtor was being sued or under threat of suit for failing to fund loans…"[18] This is flatly and blatantly false, and it reveals the UST's unwillingness to grapple with inconvenient facts.

The affiliate transfers identified in the Report were all made pursuant to loan agreements executed in September 2022. At that time, Genie had successfully funded dozens of loans, had never failed to issue a properly requested refund of an ICA Payment, had not agreed to contribute any money to the joint venture with Velanos, and had never been sued or threatened with suit related to an alleged breach of a BELOC Agreement.

The Report provides details about each of these transfers, which happened piecemeal over the course of many months, with nearly all of them taking place between September 2022 and July 2023.[19] What these schedules show is that Genie's transfers to affiliated entities generally took place before Genie was insolvent or had any reason to believe that it would become insolvent, and before any putative creditor had sued Genie or threatened suit against it.[20]

With respect to Genie's transfers to its affiliate, Zoomeral, Inc., the Report shows that the net total transferred by Genie to Zoomeral in that period – through roughly 60 separate transactions – was $1,771,555.74. Of these transactions, 14 occurred before Genie entered the joint venture with Velanos.

---

[18]     Second Mot. ¶ 19.

[19]     Report, Exh. 4 (showing approximately 60 separate transfers from Genie to Zoomeral, Inc., between September 12, 2022, and July 28, 2023); Report ¶¶ 147, 159 (showing more than 25 transfers apiece from Genie to Capitulum Homes and Cald Holdings between September 2022 and July 2023).

[20]     Genie received its first threat of legal action regarding an ICA Payment refund in [October?] 2023.

Another 20 occurred before Velanos was late making any payments due under the Joint Venture Agreement.

Further, as discussed above, Genie had a good-faith belief until at least July 2023 that it would shortly receive a payment of at least $9.5 million from Velanos pursuant to the Joint Venture Agreement. Considering that the vast majority of the affiliate transfers at issue occurred before that time, the evidence clearly shows that few, if any, of those transfers occurred when Genie was insolvent or had reason to believe it would soon become insolvent.

<u>Genie received reasonably equivalent value for the affiliate transfers</u>

The UST alleges that Genie transferred funds to affiliates "for less than the equivalent value based on the non-market nature of the loans."[21] By "non-market nature," the UST refers to the low interest rate, the absence of personal guarantees, the absence of a periodic-payment requirement, and the borrowers' option to extend the loan term for 10 years. The UST bases its allegation that the terms of these loans would not have been available to Genie's affiliates in the open market on the Report. For its part, the Report is devoid of any evidence regarding the terms that might have been available to the affiliate borrowers.

The UST fails to note that each of the loans at issue requires repayment in full of the loan's principal amount. The loans are not forgivable. Moreover, even assuming that the loan terms were more favorable than the affiliate borrowers would likely have found elsewhere, this fact alone cannot prove that Genie received less than "reasonably equivalent value" in exchange for the money lent. When evaluating the value received in exchange for allegedly fraudulent transfers, Courts recognize various "indirect" benefits – i.e., benefits that may not be easily

---

[21]     Second Motion ¶ 19.

reduced to a specific dollar value. Here, the indirect benefits of the affiliate loans are real and were shared with the Examiner.

Zoomeral, Inc., was the affiliate that received the largest amount of loans from Genie. Zoomeral built and operated the software platform that Genie and its borrowers used for communication, record management, and _____. In 2022-23, the Zoomeral platform was an integral part of Genie's business, and both Genie and Zoomeral expected that improvements to Zoomeral's systems would benefit both companies. Genie loaned money to Zoomeral so that it could hire developers to improve the software platform, establish a relationship with one or more payment processors, and create a marketing campaign to attract more potential borrowers. Genie reasonably expected its loan to Zoomeral to result in more business for Genie.

Better Methods

Capitulum

Cald

Case law research:

- "All of the authorities agree that the appointment of a trustee under § 1104 is an extraordinary remedy. Therefore, the evidence to support the appointment of a trustee must be clear and convincing." <u>In re Tyler, 18 B.R. 574, 577</u> (S.D. Fla. 1982)

- Standard of proof: clear and convincing evidence that appointment of trustee is warranted

- Strong presumption that DIP shall remain in control of its business while in bankruptcy

- Court must "weigh the benefits that would be derived by the appointment of a Trustee against the expense of the appointment." *General Oil Distributors*, 42 Bankr. 402, at 409 (Bankr. E.D. N.Y. 1984).

- As a general rule, . . . a trustee will not be appointed where affiliate transactions are called into question, unless the movant can demonstrate that the transactions were improper, detrimental to the debtor estate, or were actually fraudulent." Norton Bankruptcy Law & Practice § 53.04; *See also General Oil Distributors*, supra, 42 Bankr. at 402; *All Sun Juices*, 34 Bankr. 162 (Bankr. M.D. Fla. 1983).

- Bankruptcy Court order appointing a trustee constitutes a final order that is immediately appealable to 11th Circuit

- "…it now appears the appointment of a trustee, saddling the estate with the expense of a appointed trustee and additional counsel, and the removal of the Garbaczes from management may well seriously handicap the Debtor's efforts to maintain its customer base and operating income." *In re Waterworks, Inc.*, 538 B.R. 445, 465-66 (Bankr. N.D. Ill. 2015)

# EXHIBIT III

Page 1 of 4

**State of New Jersey**
# Prevention of Domestic Violence Act

__CAMDEN__ County, Superior Court, Chancery Division, Family Part

☑ **Final Restraining Order (FRO)**     ☐ **Amended Final Restraining Order**

| Docket Number | Plaintiff's Date of Birth | Defendant's Sex | Defendant's Race |
|---|---|---|---|
| **FV-04-002494-22** | 07/05/1989 | F | BLACK |

| In the Matter of Plaintiff | Defendant's Social Security Number | Date of Birth | Height | Weight |
|---|---|---|---|---|
| COHAN JOHN M | XXX-XX-3105 | 01/15/1993 | 5  07 | 120 |

| Defendant | Eye Color | Hair Color |
|---|---|---|
| FREEDOM PEACE M | BROWN | BROWN |

| Home Phone Number | Work Phone Number | Distinguishing Features (Scars, Facial Hair, Etc.) |
|---|---|---|
| ********** | ********** | |

| Home Address | Driver's License Number |
|---|---|
| *** CONFIDENTIAL *** | E49656206151934 |

| Work Address | State | Driver's License Expiration Date |
|---|---|---|
| *** CONFIDENTIAL *** | | |

The Court having considered plaintiff's Complaint dated ___02/10/2022___ seeking an ORDER under the Prevention of Domestic Violence Act, having established jurisdiction over the subject matter and the parties pursuant to *N.J.S.A.* 2C:25-17 et seq., and having found that defendant has committed an act of domestic violence, and all other statutory requirements having been satisfied:

It is on this __03__ day of __March__ __2022__, ORDERED that:

| Sought | Granted | Part I – Relief |
|---|---|---|

**DEFENDANT:**

1. ☑ ☑ You are prohibited against future acts of domestic violence.
2. ☑ ☑ You are barred from the following locations:
   - ☑ **Residence(s) of Plaintiff**     ☑ **Place(s) of employment of Plaintiff**
   - ☐ Other

3. You are prohibited from having __any__ oral, written, personal, electronic, or other form of contact or communication with:
   - ☑ ☑ Plaintiff
   - ☐ ☐ Other(s) (List names & relationship to Plaintiff):

4. You are prohibited from making or causing anyone else to make harassing communications to:
   - ☑ ☑ Plaintiff
   - ☐ ☐ Other(s) (Same as above or list names & relationship to Plaintiff):

5. You are prohibited from stalking, following, or threatening to harm, to stalk or to follow:
   - ☑ ☑ Plaintiff
   - ☐ ☐ Other(s) (Same as above or list names & relationship to Plaintiff):

6. You must pay emergent monetary relief (describe amount and method):
   - ☐ ☐ Plaintiff: $_____ Effective: _____
   - ☐ ☐ Dependents: $_____ Effective: _____
7. ☐ ☐ Other appropriate relief:
   Defendant (including substance abuse, mental health or other evaluations and subsequent treatment):

8. ☑ ☑ Psychiatric evaluation:
   DEF MUST COMPLETE PSYCHIATRIC EVALUATION AND DCP&P EVALUATION BEFORE APPLYING FOR UNSUPERVISED PT

9. ☐ ☐ Intake monitoring of conditions and restraints (specify):

**NOTICE TO DEFENDANT:** A violation of any of the provisions listed in this order may constitute either civil or criminal contempt pursuant to *N.J.S.A.* 2C:25-30 and may result in your arrest, prosecution, and possible incarceration, as well as an imposition of a fine or jail sentence. **Only a court can modify any of the terms or conditions of this court order.**

Revised: 4/2017, CN: 10211 (DVFRO)

**Prevention of Domestic Violence Act**

| | | |
|---|---|---|
| ☑ **Final Restraining Order (FRO)** | ☐ **Amended Final Restraining Order** | **FV-04-002494-22** |

| Sought | Granted | Part I - **Relief** continued |
|---|---|---|

**DEFENDANT:**

| | | |
|---|---|---|
| 10. ☑ | ☑ | **PROHIBITIONS AGAINST POSSESSION OF WEAPONS:** You are prohibited from possessing **any and all fire-arms or other weapons** and must immediately surrender these firearms, weapons, permits to carry, applications to purchase firearms and firearms purchaser ID card to the officer serving this court Order. Failure to do so can result in your arrest and incarceration.<br><br>Other Weapon(s) (describe)   NONE PERMITTED |

**PLAINTIFF:**

| | | |
|---|---|---|
| 11. ☑ | ☑ | You are granted exclusive possession of (residence or alternate housing, list address only if specifically known to defendant):<br>111 RICH AVE, BERLIN NJ 08009 |
| 12. ☑ | ☑ | Plaintiff is granted temporary custody of (specify name(s)):<br>AURA FREEDOM PURSUANT TO FD-04-180-22 |
| 13. ☐ | ☐ | Other appropriate relief:<br>Plaintiff (describe)<br><br><br>Child(ren) (describe) |

**LAW ENFORCEMENT OFFICER**

You are to accompany to scene, residence, shared place of business, other (indicate address, time, duration & purpose):

| | | |
|---|---|---|
| ☐ | ☐ | Plaintiff: |
| ☐ | ☐ | Defendant: |

**WARRANT TO SEARCH FOR AND TO SEIZE WEAPONS FOR SAFEKEEPING**

| | |
|---|---|
| ☐ | **To any law enforcement officer having jurisdiction –** this Order shall serve as a warrant to search for and seize any issued permit to carry a firearm, application to purchase a firearm and firearms purchaser identification card issued to the defendant and the following firearm(s) or weapon(s). |

**1.** **You are hereby commanded to** search the premises for the above described weapons and/or permits to carry a firearm, application to purchase a firearm and firearms purchaser ID card and to serve a copy of this Order upon the person at the premises or location described as:

**2.** **You are hereby ordered** in the event you seize any of the above described weapons, to give a receipt for the property so seized to the person from whom they were taken or in whose possession they were found, or in the absence of such person to have a copy of this Order together with such receipt in or upon the said structure from which the property was taken.

**3.** **You are** to execute this Order immediately or as soon thereafter as is practicable.
   ☐ Anytime   ☐ Other: _____

**4.** **You are further ordered,** after the execution of this Order, to promptly provide the Court with a written inventory of the property seized per this Order.

**NOTICE TO DEFENDANT:** A violation of any of the provisions listed in this order may constitute either civil or criminal contempt pursuant to *N.J.S.A.* 2C:25-30 and may result in your arrest, prosecution, and possible incarceration, as well as an imposition of a fine or jail sentence. Only a court can modify any of the terms or conditions of this court order.

Revised: 4/2017, CN: 10211 (DVFRO)

**Prevention of Domestic Violence Act**

| [✓] Final Restraining Order (FRO) | [ ] Amended Final Restraining Order | FV-04-002494-22 |
|---|---|---|

| Sought | Granted | Part II - Relief |
|---|---|---|

**DEFENDANT:**

| # | Sought | Granted | |
|---|---|---|---|
| 1. | [ ] | [ ] | You acknowledge parentage of: _____ |
| 2. | [ ] | [ ] | You must submit to genetic testing: _____ |
| 3. | [ ] | [ ] | No parenting time (visitation) until further order; _____ |
| 4. | [ ] | [ ] | Parenting time (visitation) pursuant to (prior FV, FM, or FD Order) # — _____ is |
| | | | suspended, a hearing is scheduled for: _____ |
| 5. | [✓] | [✓] | Parenting time (visitation) is ordered as follows: (specifiy drop-off and pick-up times and locations, participation of or supervision by designated third party): PURSUANT TO FD-04-180-22, DEF SHALL ENJOY SUPERVISED PARENTING TIME BY DEF'S FATHER, JETHRO EKUTA; PARENTING TIME TO BE ARRANGED BETWEEN PLA AND DEF'S FATHER |
| 6. | [ ] | [ ] | Risk assessment ordered (specify by whom): _____ Return Date: _____ |
| 7. | [ ] | [ ] | You must provide compensation as follows: (Appropriate notices have been attached as part of this Order): |
| | [ ] | [ ] | Emergent support - Plaintiff: $ _____ |
| | [ ] | [ ] | Emergent support - Dependent(s): $ _____ |
| | [ ] | [ ] | Interim support - Plaintiff: $ _____ |
| | [ ] | [ ] | Interim support - Dependent(s): $ _____ |
| | [ ] | [ ] | Ongoing Plaintiff support: $ _____ Effective: _____ |
| | | | Paid via income withholding through the: _____ Probation Div. _____ |
| | [ ] | [ ] | Other: _____ |
| | [ ] | [ ] | Ongoing child support: $ _____ Effective: _____ |
| | | | Paid via income withholding through the: _____ Probation Div. _____ |
| | [ ] | [ ] | Other: _____ |
| 8. | [ ] | [ ] | Medical coverage for plaintiff: _____ |
| 9. | [ ] | [ ] | Medical coverage for dependent(s): _____ |
| 10. | [ ] | [ ] | Compensatory damages to plaintiff: $ _____ |
| 11. | [ ] | [ ] | Punitive damages (describe): $ _____ |
| 12. | [ ] | [ ] | You must pay compensation to (specify third party and/or VCCO, and describe): |
| 13. | [ ] | [ ] | You must participate in a batterers' intervention program (specify): |
| 14. | [ ] | [ ] | You must make [ ] rent [ ] mortgage payments (specify amount(s) due date(s) and payment manner): |
| 15. | [ ] | [ ] | Defendant is granted temporary possession of the following personal property (describe): |
| 16. | [ ] | [ ] | Defendant is granted temporary custody of (specify name(s)): |

| | |
|---|---|
| [✓] | **You must submit to fingerprinting and other identification procedures as required by law pursuant to *N.J.S.A.* 53:1-15.** |
| [ ] | You must pay a civil penalty of $ _____ ($50.00 to $500.00 per *N.J.S.A.* 2C:25-29) to: _____ within _____ days.  You will be charged a $2.00 transaction fee for each payment or partial payment that you make. |
| [✓] | Waived due to extreme financial hardship because: PER JUDGE'S ORDER _____ |

| Sought | Granted | |
|---|---|---|

**PLAINTIFF:**

| # | Sought | Granted | |
|---|---|---|---|
| 17. | [ ] | [ ] | Plaintiff is granted temporary possession of the following personal property (describe): |

**NOTICE TO DEFENDANT:** A violation of any of the provisions listed in this order may constitute either civil or criminal contempt pursuant to *N.J.S.A.* 2C:25-30 and may result in your arrest, prosecution, and possible incarceration, as well as an imposition of a fine or jail sentence. **Only a court can modify any of the terms or conditions of this court order.**

Revised: 4/2017, CN: 10211 (DVFRO)

Prevention of Domestic Violence Act

Page 4 of 4

| ☑ Final Restraining Order (FRO) | ☐ Amended Final Restraining Order | FV-04-002494-22 |

**Comments:**
THE DEFENDANT WAS PRESENT AT THE TIME THE FRO/AFRO WAS ISSUED ON 03/03/2022

**Addendum:**

This Order is to become effective immediately and shall remain in effect until further Order of the Superior Court, Chancery Division, Family Part.

| 03/03/2022        10:26 AM | s/ LINDA W. EYNON |
| Date | Honorable |

## All Law Enforcement Officers Will Serve and Fully Enforce This Order.
## The Plaintiff Shall Not Be Arrested for a Violation of This Restraining Order.

- **This Final Restraining Order Was Issued After Defendant Was Provided with Notice and the Opportunity to Be Heard and Should Be Given Full Faith and Credit Pursuant to the Violence Against Women Act of 1991, Sec. 40221, Codified at 18 U.S.C.A. S2265(A) and S2266.**

- **If Ordered, Sufficient Grounds Have Been Found By This Court for the Search and Seizure of Firearms and Other Weapons as Indicated in This Court Order.**

- **Defendant Shall Not Be Permitted to Possess any Weapon, ID Card or Purchase Permit While This Order Is in Effect, or for Two Years, Whichever Is Greater.**

### Notice to Plaintiff and Defendant

**IMPORTANT:** The parties cannot themselves change the terms of this Order on their own. This Order may only be changed or dismissed by the Family Court. The named defendant **cannot** have any contact with the plaintiff without permission of the court. If you wish to change the terms of this Order and/or you resume living together, you **must** appear before this court for a rehearing.

### Notice to Defendant

A violation of any of the provisions listed in this Order or a failure to comply with the directive to surrender all weapons, firearm permits, application or identification cards may constitute criminal contempt pursuant to *N.J.S.A.* 2C:29-9(b), and may also constitute violations of other state and federal laws which can result in your arrest and/or criminal prosecution. This may result in a jail sentence.

### Return of Service

| ☑ | Plaintiff was given a copy of the Order by: | | |
| | SERVED IN COURT B.SMITH | 10:28 AM   03/03/2022 | CAMDEN COUNTY FAMILY COURT |
| | Print Name | Time and Date | Signature / Badge Number / Department |
| ☑ | I hereby certify that I served the within Order by delivering a copy to the defendant personally: | | |
| | SERVED IN COURT B.SMITH | 10:26 AM   03/03/2022 | CAMDEN COUNTY FAMILY COURT |
| | Print Name | Time and Date | Signature / Badge Number / Department |
| ☐ | I hereby certify that I served the within Order by use of substituted service as follows: | | |
| | Print Name | Time and Date | Signature / Badge Number / Department |
| ☐ | Defendant could not be served (explain): | | |
| | Print Name | Time and Date | Signature / Badge Number / Department |

The Courthouse is accessible to those with disabilities. Please notify the Court if you require assistance.

Distribution:    Family Part,    Plaintiff,    Defendant,    Sheriff,    Other

Revised: 4/2017, CN: 10211 (DVFRO)

# GUZZO LAW FIRM

89 N. Haddon Avenue
Haddonfield, NJ 08033
www.guzzolawfirm.com
(856) 795-0020 (phone)
(856) 795-9776 (fax)

Louis G. Guzzo*
guzzolawfirm@gmail.com

Edward H. Hill*
Direct Dial (856) 296-1838
Edward.H.Hill@gmail.com

Octavia Melendez, J.S.C. (Ret.)
Special Counsel*
*Admitted in NJ
^Admitted in NJ and PA

Lauren R. Guzzo (of counsel)^

Eric R. Foley (of counsel)^
Direct Dial (215) 570-0641
EricRFoley@gmail.com

Natasha Scott^
NatashaScottEsq.@gmail.com

May 8, 2025

VIA JEDS:
Camden County Superior Court of New Jersey
Chancery Division – Family Part (INTAKE)
101 S. 5ᵗʰ Street
Camden, NJ 08103
Attn:   DV Unit

Re:    John M. Cohan v Peace M. Freedom
       Docket No.: FV-04-2494-22

To Whom It May Concern:

As the court is aware, this matter there was a Final Restraining Order (FRO) entered with reference to the above captioned matter.

My client is requesting a certified copy of the FRO as he needs to register this Order out-of-state. I have enclosed a copy of the filed FRO. <u>Please charge my JACS account $15.00 for the fee for same.</u>

Thank you for your time and attention to this matter.

Sincerely,

LOUIS G. GUZZO, ESQUIRE

LGG//jlo
Encl.
Cc:    John Cohan – EMAIL (w/out encl.)

# EXHIBIT IV

**AFFIDAVIT OF WITNESS – PROOF OF SERVICE TO U.S. TRUSTEE**

**TO WHOM IT MAY CONCERN:**

I, **David C. Hughes**, declare under penalty of perjury as follows:

On **April 9, 2024**, at the **Jacksonville federal courthouse**, I personally witnessed my business partner, **John M. Cohan**, showed a copy of his **Order of Protection** to **Mr. Bomkamp**, the United States Trustee assigned to our bankruptcy matter. The Order of Protection involved Mr. Cohan's former partner, **Peace**, whom he had previously identified to Mr. Bomkamp during an earlier proceeding as a party who should not be permitted access to future calls or meetings.

Mr. Cohan clearly instructed Mr. Bomkamp to ensure that Peace would not be present on any future conference calls or 341 proceedings due to legitimate safety concerns for himself and his daughter.

However, during a subsequent 341 meeting held **on or about April 17, 2024**, I personally heard that John, was very upset that **Peace was again present on the call**, and Mr. Cohan once more brought this to Mr. Bomkamp's attention. Despite prior notice, her presence didn't appear to be restricted by Mr. Bomkamp.

There is no question in my mind that **Mr. Cohan acted responsibly and in good faith**, and that he has legitimate fears for the safety of himself and his child. It is deeply concerning and perplexing that Mr. Bomkamp failed to ensure that a person subject to a valid court-issued protective order was not excluded from subsequent proceedings.

I swear that the above statements are true and accurate to the best of my knowledge and belief, under penalty of perjury under the laws of the United States and the State of Florida.

Respectfully submitted,

**David C. Hughes**
2812 Pat Tillman Drive
Springfield, IL 62711
Email: davidchoatehughes@gmail.com

Dated: 5/9/2025